## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| MARK A. BOWEN | ) |
| | ) |
|       PLAINTIFF | ) |
| vs. | ) |
| | ) Civil No. 2:16-cv-195-JAW |
| DITECH FINANCIAL LLC, f/d/b/a | ) |
| GREEN TREE SERVICING LLC | ) |
| | ) |
| THE FEDERAL NATIONAL MORTGAGE | ) |
| ASSOCIATION | ) |
| | ) |
|       DEFENDANTS | ) |

## FIRST AMENDED COMPLAINT

### I.      INTRODUCTION

The Plaintiff, Mr. Mark Bowen, brings this action against Ditech Financial LLC,

("Ditech") formerly known as Green Tree Servicing ("Green Tree"), and the Federal National

Mortgage Association ("Fannie Mae") for repeated coercive and harassing attempts to collect

monies not owed by Mr. Bowen.  These unfair and misleading debt collection attempts began

less than two months after settling previous allegations of unfair debt collection practices and

wrongful foreclosure claims against Green Tree Servicing in April 2015. Mr. Bowen paid all

monies allegedly owed in a reinstatement quote from Ditech to reinstate his modified loan in

May 2015 yet, just one month later, Ditech began trying to collect a fee to which they were not

entitled, even taking the fee directly out of Mr. Bowen's bank account.  Ditech only corrected the

error after two attempts and extensive attorney involvement. Ditech then started collecting on

monies they knew should have been applied toward escrow advances per the modification

1

agreement when the loan was reinstated.  Under the threat and fear of another wrongful foreclosure, Mr. Bowen has been paying the increased amounts every month since July 2016. Every month Mr. Bowen is billed for amounts he should not have to pay because Ditech refuses to fix their escrow account errors that they know are wrong. Ditech's continuous, repeated, and knowing mismanagement of Mr. Bowen's account, including the threat of foreclosure due to their own errors, has caused Mr. Bowen not only financial harm but severe emotional harm fearing daily that Ditech will again attempt to wrongfully foreclose on his house and force his children to lose their home.   Mr. Bowen brings this amended action for the mishandling of his account, in particular the escrow account, again after settlement of the previous action pursuant to the common law claims of Fraud/ Fraudulent Misrepresentation and Breach of Fiduciary Duty and statutory claims of violation of the Maine Unfair Trade Practices Act 5 M.R.S.A. §205-A et seq.; Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* and Maine Fair Debt Collection Practices Act, 32 M.R.S.A. § 11001 *et seq*. (hereinafter collectively known as the ''FDCPA'') and the Real Estate Settlement Procedures Act 12 USC §1024.1 et seq. ("RESPA" or "Reg. X").

## II.      JURISDICTION AND VENUE

1.  The jurisdiction of this Court is conferred by 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

2.  Venue is proper as the Plaintiff is a resident of Androscoggin County, Maine; all relevant events occurred in this District, and the Defendants were doing business in Maine during all relevant times.

## III.      PARTIES

3.      Plaintiff Mark A. Bowen ("Mr. Bowen") is a natural person residing in Minot, Maine with his two minor children.

4.      Defendant Ditech Financial LLC is a limited liability corporation organized under the laws of Delaware with a principal place of business in Rapid City, South Dakota.

5.      On or around August 31, 2015, Ditech Mortgage Corp. joined with Green Tree Financial LLC to form Ditech Financial LLC. A true and accurate copy of a letter from Green Tree/Ditech explaining the change to Mr. Bowen is attached hereto as Exhibit 1 and incorporated herein by reference.

6.      Upon information and belief, Ditech Financial LLC took on the assets and liabilities of Green Tree Servicing LLC.

7.      Throughout the complaint, "Green Tree" and "Ditech" refer to the same entity, now known as "Ditech Financial LLC."

8.       At all times relevant to this Complaint, Green Tree serviced Mr. Bowen's loan and then combined with Ditech who currently services Mr. Bowen's loan.

9.      At all times relevant to this Complaint, Fannie Mae was and remains the investor and/or owner of Mr. Bowen's loan.

10.     Fannie Mae is a government-sponsored enterprise with headquarters in Washington DC.

11.     Fannie Mae hired Ditech (f/d/b/a Green Tree) to conduct transactions involved in the servicing of Mr. Bowen's loan.

12.     Ditech, as the servicer of this Fannie Mae loan, is required to follow the Fannie Mae Single Family Servicing Guide in servicing the loan.

13.     Fannie Mae was and remains the principal over its agent, Ditech, regarding the servicing of Mr. Bowen's loan.

14.     At all relevant times to this Complaint, Ditech acted within the scope of its agency relationship with Fannie Mae.

15.     Green Tree/Ditech treated Mr. Bowen's loan as if it were in default when it took on the servicing of the loan.

16.     Ditech engages in the business of collecting debts in this state.

17.     Ditech regularly engages in the enforcement of security interests securing debts.

18.     Ditech collects debts using the mails and telephone, and Ditech regularly attempts to collect debts alleged to be due to another.

19.     Ditech is a "debt collector" as defined by the FDCPA, 15 U.S.C. § 1692a(6), 32 M.R.S.A. §§ 11002(6) and 11003(7)(C).

## IV.     FACTS

20.     On December 20, 2005, Mr. Bowen and his now-ex-wife, Nancy E. Bowen, executed and delivered to Bank of America, N.A. a certain promissory note in the amount of $204,422.00.

21.     To secure said promissory note, on December 20, 2005, Mr. Bowen and Nancy Bowen executed a mortgage deed in favor of Bank of America, N.A., securing the property located at 17 Orchard Lane, Minot, ME 04258, which mortgage deed is recorded in the Androscoggin County Registry of Deeds in Book 6643, Page 97.  A true and accurate copy of the Mortgage is attached as Exhibit 2 and incorporated herein by reference.

22.     As part of the Mortgage, Bank of America, N.A. created an escrow account to pay real estate taxes and hazard insurance on the subject property.

23.     A portion of Mr. Bowen's monthly mortgage payment was used to fund the escrow account.

24.     The Mortgage Deed was then allegedly assigned to BAC Home Loans Servicing, LP by virtue of an Assignment of Mortgage dated June 13, 2011 and recorded in the Androscoggin County Registry of Deeds in Book 8185, Page 224.

4

25.     The Mortgage Deed was then further allegedly assigned to Green Tree Servicing LLC by virtue of an Assignment of Mortgage dated June 18, 2013 and recorded in the Androscoggin County Registry of Deeds in Book 8711, Page 121.

26.     In 2012, Mr. Bowen fell behind on the subject loan, which was then serviced by Bank of America, due to his divorce from Nancy Bowen.

27.     Mr. Bowen applied for a loan modification through Bank of America and in February 2013, Mr. Bowen received a Fannie Mae Trial Period Plan.

28.     The Plan required three payments of $928.24 due on March 1, April 1, and May 1, 2013.

29.     The Plan stated that, after the trial plan payments were made on time and if Mr. Bowen continued to meet all of the eligibility requirements of the modification program, his mortgage would be permanently modified.

30.     Mr. Bowen accepted the Trial Period Plan offer and made all three payments timely to Bank of America.

31.     On May 30, 2013, Bank of America sent Mr. Bowen a permanent Fannie Mae Loan Modification Agreement ("Loan Modification Agreement") with an effective date of July 1, 2013.  The Loan Modification Clarity Commitment and Loan Modification Agreement are attached hereto as Exhibit 3. The new monthly payment on the loan would be $930.67 and would include principal, interest, taxes, and insurance.  The first payment was due July 1, 2013.

32.     Per the terms of the loan modification, $38,495.97 would be capitalized into the loan for a new modified principal balance of $217,698.97 to bring the loan current.  The modification allowed for $65,309.66 of the new principal balance to be deferred, interest free.  *See* Exhibit 3.

33.     The Loan Modification Clarity Commitment stated that, of the $38,495.97 capitalized amount, $8,202.81 would be applied to past due interest, $26,662.46 would be applied to

5

servicing expenses, and $3,630.70 would be applied to taxes and insurance that had been advanced by Bank of America. *See* Exhibit 3.

34.     Mr. Bowen signed and returned the Agreement to Bank of America in a timely manner.

35.     Servicing of the loan subsequently transferred to Green Tree.

36.     Green Tree was responsible for servicing the loan on behalf of and under the authority and direction of Fannie Mae.

37.     Green Tree was obligated to follow the Fannie Mae Single Family Servicing Guide in servicing Mr. Bowen's loan.

38.     Green Tree was also responsible for the handling and maintenance of the escrow account on the loan.

39.     Green Tree did not implement the loan modification and treated Mr. Bowen's loan as if it were in default when it began servicing the loan.

40.     On or around the end of January 2014, Green Tree did capitalize at least $38,495.97 in interest, servicing expenses, and escrow advances to the unpaid principal balance of the loan.

41.     In this process, Green Tree failed to properly apply the correct amounts per the Clarity Commitment and Loan Modification Agreement to the escrow account.

42.     Green Tree made the unilateral decision to apply the capitalized funds first to servicing fees and then the remaining amounts to the escrow account.

43.     Upon information and belief, more servicing fees had accrued than accounted for on the Clarity Commitment and Green Tree made the unilateral decision to pay themselves back about $27,521.86 in servicing fees and then allocated the remaining $2,384.66 to the escrow account.

44.     This decision was made in contradiction to the agreed upon terms of the Clarity Commitment and without the consent or knowledge of Mr. Bowen.

45.     Of course this was short of the $3,630.70 the Clarity Commitment stated would be allocated to the escrow account and the account was underfunded by $1,246.04.

46.     Per the terms of Mr. Bowen's mortgage, monthly payments are to be applied in the order of interest then principal then escrow.  *See* Exhibit 2 (§§2, 3).  If the payment is not enough to cover all three, it is placed in unapplied funds until another payment comes in to make up the difference.  Because the monthly payment is not applied to the month in which it is received, the loan is considered past due and eventually in default.  *See* Exhibits 2 (§§2, 3), 25.

47.     As such, by disregarding the Clarity Commitment and Loan Modification and secretly applying the capitalized funds to their own questionable servicing fees first, thereby leaving a deficiency in the escrow account that they would then seek to recoup as part of an increased monthly payment two years later, Ditech was putting Mr. Bowen's loan at risk of default.  *See* Exhibits 3, 21, 25.

48.     Because this was not disclosed to Mr. Bowen, he was not able to dispute any of the extra, undisclosed servicing fees.

49.     On March 10, 2014 Green Tree initiated a foreclosure action captioned *Green Tree Servicing LLC v. Mark A. Bowen, et. al,* Docket No. AUSBSC RE 2014-00044 (State of Maine Superior Court, Androscoggin) ("foreclosure action") that should not have been initiated due to the permanent loan modification.

50.     Mr. Bowen amended his answer to the action and added counterclaims on January 5, 2015.  As alleged in Mr. Bowen's counterclaims in the foreclosure action, including claims for Fraud, and Negligent Misrepresentation and violations of the Maine and Federal Fair Debt Collection Practices Act, Real Estate Settlement Procedures Act, and Maine Unfair Trade Practices Act, Green Tree failed to properly implement the permanent modification bringing the

loan current and continued to attempt to collect on the pre-modified terms of the loan and monies not owed by Mr. Bowen.

51.     The foreclosure action was transferred to the Business and Consumer Docket on January 22, 2015 and the docket number changed to BCD-RE-15-01.

52.     On April 17, 2015, the parties entered into a confidential settlement agreement and release.

53.     The parties filed a Stipulation of Dismissal of the foreclosure action dated April 30, 2015 stating that "[e]ach party shall bear its own costs and attorneys' fees." A true and accurate copy of the Stipulation of Dismissal is attached hereto as Exhibit 4 and incorporated herein by reference.

54.     After the effective date of the settlement, Green Tree, through their attorneys at Shapiro and Morley, provided Mr. Bowen a reinstatement quote of $21,056.30 good through May 12, 2015 to reinstate the loan per the terms of the permanent loan modification.  A true and accurate copy of the reinstatement quote is attached hereto as Exhibit 5 and incorporated herein by reference.

55.     The loan was considered in foreclosure status at the time the reinstatement quote was issued.

56.     The itemization of the reinstatement amount included (a) 23 past due payments, including principal, interest, and escrow amounts for taxes and insurance, from July 1, 2013 through May 1, 2015 per the terms of the loan modification, (b) late fees of $37.53, and (c) unpaid amounts in the loan's suspense account of $386.64. *See* Exhibit 5.

57.     The reinstatement quote did not include any funds allegedly owed for any additional advanced escrow amounts or make any reference to any escrow deficiency.

58.     On May 8, 2015, Mr. Bowen hand delivered a check in the amount of $21,056.30 to counsel for Green Tree to effectuate the reinstatement.  A true and accurate copy of the cover letter, check, and confirming email are attached hereto as Exhibit 6 and incorporated herein by reference.

59.     In a mortgage statement dated June 14, 2015, Green Tree acknowledged receipt of the $21,056.30 payment and reflected the terms of the loan modification in the regular monthly payment due of $930.67 for principal, interest, and escrow.  In addition, Green Tree attempted to collect $35.70 in "Total Fees and Charges Due" for a grand total of 966.37. A true and accurate copy of the Mortgage Statement is attached hereto as Exhibit 7 and incorporated herein by reference.

60.     Green Tree failed to provide a history of the escrow account within 90 days of the reinstatement.

61.     Mr. Bowen made a payment of $966.37 to Green Tree on or around June 25, 2015 for July to cover the additional $35.70 charges.

62.     In a mortgage statement dated July 14, 2015, Green Tree again attempted to collect $35.70 in "Total Fees and Charges Due."  A true and accurate copy of the July Mortgage Statement is attached hereto as Exhibit 8 and incorporated herein by reference.

63.     Mr. Bowen made a payment of $966.37 to Green Tree on or around July 28, 2015 for August.

64.     Mr. Bowen contacted Green Tree to dispute the $35.70 charge several times by phone, explaining that the fees were part of a settlement and he should not have to pay them

65.     In a letter dated July 28, 2015, Green Tree claimed the $37.50 was a proper fee on the account.  A true and accurate copy of the letter is attached hereto as Exhibit 9 and incorporated herein by reference.

66.     When Green Tree failed to correct the error, Mr. Bowen retained counsel to assist him with his dispute.

67.     Through counsel, on August 3, 2015, Mr. Bowen delivered a Qualified Written Request ("QWR") including a Notice of Error ("NOE") and Request for Information ("RFI") to Green Tree explaining that Mr. Bowen did not owe the fees and charges Green Tree was attempting to collect.  Green Tree received the letter on August 10, 2015.  A true and accurate copy of the letter and proof of receipt is attached hereto as Exhibit 10 and incorporated herein by reference.

68.     In a mortgage statement dated August 14, 2015, Green Tree attempted to collect $35.70 in "Total Fees and Charges Due."  A true and accurate copy of the August Mortgage Statement is attached hereto as Exhibit 11 and incorporated herein by reference.

69.     In a letter dated August 20, 2015, Green Tree stated that it had determined that the additional monthly fees of $37.50 were improper and would be removed from the loan. Enclosed with the letter was a document entitled "Advances" which shows a series of amounts paid from the account that include attorneys' fees, legal costs, filing fees, and foreclosure costs. A true and accurate copy of the letter and Advances enclosure is attached hereto as Exhibit 12 and incorporated herein by reference.

70.     Even though it had determined that the fee was improper, in a letter dated August 26, 2015, Green Tree stated it would take out a payment from Mr. Bowen's bank account that included the $37.50 fee.  A true and accurate copy of the letter is attached hereto as Exhibit 13 and incorporated by reference herein.

71.     Green Tree did take this money from Mr. Bowen's account.

72.     On or around August 27, 2015, Green Tree delivered a notice to Mr. Bowen about their "new name." The letter stated that as of August 31, 2015, Green Tree and Ditech Mortgage Corp would be known as Ditech. A true and accurate copy of the letter is attached hereto as Exhibit 1.

73.     In a mortgage statement dated September 7, 2015, Ditech listed only the principal, interest, and escrow payment of $930.67 due and omitted the disputed $37.50 fee. A true and accurate copy of the September Mortgage Statement is attached hereto as Exhibit 14 and incorporated herein by reference.

74.     In a mortgage statement dated October 7, 2015, Ditech again attempted to collect $37.50 in "Total Fees and Charges Due." A true and accurate copy of the October Mortgage Statement is attached hereto as Exhibit 15 and incorporated herein by reference.

75.     Mr. Bowen made a payment of $966.37 to Ditech on or around November 2, 2015.

76.     Mr. Bowen contacted Ditech directly to dispute the fees again.

77.     Mr. Bowen paid his counsel $50.00 to send another QWR, RFI, and NOE to try and resolve the problem.

78.     On November 3, 2015, through counsel, Mr. Bowen delivered a second QWR with NOE and RFI to Ditech outlining why Mr. Bowen did not owe the alleged fees and costs and demanding Ditech adjust the account accordingly. Ditech received the letter on November 6, 2015. A true and accurate copy of the QWR and proof of receipt is attached hereto as Exhibit 16 and incorporated herein by reference.

79.     Also on November 3, 2015, Mr. Bowen, through counsel, delivered a demand letter to Ditech pursuant to the Maine Unfair Trade Practices Act, 5 M.R.S. §213 outlining Ditech's failure to properly maintain Mr. Bowen's loan account and unfair conduct of attempting to

11

collect amounts not owed.  Ditech received the demand letter on November 9, 2015. A true and accurate copy of the demand letter and proof of receipt is attached hereto as Exhibit 17 and incorporated herein by reference.

80.     In a mortgage statement dated November 7, 2015, Ditech again attempted to collect $35.70 in "Total Fees and Charges Due."  A true and accurate copy of the November Mortgage Statement is attached hereto as Exhibit 18 and incorporated herein by reference.

81.     Mr. Bowen made a payment of $966.37 to Ditech on or around December 1, 2015.

82.     On December 4, 2015, Mr. Bowen's online Ditech account showed that his payments were being unapplied.  Ditech also misstated that the next payment amount due was $823.57.  A true and accurate copy of the screen shot is attached hereto as Exhibit 19 and incorporated by reference herein.

83.     Mr. Bowen paid at least $142.80 in fees he did not owe and should not have been billed by Ditech.

84.     On December 9, 2015, Ditech delivered to Mr. Bowen, care of his counsel, a letter explaining that the advances that had been applied to the escrow account before the modification took place were waived and there was a zero balance owed.  Ditech promised to remove the fees and refund $142.80 to the account.  A true and accurate copy of the letter is attached hereto as Exhibit 20 and incorporated by reference herein.

85.     The $142.80 was never refunded in cash or check to Mr. Bowen.  This was money he never should have had to pay to Ditech.

86.     In an Annual Escrow Disclosure Statement dated January 25, 2016, Ditech alleged that Mr. Bowen had an escrow shortage of -$1,109.22 and escrow deficiency of -$1,702.16.  The alleged amounts owed would be charged over a 36 month period beginning March 1, 2016:

$30.87 per month extra for the shortage and $47.28 per month extra for the alleged deficiency, making his new monthly payment $992.28. Ditech included a payment coupon for $2,811.38 for the alleged amounts due to escrow. A true and accurate copy of the Escrow Disclosure Statement is attached hereto as Exhibit 21 and incorporated by reference herein.

87.     This is the first escrow analysis Ditech performed on the loan and delivered to Mr. Bowen.

88.     The escrow deficiency of -$1,702.16 alleged in the Escrow Disclosure Statement was comprised in part of the underfunded $1,246.04 explained above that should have been applied to the escrow account per the terms of the Clarity Commitment and Loan Modification but were unilaterally and secretly applied and capitalized as part of Ditech's servicing fees instead.

89.     Ditech took care of servicing fees it had paid out first to line their own pockets causing the escrow account to be underfunded, and now is trying to collect on that underfunded amount as an escrow deficiency over 36 months.

90.     This money should never have been treated as an escrow deficiency- Ditech should have fulfilled their fiduciary duty and funded the escrow account first and then their own pockets second.

91.     A deficiency in servicing fees does not carry the same consequences as a deficiency in an escrow account. Per the mortgage, a loan payment is not placed in unapplied funds solely because there are outstanding servicing fees due. If a payment is short due to increased escrow amounts, however, it does get placed in unapplied funds until another payment comes in the next month to make up the difference at which time it is applied to the previous month causing the borrower to be past due and at risk of default.

92.     Had Ditech applied the $1,246.04 to the escrow account per the agreements, Mr. Bowen's escrow deficiency would not have been nearly what was alleged and Ditech would not be trying to collect an extra $47.28 per month over 36 months.

93.     Even if the $1,246.04 is found to be money technically owed on the loan, per the Loan Modification it should not be owed as an escrow amount and definitely is not owed over a 36 month period.  It should have been added to the deferred principal of the loan to be paid at the end of the 40-year loan term in 2053.

94.     Yet Ditech has now demanded these amounts be paid as escrow over 36 months and has actually placed the loan in default, and in jeopardy of foreclosure, for Mr. Bowen's failure to pay the full overstated monthly payment of $992.28 for March through June 2016.

95.     Because of Ditech's continuous threats of default and foreclosure, Mr. Bowen did start paying the inflated $992.28 per month in July 2016 and has paid this amount each month.

96.     The total payments made by Mr. Bowen since March 2016 to the present should have been more than sufficient to keep the loan current.

97.     Ditech had many chances to correct their misapplication of the capitalized amounts by performing an escrow analysis at the time the loan modification was booked to capture and capitalize the funds, at the time of the reinstatement to include any escrow advances in the quote, and shortly after the reinstatement, but did not.

98.     No alleged escrow advances that would have equaled the escrow deficiency of -$1,702.16 were included in the May 2015 reinstatement quote in violation of Ditech's policies and Fannie Mae's Servicing Guide, section E-3.2-08, the latter of which is attached hereto as Exhibit 22.

99.     When they finally did perform an escrow analysis and discovered a deficiency, they did not investigate the cause of the deficiency.

14

100.    On February 10, 2016, through counsel, Mr. Bowen sent a settlement demand letter to Ditech per the Maine UTPA explaining the unfair and deceptive trade practices of the extra payments charged to and taken from Mr. Bowen's account in the amount of $35.70 each month and the inaccurate escrow deficiency.

101.    Ditech acknowledged receipt of the demand letter in a letter dated February 22, 2016.

102.    Ditech failed to apply Mr. Bowen's February payment for March in the amount of $930.67 to the loan and instead placed it in suspense because it allegedly did not constitute a "full payment."

103.    Ditech reported a monthly payment due on March 1, 2016 of $992.28 on Mr. Bowen's online account.  A screen shot of the account is attached hereto as Exhibit 23 and incorporated by reference herein.

104.    In a monthly billing statement dated March 7, 2016, Ditech alleged an amount due of $1,984.56 which included current and alleged past due payments due in the inflated monthly amounts of $992.28.  A true and accurate copy of the Monthly Billing Statement is attached hereto as Exhibit 24 and incorporated by reference herein.

105.    Mr. Bowen has made every payment due on time in the amount of at least $930.67 per the terms of the loan modification since reinstating his loan.  Attached and incorporated by reference herein as Exhibit 25 is the loan payment histories from Ditech for Mr. Bowen's loan covering May 31, 2013 to October 31, 2016.

106.    In a letter dated March 17, 2016, Ditech stated that all maintenance has been completed on the loan to credit the overpayments and the escrow analysis was correct, including the alleged shortage and deficiency.  Ditech stated that the final calculations determining the escrow shortage and deficiency were correct and that Mr. Bowen would owe an additional $47.28 per

15

month for the alleged deficiency and $30.81 per month extra for the escrow shortage.  A true and accurate copy of the March 17, 2016 letter is attached hereto as Exhibit 26 and incorporated by reference herein.

107.    On April 5, 2016, Mr. Bowen filed this current action.

108.    The implementation of the loan modification along with the reinstatement payment should have brought the loan current.  Any alleged escrow advances should have either been capitalized into the modification or provided for in the reinstatement quote.

109.    Ditech should have known about and corrected its error in misapplying the capitalized amounts at the time it calculated the reinstatement quote, at the time it performed the escrow analysis, and definitely after the demand letter was delivered in February 2016.

110.    Ditech did not conduct a proper investigation of the issue and therefore did not determine their error until sometime after the Complaint was filed in April 2016.

111.    Even upon their knowledge of the mishandling of the loan and escrow account, they did not correct their error and, to the date of this filing, have not corrected the error.

112.    Instead, they are passing their mistakes on to Mr. Bowen to fix by paying an escrow amount he should not have to be paying at all, especially over 36 months.

113.    Because of Ditech's mishandling of the escrow account, they are now billing Mr. Bowen at least an extra $34.59 per month that he otherwise should not have to pay.

114.    Mr. Bowen has paid at least $172.95 more than he should have had to pay on the loan ($34.59  x 5 months) and he continues to pay the $34.59  extra each month because he is terrified Ditech will again attempt to wrongfully foreclose on his home.

115.    Based on his payments from the date of reinstatement to the present, Mr. Bowen should be considered current on his loan.  *See* Exhibit 25.

116.    Ditech has put all monthly payments less than $992.28 in suspense and is treating Mr. Bowen's loan as if in default.

117.    Since April, each monthly billing statement has alleged a past due amount on the account. Exhibit 27 contains copies of Ditech's monthly billing statements from April 29, 2016 to October 31, 2016 and are incorporated herein by reference.

118.    In a letter dated April 1, 2016, Ditech offered loss mitigation assistance to Mr. Bowen which included "information on avoiding foreclosure." The letter stated it was from a debt collector and was an attempt to collect a debt.  A true and accurate copy of the letter is attached hereto as Exhibit 28 and incorporated herein.

119.    In a letter dated April 14, 2016 to Mr. Bowen, Ditech informed Mr. Bowen of loss mitigation options as an "alternative to foreclosure."  The letter stated it was from a debt collector and was an attempt to collect a debt.  A true and accurate copy of the letter is attached hereto as Exhibit 29 and incorporated herein.

120.    In a letter dated May 2, 2016, Ditech offered loss mitigation assistance to Mr. Bowen which included "information on avoiding foreclosure." The letter stated it was from a debt collector and was an attempt to collect a debt.  A true and accurate copy of the letter is attached hereto as Exhibit 30 and incorporated herein.

121.    In a letter dated July 12, 2016, Ditech alleged Mr. Bowen was past due $1,984.56 and suggested connecting with a homeownership counselor to explore home retention options.  The letter stated it was from a debt collector and was an attempt to collect a debt.  A true and accurate copy of the letter is attached hereto as Exhibit 31 and incorporated herein.

122.    In a letter dated September 17, 2016, Ditech alleged Mr. Bowen was "past due."  The letter stated it was from a debt collector and was an attempt to collect a debt.  A true and accurate copy of the letter is attached hereto as Exhibit 32 and incorporated herein.

123.    In a letter dated October 18, 2016, Ditech alleged Mr. Bowen was "past due."  The letter stated it was from a debt collector and was an attempt to collect a debt.  A true and accurate copy of the letter is attached hereto as Exhibit 33 and incorporated herein.

124.    Ditech's conduct outlined above constituted a pattern and practice of mismanagement of the loan and escrow account in particular, misrepresentations of amounts owed and the status of the loan, and failure to take corrective actions after notice and discovery of such errors after the settlement of the previous matter.

125.    Upon information and belief, Ditech has engaged in a pattern and practice of similar misconduct on other loans.

126.    Ditech did not have proper policies and procedures in place to manage Mr. Bowen's loan including calculation of escrow and monthly amounts owed before and after the reinstatement of the modified loan.

127.    As a result of Ditech's conduct, Mr. Bowen has experienced severe emotional distress. During the conduct alleged in the previous matter against Green Tree, Mr. Bowen began taking medication to help him sleep and deal with the anxiety caused by Green Tree's conduct and the fear that he might lose his home.  After the settlement of the first matter with Green Tree, it took Mr. Bowen some time to feel relieved and trust that the loan was now current.  It was not one month after his reinstatement of the loan that Green Tree started attempting to collect on alleged Fees and Charges from Mr. Bowen.  When Green Tree eventually admitted its mistake of attempting to collect the $37.50 each month in August 2015 after Mr. Bowen and his counsel's

efforts to resolve the issue, Mr. Bowen began to feel relieved again.  He did not refill his prescription for the anti-depressant/sleep medication.  However, Green Tree and Ditech's continued collection of fees not owed and misrepresentations about amounts owed and the status of his loan made Mr. Bowen anxious and fearful again.  He suffered shortness of breath and heart palpitations.  By the end of December into January 2016, Mr. Bowen felt increasingly anxious, depressed, and worried about his home.  He could not sleep and would lay awake wondering how this could be happening again and if he might really lose his house this time.  He would check his online account in the middle of the night, trying to figure out Ditech's errors. He had to take time off from work and, at times, struggled to get out of bed.  He spent less time with his children and became irritable and short tempered.  Mr. Bowen became afraid that there would be a knock on the door from the sheriff with another foreclosure complaint even though he was making every payment on time each month as agreed.  He worried about his children and losing the home.  He started on the anti-anxiety, sleep medication again in February 2016 but still constantly worries about his home.  He checks his account daily and pours over his statements and notices wondering what went wrong. He has lacked focus at work and with his family because he is constantly plagued with the thought of losing his home.  He just could not believe that or understand why Ditech was mishandling his loan again.

### V.    CLAIMS

### COUNT I
### Fraud/Fraudulent Misrepresentation

128.    Mr. Bowen realleges each and every preceding allegation set forth in the above paragraphs as if fully set forth herein.

129.    As outlined above, Ditech misrepresented amounts due on Mr. Bowen's loan including

fees and charges; the total amounts due; an alleged escrow deficiency; the regular monthly

payment; past due amounts; and the past due status of his loan when they knew he did not owe

the $35.70 per month in fees and they knew they had made an error with the escrow account but

refused to correct it.  *See* Exhibits 7, 8, 9, 11, 13, 15, 18, 19, 20, 21, 23, 24, 26, 27, 33.

130.    Mr. Bowen acted justifiably in reliance on Ditech's misrepresentations when he paid

Ditech at least four inflated payments of $966.37 which included amounts he did not owe. Such

reliance was to his detriment as he paid $142.80 he did not owe at that time.  *See* Exhibit 25.

131.    Mr. Bowen also reasonably relied on Ditech's misrepresentations that his loan was in

jeopardy of foreclosure for failure to make the inflated monthly payments including a deficiency

amount of $47.28 that he should not have had to pay. *See* Exhibits 28, 29, 30, 31, 32, 33.   Green

Tree/Ditech have filed a foreclosure action against Mr. Bowen before that should never have

been filed.

132.     In addition to paying amounts he does not owe, Ditech's misrepresentations have

directly led to Mr. Bowen's account being placed in a past due status and have caused Mr.

Bowen severe emotional distress worrying again whether or not he will lose his home.

133.    Ditech's repeated mismanagement of Mr. Bowen's loan and escrow account and

misrepresentation of amounts owed after 1)settlement for similar conduct, 2)reinstatement of the

modified loan bringing the loan current, 3)repeated notice of the issues from Mr. Bowen and

counsel, 4)agreeing to correct the account in August 2015 and then trying to collect on the

inflated amounts again in October 2015,  5)miscalculating the escrow account and  placing the

loan in past due status for failure to apply the payments, 6)sending Mr. Bowen information about

avoiding foreclosure, and 7)then not correcting the error to this day when they know they made a

mistake is so egregious and outrageous as to imply malice.

   WHEREFORE, by reason of said violations, Mr. Bowen is entitled to actual,

consequential, emotional distress and punitive damages; court costs; reasonable attorney's fees;

and any and all other relief permitted by law.

**COUNT II**
**<u>Violation of the Maine Unfair Trade Practices Act 5 M.R.S.A. §205-A et seq.</u>**

134.  Mr. Bowen realleges each and every preceding allegation set forth in the above

paragraphs as if fully set forth herein.

135.  As evidenced by the facts and exhibits above, Ditech engaged in unfair and deceptive

trade practices after the effective date of the settlement agreement, April 24, 2015 including but

not limited to:

   a.  Collecting fees and charges from Mr. Bowen's account that he did not owe;

   b.  Attempting to and collecting on inflated amounts that resulted from Ditech's own

errors and failure to mitigate, investigate, and resolve such errors;

   c.  Stating that the collection of fees and costs would stop and then trying to collect

those same amounts of costs and fees two months later;

   d.  Misrepresenting inflated amounts due for the monthly payment;

   e.  Failing to include all alleged escrow advances in the reinstatement quote in

violation of Ditech's policies and the Fannie Mae Servicing Guide ;

   f.  Misrepresenting and collecting inflated amounts due for the alleged escrow

deficiency over 36 months;

   g.  Failing to apply the reinstatement amounts per the terms of the loan modification;

21

h. Failing to provide a history of the escrow account within 90 days of reinstatement in violation of 12 CFR 1024.17 (i)(2);

i. Placing Mr. Bowen's payments in suspense and not applying them to the loan;

j. Alleging Mr. Bowen's account as past due and threatening that the loan will be placed in foreclosure; and

k. Failing to correct the loan accounting when it knew it had made an error.

136. Such conduct could not reasonably be avoided by Mr. Bowen as he had no control over Ditech's processes and policies. He tried to correct the issues himself and then through counsel but to no avail. Even when Ditech knew of the error in the escrow deficiency, it did not correct it and continues to treat the loan as if in default and in jeopardy of foreclosure.

137. Such misrepresentations regarded material terms of the loan, amounts owed and status of his loan, and misled Mr. Bowen to his detriment into paying an extra $142.80 on the loan he did not owe at that time and paying the inflated monthly amount alleged owed of $992.28 for five months and counting to ward off a wrongful foreclosure.

138. As detailed above, such conduct has also caused Mr. Bowen emotional distress.

139. WHEREFORE, by reason of said violations, Mr. Bowen is entitled to equitable relief, actual and consequential damages; actual damages for emotional distress, court costs; reasonable attorney's fees; and any and all other relief permitted by law.

## COUNT III
## Violation 32 M.R.S.A. §11001 et seq.: Maine Fair Debt Collection Practices Act

140. Mr. Bowen realleges each and every preceding allegation set forth in the above paragraphs as if fully set forth herein.

141.    Ditech, as servicer of the subject loan, took on servicing of the loan when it was in default and/or treated the loan as if it were in default when it acquired servicing of the loan and is a debt collector subject to the Maine Fair Debt Collection Practices Act ("Maine FDCPA").

142.    As supported by the facts above, within one year prior to the filing of this suit, and ongoing for more than one year prior, by example only and without limitation, Ditech violated the Maine Fair Debt Collection Practices Act 32 M.R.S.A. § 11001 et seq. as outlined fully above by, including but not limited to, the following conduct after the effective date of the settlement agreement, April 24, 2015:

a.      The use of false representations or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer: 32 M.R.S.A. §11013(2); *See* Exhibits 7, 8, 9, 11, 13, 15, 18, 19, 21, 23, 24, 26, 27, 28, 29, 30, 31, 32, 33.

a.      The false representation of the amount of the debt owed after May 2015: 32 M.R.S.A. §11013(2)(B)(1). *Id.*.

b.      Engaging in conduct, the natural consequence of which was to harass, oppress or abuse Mr. Bowen in connection with the collection of the mortgage debt by delivering notices seeking payment of monies not owed, misapplying payments, and wrongly placing the loan in past due status: 32 M.R.S.A. § 11013(1)); *Id.*

c.      The use of unfair or unconscionable means to collect or attempt to collect any debt: 32 M.R.S.A. §11013(3). *Id.*

143.    Ditech's conduct caused Mr. Bowen actual damages in the form of monies paid to Ditech that were not due at the time, paying amounts to an attorney in an effort to notify Ditech of its errors and obtain information, and severe emotional distress as described above around experiencing such conduct again and putting his home at risk again of wrongful foreclosure.

144.    WHEREFORE, by reason of said violations, Mr. Bowen is entitled to relief including statutory, actual, compensatory, consequential, and emotional damages; court costs; reasonable attorney's fees; and any and all other relief permitted by law.

## COUNT IV
## Violation 15 U.S.C. § 1692 et seq.: Fair Debt Collection Practices Act

145.    Mr. Bowen realleges each and every preceding allegation set forth in the above paragraphs as if fully set forth herein.  Ditech, as servicer of the subject loan, took on servicing of the loan when it was in default and/or treated the loan as if it were in default when it acquired servicing of the loan and is a debt collector subject to the Fair Debt Collection Practices Act ("FDCPA")

146.    As supported by the facts above, within one year prior to the filing of this suit, and ongoing for more than one year prior by example only and without limitation, Ditech violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq. as outlined fully above by, including but are not limited to, the following conduct after the effective date of the settlement agreement, April 24, 2015:

a.  The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer: 15 U.S.C. § 1692e(10); *See* Exhibits 7, 8, 9, 11, 13, 15, 18, 19, 21, 23, 24, 26, 27, 28, 29, 30, 31, 32, 33.

b.  The false representation of the amount of the debt: 15 U.S.C. § 1692e(2); *Id.*

c.  Engaging in conduct, the natural consequence of which was to harass, oppress or abuse Mr. Bowen in connection with the collection of the mortgage debt by delivering notices seeking payment of monies not owed, misapplying payments, and wrongly placing the loan in past due status: 15 USC § 1692d ; *Id*. and

24

    d.   The use unfair or unconscionable means to collect or attempt to collect any debt: 15 USC §1692f. *Id.*   .

147.    Ditech's conduct caused Mr. Bowen actual damages in the form of monies paid to Ditech that were not due at the time, paying money to his attorney to alert Ditech of their error and obtain information, and severe emotional distress as described above around experiencing such conduct again and potentially putting his home at risk again.

148.    WHEREFORE, by reason of said violations, Mr. Bowen is entitled to relief including statutory, actual, compensatory, consequential, and emotional damages; court costs; reasonable attorney's fees; and any and all other relief permitted by law.


## COUNT V
## Violation of the Real Estate Settlement Procedures Act, 12 U.S.C. §2601 et. seq.

149.    Mr. Bowen realleges each and every preceding allegation set forth in the above paragraphs as if fully set forth herein.

150.    On April 3, 2015, Mr. Bowen, through counsel, delivered via registered mail to Green Tree's designated address a Qualified Written Request (QWR), Request for Information (RFI) and Notice of Error (NOE)  pursuant to Sections 1024.35 and 36 of Regulation X (12 CFR 1024).

151.    Green Tree received the QWR on August 10, 2015.

152.    Pursuant to 1024.36(c), Green Tree was to acknowledge receipt of the request within five days of receipt.  Green Tree did not.

153.    Failure to comply with 12 CFR 1024.36 is governed by 12 U.S.C. §2605(f).

154.    On August 20, 2015 Green Tree admitted the error and promised to correct the error by removing the alleged fees and charges from Mr. Bowen's account. *See* Exhibit 12.

155.    However, beginning in October 2015, Green Tree again started to collect the additional $35.70 per month in alleged fees and charges. *See* Exhibits 15, 18.

156.    Mr. Bowen retained and paid his counsel $50.00 on October 23, 2015 to deliver another QWR and NOE in an attempt to correct the errors.

157.    On November 3, 2015, Mr. Bowen, through counsel, delivered via registered mail to Ditech's designated address a Qualified Written Request (QWR), Request for Information and Notice of Error pursuant to Section 1024.36 of Regulation X (12 CFR 1024).

158.    Ditech received the letter on November 6, 2015.

159.    Ditech did acknowledge receipt of the QWR in a letter dated November 9, 2015 stating they would investigate the inquiry and would respond in 30 business days.

160.    On November 7, 2015 Ditech again tried to collect on the $35.70 charge. *See* Exhibit 18.

161.    On December 4, 2015, Mr. Bowen's online account showed an amount due of 966.37 that again included the $37.50 charge. *See* Exhibit 19.

162.    In a letter dated December 9, 2015 Ditech again admitted it had inadvertently charged Mr. Bowen's account an extra $142.80 and the amount would be credited to the account and the fees and charges removed. *See* Exhibit 20.

163.    Ditech had not corrected the error.

164.    Ditech also failed to provide an escrow history to Mr. Bowen within 90 days of his reinstatement of the loan pursuant to 12 CFR 1024.17(i)(2) which could have prevented Ditech's continued mismanagement of the escrow account.

165.    As a result, Ditech collected and continues to collect inflated amounts due for an escrow deficiency. *See* Exhibits 21, 23, 24, 27, 28, 29, 31, 32, 33.

166.    Ditech has misapplied Mr. Bowen's payments to an inflated escrow deficiency he does not owe and has placed the loan in past due status, in jeopardy of foreclosure. *See* Exhibit 25.

167.    Upon information and belief, Ditech has mismanaged loans and escrow accounts similarly in other loans.

168.    Ditech's repeated failures to comply with RESPA constitutes a pattern and practice of noncompliance.  First, Green Tree failed to acknowledge receipt of the first QWR within five days of receipt.  *See* Exhibit 10, 12.  Second, Green Tree failed to perform a thorough investigation of the error and, beginning in October 2015, Green Tree again started to collect the additional $35.70 per month in alleged fees and charges evidencing their failure to correct the error.  *See* Exhibit 15.   Third, on November 7, 2015 Ditech again tried to collect on the $35.70 charge evidencing a continued failure to correct the error.  *See* Exhibit 18. Fourth, on December 4, 2015, Mr. Bowen's online account showed an amount due that again included the $37.50 charge evidencing a continued failure to correct the error. *See* Exhibit 19. Fifth, Ditech failed to provide an escrow history within 90 days of reinstatement of the loan.

169.    Ditech's conduct caused Mr. Bowen severe emotional distress as detailed above.

170.    WHEREFORE, by reason of said violations, Mr. Bowen is entitled to relief including statutory, actual, compensatory, consequential, and emotional damages; court costs; reasonable attorney's fees; and any and all other relief permitted by law.

## COUNT VI
## Breach of Fiduciary Duty

171.    Mr. Bowen realleges each and every preceding allegation set forth in the above paragraphs as if fully set forth herein.

172.    An escrow account was created as part of Mr. Bowen's mortgage when he first took out the loan with Bank of America.  *See* Exhibit 2 ¶3.

27

173.     An escrow account was also required for the 2013 loan modification.  *See* Exhibit

3 ¶4(C)& (D).

174.     When it acquired servicing of the loan, Green Tree assumed fiduciary duties over

Mr. Bowen's escrow account.

175.     A fiduciary relationship is created by and inherent in the nature of an escrow

agreement.

176.     Green Tree/Ditech breached their fiduciary duty of care to Mr. and caused him

harm by mismanaging his escrow account after the effective date of the settlement

agreement, April 24, 2015, when they 1) failed to reinstate the loan per the terms of the

modification which would have required capitalizing any and all escrow advances into

the modified principal balance; 2) failed to include any alleged escrow advances in the

reinstatement quote; 3) failed to generate an escrow history within 90 days of Mr.

Bowen's reinstatement of the loan; 4) failed to do a proper investigation and discover the

error upon conducting an escrow analysis in January 2016; 5) failed to do a proper

investigation and discover the error upon receipt of Mr. Bowen's demand letter in

February 2016; 6) failed to correct the error when they discovered it; 7) to this day,

continuing to fail to correct the error and; 8) attempting to collect money not due from

Mr. Bowen.

177.     As a result of Green Tree/ Ditech's breach, Ditech is treating Mr. Bowen's loan as

in default and sends monthly billing statements seeking money he does not owe and

stating he is past due.  Ditech also is sending Mr. Bowen notices regarding foreclosure

alternatives.

178.     Green Tree/ Ditech's breach caused Mr. Bowen harm in that he paid and continues to pay money each month toward an alleged escrow deficiency he does not owe because he is terrified Ditech will initiate another wrongful foreclosure against him.

179.     As described above, Ditech's persistent conduct has also caused Mr. Bowen severe emotional distress fearing daily that he may lose his home.  Such emotional distress was reasonably foreseeable by Ditech's mishandling of the escrow account as such mismanagement caused them to collect on monies not owed, treat Mr. Bowen's loan in default, and in put him in jeopardy of losing his home.

180.     Green Tree/Ditech failed to follow their own, and Fannie Mae's, policies and procedures regarding the escrow account in reinstating the loan per the terms of the loan modification and capitalizing all escrow advances, providing the escrow advances in the reinstatement quote, notifying Mr. Bowen each year of any alleged deficiency, and providing an escrow history 90 days after the reinstatement which has exacerbated the harm to Mr. Bowen.

181.     Green Tree/Ditech's conduct constitutes a pattern and practice of mismanagement of Mr. Bowen's escrow account separately and jointly with its conduct in the previous action.

182.     Ditech now knows about the mismanagement of the account including its error to apply the correct amount of capitalized funds to the escrow account and the consequences that has had on the account post-reinstatement yet it refuses to this day to correct the account.  Instead it continues to deliver past due notices with veiled threats regarding foreclosure of Mr. Bowen's home to Mr. Bowen, a borrower who has been harmed before by Green Tree's conduct and has been the victim of a wrongful foreclosure before.

Ditech knows the anguish this is causing Mr. Bowen yet has consciously chosen not to correct the account.

183.     Ditech's conduct is so outrageous and extreme as to constitute malice or at least implied malice.

184.     WHEREFORE, by reason of said violations, Mr. Bowen is entitled to actual, compensatory, emotional distress, and punitive damages and all other relief permitted by law.

## JURY DEMAND

Mr. Bowen demands a jury trial of all issues properly triable thereby.

Dated this 14th day of December 2016.

MOLLEUR LAW OFFICE


/s/ *Andrea Bopp Stark*
Andrea Bopp Stark, Bar #8763
Molleur Law Office
419 Alfred Street
Biddeford, ME 04005-3747
207-283-3777
andrea@molleurlaw.com

Gary Goldberg, Esquire
Terry Garmey & Associates
482 Congress Street, Suite 402 | Portland,
ME  04101-3424
(207) 899-4644 ext 2336 |
ggoldberg@garmeylaw.com

## CERTIFICATE OF SERVICE

I, Susan Black, hereby certify that I am over eighteen years old and caused a true and correct copy of the First Amended Complaint to be served on the parties per the Court's ECF System on December 14, 2016

Dated:  December 14, 2016

By:     */s/ Susan Black*
        Susan Black, Paralegal
        Molleur Law Office
        419 Alfred Street
        Biddeford, ME  04005
        (207) 283-3777
        susan@molleurlaw.com

## SERVICE LIST

**Served electronically:**

All parties on Court ECF mailing list including, Richard Briansky, Counsel for Defendants.