UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| MARK A. BOWEN )<br>)<br>Plaintiff, )<br>v. )<br>)<br>DITECH FINANCIAL, LLC f/d/b/a GREN TREE )<br>SERVICING, LLC (sic), and THE FEDERAL )<br>NATIONAL MORTGAGE ASSOCIATION, )<br>)<br>Defendants. )<br>) | CIVIL ACTION NO. 2:16-cv-00195-JAW<br><br>**ORAL ARGUMENT REQUESTED** |

## MOTION TO DISMISS FIRST AMENDED COMPLAINT
### (Memorandum of Law Incorporated)

Defendants Ditech Financial LLC, formerly known as Green Tree Servicing LLC ("Ditech"), and Federal National Mortgage Association ("Fannie Mae") move pursuant to 12(b)(6) to dismiss the First Amended Complaint filed by Plaintiff Mark Bowen ("Bowen").

## INTRODUCTION

Through his First Amended Complaint, Bowen challenges the right of his loan servicer, Ditech, and the alleged owner of his loan, Fannie Mae, to collect "monies" from him that "should have been applied toward escrow advances per [a] modification agreement." Although Bowen previously asserted and settled related claims against Ditech concerning the same loan modification,[1] Bowen nevertheless asserts claims in this action that Ditech and Fannie Mae:

- committed fraud, breached their fiduciary duty and violated the Maine Fair Debt Collection Practices Act, Fair Debt Collection Practices Act ( collectively "FDCPA"), and the Unfair Trade Practices Act ("UTPA") by issuing monthly invoices which

---

[1] Bowen's previously asserted claims include negligence, negligent misrepresentation, fraud, violation of the Maine Unfair Trade Practice Act, violation of the federal and state Fair Debt Collection Practices Act ("FDCPA"), and the Real Estate Settlement Procedures Act ("RESPA").

included amounts that Ditech was prohibited from collecting under the loan modification agreement; and

- violated the Real Estate Settlement Procedures Act ("RESPA") by wrongfully assessing charges (which Bowen paid) and refusing after written notice to either refund or credit the these previously paid charges.

All of these claims currently asserted by Bowen fail as a matter of law. Specifically

- **FDCPA, UTPA, Fraud, and Breach of Fiduciary Duty** (collectively "Barred Claims"). The Barred Claims fail as a matter of law because Bowen released and waived these claims through a settlement agreement. Specifically, all of the Barred Claims are based upon Ditech's pre-settlement conduct in failing to capitalize costs "per the modification agreement." As a result, these claim should be dismissed. Moreover, the FDCPA and fiduciary duty claims fail, respectively, because Ditech in not a debt collector as a matter of law and Ditech did not owe Bowen a fiduciary duty.

- **RESPA**. This claim is barred because at least one of the alleged qualified written requests ("QWR") was not actionable as a matter of law - it was issued to the wrong address and, even if it was actionable, Bowen has failed to allege any damages causally connected to Ditech's allegedly inadequate response;

- **Fannie Mae**. Even assuming arguendo that the claims survive against Ditech, there are no allegations in the complaint sufficient to support the claims against Fannie Mae.

**ALLEGATIONS SET FORTH IN THE FIRST AMENDED COMPLAINT**

On October 20, 2005, Bowen and his wife, Nancy Bowen, signed a note in the principal amount of $204,422 (the "Note") payable to Bank of America, N.A. ("BOA") and a mortgage

(the "Mortgage") granting BOA a security interest in property located at 17 Orchard Lane, Minot Maine (the "Property"). (First Amended Complaint ("Am. Comp.") ¶¶ 20, 21).

Bowen subsequently defaulted on the Note and by letter dated February 5, 2013, requested a modification. In response, BOA offered Bowen a Fannie Mae Trial Period Plan ("TPP"). (Am. Comp. ¶¶ 26-30; TPP, a copy of which is attached as **Exhibit A**).[2] The TPP required Bowen to make three "trial plan payments" from March to May 2013 and, in exchange, Bowen's loan would be "permanently modified." (Id.; see also **Exhibit A**). Bowen accepted the offer, made all three payments, and BOA issued a Loan Modification Agreement dated June 3, 2013 and effective July 1, 2013 (the "Modification Agreement"). (Am. Comp. ¶ 31; Modification Agreement, a copy of which is attached as **Exhibit B**.)[3]

The Modification Agreement required BOA to capitalize costs, including "escrow advances," reduce the interest bearing principal balance to $152,389.21, and issue monthly statements that included a principal and interest payment of $636.89 and an "estimated monthly escrow payment of $293.78." (Id.) The Modification Agreement warned that "escrow payments may be adjusted periodically in accordance with applicable law and therefore my total monthly payment may change accordingly." (Id.) Bowen agreed to and signed the Modification Agreement. (Am. Comp. ¶ 34).

Before the effective date of the Modification, BOA service transferred the loan to Ditech effective June 1, 2013. (Am. Comp. ¶ 35). Through its service transfer notice, Ditech

---

[2] All of the attached exhibits may be considered by this Court because they are referred to and integral to the Complaint and the authenticity is undisputed. See Watterson v. Page, 987 F.2d 1, 3–4 (1st Cir. 1993); Schaefer v. Indymac Mortg. Servs., 731 F.3d 98, 100, n. 1 (1st Cir. 2013); Hall v. Bank of Am., N.A., No. 13-CV-387-JD, 2014 WL 2608119, at *1 (D.N.H. June 11, 2014).

[3] The Modification Agreement is attached to the Amended Complaint as Exhibit 3. For simplicity, Ditech has attached another copy to its Motion.

represented that "[I]f you want to send a 'qualified written request' regarding the servicing of your loan to your new servicer, it must be sent to this address: Green Tree PO Box 6176, Rapid City, SD." (Id.)

At the time BOA service transferred the loan:

- BOA issued notice to Bowen of a negative escrow balance of $3,763.20 (Bank of America May 30, 2013 statement, a copy of which is attached as **Exhibit C**);[4]

- Ditech confirmed that Bowen's transferred account reflected a negative escrow balance of $3,763.20 (Ditech June 10, 2013 account transfer notice, a copy of which is attached as **Exhibit D**); and

- Ditech issued a monthly statement for June 2013 demanding payment for the entire negative escrow balance. (Ditech June 2013 monthly statement, a copy of which is attached as **Exhibit E**).

After BOA service transferred the loan, Ditech issued monthly statements reflecting the negative escrow balance in the amount of $3,763.20. (Post-modification invoices reflecting the negative escrow balance, copies of which are attached as **Exhibit F**.)

By January 2014, Ditech confirmed the execution of the Modification Agreement, adjusted Bowen's account to reflect the modified agreed-upon monthly interest payment, but failed to capitalize the entire negative escrow balance of $3,763.20 and, instead, only capitalized $2,384.66. (Am. Comp. ¶¶ 40, 41, 43). The remaining portion of the negative escrow balance $1,246.04 ("Remaining Negative Escrow Balance") remained in the escrow account and continued to be charged to Bowen. (Am. Comp. ¶ 45).

Bowen refused to make any payments claiming, among other things, that the escrow amounts reflected on his monthly invoices were inaccurate and as a result, on March 10, 2014,

---

[4] This amount was previously disclosed to Bowen by BOA in a December 27, 2012 "Escrow Account Review." (Escrow Account Review, a copy of which is attached as **Exhibit G**.)

Ditech filed an action to foreclose. (Am. Comp. ¶ 49). In response, Bowen filed a counterclaim alleging that:

- Ditech failed to "recognize and implement" the Modification Agreement;

- "the escrow payment of $2,350.24 and Regular Monthly Payment of $636.89 remained inaccurate;" and

- As a result, Bowen "suffered sleeplessness, anxiety, frustration, fatigue, weight gain and desperation."

(Am. Comp. ¶ 50; Counterclaim, a copy of which is attached as **Exhibit H**). Bowen asserted claims for Fraud and Negligent Misrepresentation and violation of the Maine and Federal Fair Debt Collection Practices Act, Real Estate Settlement Procedures Act, and the Maine Unfair Trade Practices Act. (Id.)

After approximately a year of litigation, by Settlement Agreement and Release dated April 21, 2015 in exchange for a payment,[5] Bowen "unconditionally and irrevocably" released Ditech "from and against any and all past and present claims up until the Effective Date [April 21, 2015] of this Agreement . . .arising from the origination or servicing of the Loan (in any manner)." (Am. Comp. ¶ 52). Specifically Bowen "for himself and each of his present and former heirs, executors, attorneys, insurers, agents"

> **unconditionally and irrevocably** remise, waive, satisfy, **release**, acquit, and forever discharge BANA, **Green Tree** and each of their present, former and future parents, predecessors, successors, assigns, assignees, affiliates, creditors, shareholders, joint ventures, co-ventures, officers and directors…and/or each person or entity action or purporting to act for them or on their behalf as well as any past, present or future person or entity that held or holds any interest in the Loan(s) and the underlying Note, Deed of Trust and/or Mortgage…from and against **any and all** past and present

---

[5] The terms of the settlement agreement are confidential. Ditech and Fannie Mae intend to file the settlement agreement under seal.

> **claims up until the Effective Date of this Agreement,** counterclaims, actions, defenses, affirmative defenses, suits, rights causes of action, lawsuits, set-offs, costs, losses, controversies, agreements, promises, and demands or liabilities of **whatever kind or character, direct or indirect whether known or unknown or capable of being known** whether existing now or to become known in the future, arising at law or in equity by right of action or otherwise including but not limited to suits, debts, accounts, bills, damages, judgments, executions, warranties, attorneys' fees, costs of litigation, expenses, claims and demands whatsoever that the Releasors …have or may have against the Releasees for upon or by reason of any matter, cause or thing whatsoever in law or equity including without limitation the claims m or which have been made by Bowen arising from the origination or servicing of the Loan (in any manner) as well as in any way related to the underlying property, Notes, Mortgage and/or Deeds of Trust, any servicing act or omission thereof as well as any claim or issue which was or could have been brought in the Litigation.

Bowen subsequently signed and filed a "Stipulation of Dismissal" of the counterclaims with prejudice. (Am. Comp. ¶ 53).

Post-settlement, Ditech mistakenly included "fees and charges due" in two monthly statements. By letter dated August 3, 2015 (the "First QWR"), Bowen issued a "Qualified Written Request" to P.O. Box **6176**, challenging these fees and requesting that Ditech "provide an explanation for the total fees and charges sought in the July 2015 statement." (Am. Comp. ¶¶ 59, 62, 67, 68, 69).

In response by letter dated August 20, 2015, Ditech acknowledged that "the additional fees assessed after the reinstatement payoff will be removed." (Am. Comp. ¶ 69; see also Exhibit 12).

By letter dated November 3, 2015 (the "Second QWR"), Bowen issued a "qualified written request" to P.O. Box **6172** challenging the collection of fees and other costs. (Am. Comp. ¶ 78).

In response, by letter dated December 9, 2015, Ditech claimed that the Second QWR was not a qualified written request because it was mailed to the wrong post office box but confirmed that Ditech has "removed the fees that were inadvertently charged toward your client's account." (Am. Comp. ¶ 84).[6]

After completing its annual escrow analysis, Ditech represented that Bowen's escrow payment effective March 2016 would increase from $292.78 to $355.39 because of an:

- escrow shortage (i.e., the amount Ditech was currently collecting for escrow was insufficient to cover the costs related to taxes and insurance) in the amount of $1,109.22; and

- escrow deficiency, which included, among other costs, the $1,116.75 that should have been capitalized pursuant to the Modification Agreement.

(Am. Comp. ¶ 86). Bowen refused to pay the increased escrow but paid his previous monthly payment of $930.67 ($61.61 less than the amount owed) resulting in a default. (Am. Comp. ¶ 102).

On or about April 19, 2016, Bowen filed this Action claiming that Ditech and Fannie Mae:

- violated the FDCPA. Specifically, Bowen claims that Ditech violated the FDCPA by failing to capitalize the full negative escrow balance as required by the Modification Agreement and instead amortizing the negative escrow balance over a sixty month period and charging him an additional approximately $40;

---

[6] By his allegations Bowen appears to concede that the mistaken amounts charged to Bowen were actually credited to his account. (See Am Comp. ¶ 85) ("The $142.80 was **never refunded in cash or check** to Bowen.")

- violated RESPA and committed fraud by failing to respond and correct the additional charges on the account (which Bowen did not owe) but which he did pay; and
- violated the UTPA by violating the FDCPA and RESPA.

(Am. Comp. ¶ 107).

## **ALLEGATIONS RELATED TO FANNIE MAE**

Bowen fails to identify any conduct of Fannie Mae in the Amended Complaint. Rather the sole allegations related to Fannie Mae are set forth in paragraphs 9 to 14, and 36 of the Amended Complaint and allege that Fannie Mae: "is a government-sponsored enterprise" that "was and remains the investor and/or owner of Mr. Bowen's loan," that hired Ditech to service the loan, and that retained Ditech to service the loan. (Am. Comp. ¶¶ 9-14).

## **ARGUMENT**

**I.   PLAINTIFF'S CLAIMS ARE BARRED BY THE PLAIN LANGUAGE OF THE SETTLEMENT AGREEMENT.**

The Barred Claims are all based upon pre-settlement conduct and are, therefore, precluded by the terms of the Settlement Agreement. In exchange for substantial consideration, Bowen "unconditionally and irrevocably . . .waive[d] . . .release[d]" and "forever discharge[d]" Ditech from "any and all past or present claims . . . known or unknown or capable of being known . . . by reason of any matter . . . whatsoever." Moreover, Bowen specifically and without reservation "waive[d]" "release[d]" and "forever discharge[d]"

- "claims made or that could been made by Bowen arising from the origination of servicing of the loan;"
- claims made or that could have been made "related to the underlying property, Note, Mortgage and/or Deeds of Trust;"

- claims made or that could have been made related to "any servicing act or omission thereon"; and
- "any claim or issue which was or could have been brought in the Litigation."

Bowen's current claims are based upon the same operative facts as his previously filed and dismissed counterclaim. ( See Am. Comp. ¶ 41) ("Green Tree failed to properly apply the correct amounts per…Loan Modification Agreement to the escrow account.") Specifically, Bowen has alleged that:

- the Modification Agreement required Ditech to capitalize escrow payments;
- Ditech breached the terms of the Modification Agreement by failing to capitalize the escrow payment;
- Ditech's failure to capitalize the escrow payments resulted in the collection of "at least an extra $34.59" which Ditech was not entitled to under the Modification Agreement; and
- As a result, Ditech attempted to and did collect money to which it was not entitled, which triggers liability under the Barred Claims.

(See Am. Comp. ¶¶ 86, 88, 89, 90, 92).

A comparison of the factual allegations between the previously dismissed counterclaim and the First Amended Complaint further supports the conclusion that these two actions are based upon the same operative facts (i.e., a failure to comply with the Loan Modification Agreement) and seek to collect the same damages. In the previously dismissed counterclaim, Bowen alleged that

- Ditech failed to "recognize and implement" the Modification Agreement;
- "the escrow payment of $2,350.24 and Regular Monthly Payment of $636.89 remained inaccurate;" and

- As a result Bowen "suffered sleeplessness, anxiety, frustration, fatigue, weight gain and desperation."

In this action Bowen again alleges that:

- Ditech failed to comply with the Modification Agreement (Am Comp.¶¶ 88, 92, 93);

- The escrow payment is "inaccurate" based upon Ditech's alleged failure to comply with the Modification Agreement (¶¶ 88, 89, 92); and

- As a result Bowen again claims that he "could not sleep," "started on anti-anxiety, sleep medication," and was "anxious and fearful." (Am. Comp. ¶127).

At a minimum, the claims should have been known to Bowen at the time he executed the settlement agreement and released all claims. By that time, he had been notified several times that there was a negative escrow balance of $3,763.20 that Ditech was attempting to collect, which had not been capitalized. Moreover, even if the claims or their factual basis were unknown to Bowen at the time he signed the settlement agreement, the claims are still barred because the settlement agreement released "any and all past or present claims . . . known or unknown or capable of being known . . . by reason of any matter . . . whatsoever." The "broad wording in the release operates to settle all other, unrelated matters, even if they were not specifically in the parties' minds at the time the release was executed." Eck v. Godbout, 444 Mass. 724, 728 (Mass. 2005). Bowen, therefore, waived his right to assert the claims he now raises here.

Nor can Bowen avoid the broad-based release by relying upon Ditech's alleged post-settlement conduct. While Bowen alleges certain invoices were issued after the effective date of the settlement, the error that Bowen relies upon (i.e., the failure to capitalize certain amounts) occurred pre-settlement. See generally TLT Constr. Co. v. A Anothy Tappe & Associates, 48

Mass. App. Ct. 1, 8 (1999) ("A claim in a later case is considered the same as the one in the prior case…if it is derived from the same transaction or series of connected transactions."). Bowen's own allegations confirm that Ditech's alleged failure "to properly apply the correct amounts" to the "escrow account" occurred "[O]n or around the end of January 2014" – *before* Bowen signed the settlement agreement. (Am. Comp. ¶¶ 40-44). Thus, all of the claims are barred by the settlement agreement.

## II. THE FDCPA/MFDCPA CLAIM IS NOT APPLICABLE TO A SERVICER

Ditech is a creditor and not subject to the FDCPA. The FDCPA expressly exempts from the definition of "debt collector[7]" "loan servicers who obtain a debt prior to default, from the definition of an FDCPA debt collector. When a loan servicer obtains an account prior to its default, that loan servicer operates as a creditor, not a debt collector, for the purposes of the FDCPA." See Bridge v. Ocwen Federal Bank, FSB, 681 F.3d 355, 359 (6th Cir. 2012); Hamilton v. Federal Home Loan Mortgage Corp., 2014 WL 4594733, at *18-19 (D. Me. Sept. 15, 2014); Yarney v. Ocwen Loan Servicing LLC, 929 F.Supp.2d 569, 575 (W.D. Va. 2013) (explaining that "mortgage servicers are considered debt collectors under the [FDCPA] if they became servicers after the debt they had serviced fee into default."); ValleCastro v. Tobin, Melien & Marohn, No. 3:13-cv-01441-SRU, Ruling and Order, Dk. No. 55, at 5 (D. Conn. Dec. 16, 2014) (Underhill, J.) (collecting cases). Where, as here, there is a superseding renegotiated payment plan in the form of the Modification Agreement, and at the time of service transfer the Plaintiff was not in default, the servicer is not a debt collector for the purposes of the FDCPA. See Bailey v. Security National Servicing Corp., 154 F.3d 384 (7th Cir. 1998) ("Common sense and the plain meaning of the statute require that we distinguish between an individual who

attempts collection on a defaulted debt and one who seeks collection on a debt owed under a brand new payment plan or forbearance agreement that is current."); see also Dolan v. Fairbanks Capital Corp., 930 F.Supp.2d 396 (E.D.N.Y. 2013) (concluding that "the relevant debt (for the purposes of the FDCPA) is the debt plaintiff owed pursuant to the…Forbearance Agreement and because plaintiff was not in default of that debt" as of the date of service transfer it was not a debt collector).

In this case, on the date of service transfer there was no default under the terms of the Modification Agreement. Bowen successfully completed his TPP payments by May of 2013 entitling him to a permanent modification. (Am. Comp. ¶ 30). In recognition of his entitlement to the permanent modification, BOA on May 31, 2013 issued the Modification Agreement. By its plain language no payment was due until July 1, 2013. ("Your total monthly payments will be due on the 1st of the month starting the 1st of July, 2013."). (Am. Comp. ¶ 31). As a result Ditech is not a debt collector.

Nor can Bowen avoid this conclusion by claiming that he has alleged that Ditech is a "debt collector." (Am. Comp. ¶¶ 16-19). The mere conclusory allegation that the servicer is a debt collector is insufficient as a matter of law to sustain a claim. See Casualt v. Federal National Mortgage Association, 915 F.Supp.2d 1113 (C.D. Cal. 2012) ("merely label[ing] the servicer defendants debt collectors" in sufficient to sustain a claim under the FDCPA. Rather plaintiff required to allege that "Servicer Defendants were assigned defaulted loans of the purposes of collection.")

### III. THE RESPA CLAIM FAILS AS A MATTER OF LAW

Bowen's Second QWR was defective as a matter of law; and even if it was not, Bowen has failed to allege any causally related damages. Under RESPA a servicer of a "federally

related mortgage loan" may be liable for damages to the borrower if it fails to adequately respond to a qualified written request ("QWR"). 12 USC § 2605. A "qualified written request" is a "written request" that identifies the "name and the account of the borrower" and describes the "reasons for the belief" that "the account is in error." 12 U.S.C. § 2605(e).[8] In response to a QWR, a servicer must either "make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties," or "after conducting an investigation, provide the borrower with a written explanation" as to why the servicer believes the account is correct or why the requested information is unavailable. Watt v. GMAC Mortgage Corp., 457 F.3d 781, 783 (8th Cir. 2006); see also 12 U.S.C. § 2605. To assist servicers in responding to QWRs timely, RESPA's implementing regulations authorize servicers to establish a designated address for QWRs. 24 CFR 3500.21(e)(1) ("By notice either included in the Notice of Transfer or separately delivered by first-class mail, postage prepaid a server may establish a separate and exclusive office and address for the receipt and handling of qualified written requests."). The failure to send a QWR to the designated address does not trigger a servicers duties. See Roth v. CitiMortgage Inc., 756 F.3d 178, 181–82 (2d Cir. 2014); See Warren v. Green Tree Servicing, LLC, No. 14-cv-02241-PAB-CBS, 2015 WL 9259454 (D. Co. Dec. 18, 2015) (Brimmer, J.) (holding that letters sent to Ditech at PO Box 6172 did not qualify as QWRs (even though such address was identified on certain correspondence with the borrowers); see Bailey v. Hoemside Lending, Inc., No. 02 cv 5799, 2005 WL 2250856 (N.D. Ill. Sept. 8, 2005) (actually received QWR sent to a non-designated address insufficient to trigger duties under RESPA); see Berneike v. Citimortgage, Inc., 708 F.3d 1141, 1149 (10th Cir. 2013) ("Failure to send the SQR to the

---

[8] This statutory requirement is supplemented by "Regulation X" 12 C.F.R. 1024.35 (e).

designated address 'for receipt and handling of [QWRs' does not trigger the servicer's duties under RESPA.").

Here, as a matter of law, Ditech had no duty to respond to the Second QWR. While the First QWR was issued to the appropriate address (P.O. Box 6176) the Second QWR was issued to the wrong address (P.O. Box 6172). Therefore Ditech had not duty to respond as a matter of law.

Even if there was violation of RESPA (which Ditech denies), Bowen has alleged neither actual damages nor emotional distress caused by the alleged RESPA violation. See 12 U.S.C. 2605(e), (f) (a plaintiff must allege that the violation of RESPA resulted in actual damages to state a claim); Hensley v. Bank of New York Mellon, No. 1:10-cv-1316 2011 WL 4084253 at *3-4 (E.D.Cal. Sept. 13, 2011) (a loss alleged must be related to a violation of RESPA itself); Yates v. GMAC Mortgage LLC, Civil Action No. 1:10-cv-2546-RWS 2010 WL 5316550 at *4 (N.D. Ga. Dec. 17, 2010) (dismissing RESPA claim with prejudice because plaintiff failed to articulate any facts showing how Defendant's failure to respond or inadequate responses to the RESPA requests resulted in damages or the amount of damages.") Long v. Residential Credit Solutions, Inc., No. 9:15-cv-80590 2015 WL 4983507, at 1* (S.D. Fla. August 21, 2015) ("Costs incurred while preparing a qualified written request for information from a servicer cannot serve as a basis for damages because at the time those expenses are incurred there has been no RESPA violation."). Absent from the Amended Compliant are any specific allegaitons that the emotional distress alleged was caused by the failure to respond to the QWRs. Giordano v. MGC Mortgage, Inc., 160 F.Supp.3d 778 (D.N.J. 2016) (recognizing that "bare" allegations that the plaintiff "felt anxious and experienced side effects from anxiety" "do not establish the alleged distress was the result of the failure to respond to" the QWR.); see Skaggs v. HSBC Bank USA,

N.A., Civil Action No. 10-00247 2011 WL 3861373 * 16 (D. Hawaii Aug. 31, 2001) (rejecting a claim of emotional distress concluding that 'even assuming plaintiff suffered emotional distress and such distress can suffice as actual damages under 2605(f) Plaintiff has not established that her distress damages were' as a result of the lack of response to the April 29, 2010 QWR." To the contrary, Bowen claims that Ditech's misapplication of payments to an inflated escrow deficiency has resulted in severe emotional distress (Am. Comp.¶¶ 166-168).

## IV. NEITHER DITECH NOR FANNIE MAE OWE A FIDUCIARY DUTY

Bowen's attempt to impose a fiduciary duty upon a mortgage servicer based upon its alleged escrow obligations and Fannie Mae the "investor and/or owner" of Mr. Bowen's loan fails as a matter of law. A fiduciary relationship is created by "the actual placing of trust or confidence in fact by one party in another" and "a great disparity of position and influence between the parties at issue." Byran R v. Watchtower Bible & Tract Society of New York, Inc., 738 A.2d 839, 846 (1993). "Standing alone" neither a creditor-debtor relationship nor a mortgagee-mortgagor relationship are sufficient to establish a confidential relationship to support the imposition of a fiduciary obligation. Stewart v. Machias Savings Bank, 2762 A.2d 44, 46 (2000); Camden National Bank v. Crest Construction, Inc., 952 A.2d 213 (2008) (relationship of mortgagor and mortgagee insufficient to establish fiduciary duty); see also Lariviere v. Bank of NY as Trustee, Civil Action No. 9-515, 2010 WL 2399583 *6 (D. Maine May 7, 2010) ("A mortgagee-mortgagor relationship does not, without more create a duty of care between a bank and a customer.").

In recognition of this limitation, Bowen claims that the escrow "agreement" in the Mortgage is sufficient to establish a relationship of trust to justify the imposition of a fiduciary obligation. "There is no dispute that a fiduciary relationship is created by and inherent in the

nature of" a traditional escrow agreement; that is where money and/or property are deposited with a third party until the performance of a condition or the occurrence of an event. Crandall v. Bangor Savings Bank, Civil Action No. CV-98-239 1999 WL 35360329 *2 (Me. Super. Nov. 4, 1999);[9] Johnson v. Exclusive Properties Unlimited, 720 A.2d 568, 571 (1998) (An escrow is a written instrument imparting a legal obligation that one party to a transaction (i.e. grantor, promisor or obligor) deposits with a third party, the escrow agent, for the escrow agent to hold until performance of a condition or occurrence of an event and then to deliver to the other party to the transaction (i.e. grantee, promise, or obligee)) A traditional disinterested third party escrow agent exercises discretion and therefore to protect the depositor courts impose a fiduciary obligation. See Stern v. Great Western Bank, 959 F.Supp. 478, 487 (N.D. Ill. 1997) (a fiduciary relationship may arise when one party due to a close relationship relies heavily on the judgment of another).

In this case, the alleged escrow agreement does not establish a special relationship of trust nor does it significantly alter the traditional relationship between mortgagor and mortgagee. Rather, the alleged escrow agreement merely provides Ditech authorization to protect the priority of its security interest. Ditech exercises no significant discretion but administratively processes and pays bills for taxes and insurance. Compare Crandall v. Bangor Savings Bank, CV 98-239 1999 WL 35360329 *1 (Me. Super. 1999) (bank as escrow agent exercised discretion to disburse

---

[9] Although most cases summarily conclude as a matter of the that an escrow agent owes a fiduciary duty to the principal, the justification appear to be based upon trust law. Specifically where a trustee (by definition a disinterested third party) holds property for beneficiaries. See Toro Petroleum Corp v. Newell, 33 Ill.App. 3d 223, 228 (1974) ("the relationship of the escrowee to the depositor has been characterized in various ways. The escrowee has been described as a 'trustee' for both the party making the deposit and the party for whose benefit it is made…Like a trustee, the escrowee owes a fiduciary duty to act only in accordance with the escrow instructions.")

proceeds from a construction loan periodically to a contractor based upon the percentage complete). Indeed, the establishment of the escrow account is not to protect a borrower like Bowen but instead to protect the mortgagee Ditech. As a result, courts routinely refuse to impose fiduciary obligations upon a servicer. Palestini v. Homecomings Financial LLC, No. 10 cv 1049 NNA, 2010 WL 3339459 at *5 (S.D. Cal. Aug. 23, 2010) (dismissing a claim for breach of fiduciary duty against a loan servicer) White v. Mellon Mortgage Co., 995 S.W.2d. 795, 801 (Tex App. 1999); see also Knight v. Firs Federal Savings & Loan Ass'n, 260 S.E. 2d 511, 515 (Ga. App. 1979) ("the majority rule appears to be that funds paid by a mortgagor to an escrow account to be used by the mortgagee to meet tax and insurance obligations…do not constitute trust properties such as would render the mortgage accountable to the mortgagor for any earrings or profits from funds."); Southwestern Life Insurance Co. v. United States, 560 F.2d 627, 634 (5th Cir. 1977) (mortgage escrow funds create "a contractual obligation and nothing more."); Telfair v. First Union Mortgage Corp., 216 3d 1333, 1342 (11th Cir. 2000) (affirming dismissal of escrow-related fiduciary obligation).

At least one Federal District Court in Maine has recognized and imposed a fiduciary obligation upon a mortgage servicer based upon its administration of an escrow account. Hamilton v. Federal Home Loan Mortgage Corporation, 2:13-cv-00414, 2015 WL 144562 (D. Maine Jan. 12, 2015). In Hamilton, the Court recognized that "[T]he Maine Supreme Judicial Court has not directly address whether obligations of a mortgagee under an escrow account could constitute an exception to the general rule against finding a fiduciary relationship," but concluded based upon other cases imposing a fiduciary duty upon an escrow agent, that Maine law would "accept" the borrower's claim that when the "servicer created an escrow account it assumed fiduciary duties over the escrow account." Id. at 18.

But the Court in Hamilton never reconciled the administrative contractual duties assumed by a servicer with the discretion exercised by a traditional escrow agent. Nor did the Court consider the mortgagee self-interest in the preservation of its security interest. While there is no doubt that a heightened duty upon a traditional escrow agent to protect the depositors of property or money, no such obligation is required here.

V. THE PLAINTIFF HAS FAILED TO SET FORTH ANY CLAIM AGAINST FANNIE MAE

Bowen's limited factual allegations related to Fannie Mae are insufficient as a matter of law to state any claim against it. (Am. Comp. ¶¶ 9-14, 36). These bare allegations merely establish that Fannie Mae purchased Bowen's loan and retained Ditech to service it. (Id.) There are no other specific allegations of any conduct of Fannie Mae to support any of the claims alleged. Nor does Bowen identify the specific basis for Fannie Mae's liability under any of its claims. As a result, the claims should be dismissed.

Nor can Bowen claim that Fannie Mae is vicariously liable for Ditech's alleged statutory violations. Neither the FDCPA nor RESPA allow claims of vicarious liability.. Doucette v. GE Capital Retail Bank, No. 14-CV-012-LM, 2014 WL 4562758, at *2 (D.N.H. Sept. 15, 2014) (McCafferty, J.); see also Chiang, 2009 WL 102707, at *5 (a creditor is not "vicariously liable under the FDCPA for the efforts of a debt collector to collect on that creditor's debts"); Ricciardi v. Serv. Credit Union, No. 06–cv–092–JD, 2006 U.S. Dist. LEXIS 28468, at *6 (D.N.H. May 11, 2006) (DeClerico, J.) ("Because the FDCPA applies only to 'debt collectors,' however, courts have consistently rejected attempts to impose FDCPA liability on a creditor for the actions of those who collect its debts based on respondeat superior or similar theories.") (collecting cases); (12 U.S.C. § 2605 (RESPA) imposes liability on a "servicer" that takes or fails to take certain action). See Castrillo v. Am. Home Mortgage Servicing, Inc., No. 09-4369 R, 2010 WL

1424398, at *7 (E.D. La. Apr. 5, 2010) (dismissing RESPA claim against defendant where there was no evidence that defendant received periodic payments from plaintiffs and then made payments of principal and interest pursuant to terms of loan; record indicated that co-defendant performed this function and that defendant merely administered payments and held loan as trustee).

## CONCLUSION

Wherefore, for the above reasons, Ditech and Fannie Mae dismiss all the claims asserted in the Amended Complaint.

Dated: January 13, 2017

> DITECH FINANCIAL, LLC f/d/b/a
> GREEN TREE SERVICING, LLC and
> FEDERAL NATIONAL
> MORTGAGE ASSOCIATION
> By their Attorneys,
>
> /s/ *Richard E. Briansky*
> Richard E. Briansky, Esq.
> MCCARTER & ENGLISH, LLP
> 265 Franklin Street
> Boston, MA 02110
> (617) 449-6500
> rbriansky@mccarter.com
>
> /s/ *Paul J. Greene*
> Paul J. Greene, Esq.
> GLOBAL SPORTS ADVOCATES, LLC
> One Monument Way, Suite 426
> Portland, Maine 04101
> T: (207) 747-5899
> pgreene@globalsportsadvocates.com
> *Local Counsel for Defendants*

## CERTIFICATE OF SERVICE

I, Richard E. Briansky, hereby certify that this document was filed through the Court's ECF System and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: January 13, 2017

/s/ *Richard E. Briansky*
Richard E. Briansky, Esq.
MCCARTER & ENGLISH, LLP
265 Franklin Street
Boston, MA 02110
(617) 449-6500
rbriansky@mccarter.com