## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| MARK A. BOWEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:16-cv-00195-JAW |
| | ) | |
| DITECH FINANCIAL LLC, f/d/b/a/ | ) | |
| GREEN TREE SERVICING LLC, | ) | |
| and FEDERAL NATIONAL | ) | |
| MORTGAGE ASSOCIATION, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON MOTION TO DISMISS

The plaintiff brings this action against the owner of his loan and the loan servicer for unfair and misleading debt collection attempts in violation of statutory and common law. The defendants moved to dismiss the complaint and, in support of their motion, they have attached several documents. The Court grants in part and denies in part the defendants' motion to dismiss (ECF No. 66).

## I.    PROCEDURAL BACKGROUND

On April 5, 2016, Mark A. Bowen filed a complaint against Ditech Financial LLC (Ditech), f/d/b/a Green Tree Servicing LLC (Green Tree), and the Federal National Mortgage Association (Fannie Mae) alleging common law and statutory violations for "repeated coercive and harassing attempts to collect on monies not owed by [him]." *Compl.* at 1 (ECF No. 1). Ditech and Fannie Mae answered on June 3, 2016. *Defs.' Answer and Affirmative Defenses* (ECF No. 11).

On November 18, 2016, Mr. Bowen filed a motion for leave to amend his Complaint due to newly discovered facts and evidence, *Pl.'s Mot. for Leave to Amend Compl.* at 1 (ECF No. 25), which the Court granted without objection on December 13, 2016. *Order* (ECF No. 28). Mr. Bowen filed the First Amended Complaint on December 14, 2016. *First Am. Compl.* (ECF No. 29) (*Am. Compl.*). The Amended Complaint contains six counts: Count I—Fraud and Fraudulent Misrepresentation; Count II—violations of the Maine Unfair Trade Practices Act (MUTPA), 5 M.R.S. §§ 205-A *et seq.*; Count III—violations of the Maine Fair Debt Collection Practices Act (MFDCPA), 32 M.R.S. §§ 11001 *et seq.*; Count IV—violations of the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. §§ 1692 *et seq.*; Count V—violations of the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. §§ 2601 *et seq.*; and Count VI—Breach of Fiduciary Duty. *Id.* The Amended Complaint contains thirty-three exhibits as attachments. *Id.* Attachs. 1–33.

On January 13, 2017, the Defendants moved to dismiss Mr. Bowen's First Amended Complaint. *Mot. to Dismiss First Am. Compl.* (ECF No. 48). Four days later, both parties notified the Court of their intent to file summary judgment motions. *Ditech Financial LLC f/d/b/a Green Tree Servicing LLC and Federal National Mortgage Association Pre-Conference Filing* (ECF No. 49); *Pl.'s Pre-Filing Conference Mem.* (ECF No. 50). At the Rule 56(h) pre-filing conference on January 30, 2017, the Court suggested that instead of briefing three separate dispositive motions, the parties submit the case to the Court on a stipulated record. *Procedural Order* at 1–2 (ECF No. 59). Counsel initially agreed, pending approval from their

clients, and so the Court dismissed without prejudice the Defendants' Motion to Dismiss the First Amended Complaint. *Id.* at 2–3. However, after consulting with their clients, the parties informed the Court during a teleconference on February 7, 2017 that they preferred to proceed with traditional dispositive motions, and the Court vacated its earlier procedural order. *Further Procedural Order* (ECF No. 63).

On February 8, 2017, the Defendants refiled the motion to dismiss, including eight exhibits, and requested oral argument. *Mot. to Dismiss First Am. Compl.* (ECF No. 66) (*Defs.' Mot.*); *Mot. for Oral Arg./Hr'g* (ECF No. 67). Neither these eight exhibits nor the exhibits attached to the Amended Complaint included a document the Defendants relied upon in their motion to dismiss—namely, the parties' April 24, 2015 confidential settlement agreement and release with regard to the Defendants' foreclosure action, captioned *Green Tree Servicing LLC v. Mark A. Bowen, et al.*, No. AUSBSC RE 2014-00044 (State of Maine Superior Court, Androscoggin). *See Defs.' Mot.* Attachs. 1–8. On March 10, 2017, Mr. Bowen objected to the motion to dismiss. *Pl. Mark A. Bowen's Opp'n to Defs.' Mot. to Dismiss* (ECF No. 82) (*Pl.'s Opp'n*).[1]

## II.  THE FACTUAL ALLEGATIONS

### A.  Background

On December 20, 2005, Mr. Bowen and his now-ex-wife, Nancy E. Bowen, executed and delivered to Bank of America, N.A. (BOA) a promissory note in the amount of $204,422.00. *Am. Compl.* ¶ 20. To secure the promissory note, Mr. Bowen

---

[1]     After some discussion at oral argument, Mr. Bowen's counsel agreed to withdraw the motion to exclude or convert motion to dismiss (ECF No. 68). The oral withdrawal is docketed at ECF Number 113.

and Nancy Bowen executed a mortgage deed in favor of BOA securing the property located at 17 Orchard Lane, Minot, Maine 04258. *Id.* ¶ 21. As a part of the mortgage, BOA created an escrow account to pay real estate taxes and hazard insurance on the property, and BOA used a portion of Mr. Bowen's monthly payment to fund the escrow account. *Id.* ¶¶ 22–23.

### B. Loan Modification Agreement

In 2012, Mr. Bowen fell behind on the loan due to his divorce from Nancy Bowen, and he applied for a loan modification through BOA. *Id.* ¶¶ 26–27. Mr. Bowen received a Fannie Mae Trial Period Plan in February 2013, which required three payments of $928.24 due on March 1, April 1, and May 1, 2013. *Id.* ¶¶ 27–28. The Plan stated that if Mr. Bowen made the trial plan payments on time and continued to meet all of the eligibility requirements of the modification program, his mortgage would be permanently modified. *Id.* ¶ 29. Mr. Bowen accepted the Trial Period Plan offer and made all three payments to BOA on time. *Id.* ¶ 30.

On May 30, 2013, BOA sent Mr. Bowen a permanent Fannie Mae Loan Modification Agreement with an effective date of July 1, 2013. *Id.* ¶ 31. Under the Modification Agreement and Clarity Commitment, the new monthly payment on the loan would be $930.67 and would include principal, interest, taxes, and insurance. *Id.* Additionally, according to the terms of the Modification Agreement, $38,495.97 would be capitalized into the loan for a new modified principal balance of $217,698.97 to bring the loan current. *Id.* ¶ 32. The modification allowed for $65,309.66 of the new principal balance to be deferred, interest free. *Id.* The Modification Agreement

4

stated that of the $38,495.97 capitalized amount, $8,202.81 would be applied to past due interest, $26,662.46 would be applied to servicing expenses, and $3,630.70 would be applied to taxes and insurance that had been advanced by BOA. *Id.* ¶ 33.

Mr. Bowen signed and returned the Modification Agreement to BOA in a timely manner. *Id.* ¶ 34.

### C.    Transfer of Loan Servicing

BOA transferred  servicing of the loan to Green Tree effective June 1, 2013, and the mortgage deed was eventually assigned to Green Tree on June 18, 2013. *Id.* ¶¶ 25, 35. Green Tree was responsible for servicing the loan on behalf of and under the authority and direction of Fannie Mae. *Id.* ¶ 36. Green Tree was obligated to follow the Fannie Mae Single Family Servicing Guide in servicing Mr. Bowen's loan. *Id.* ¶ 37. Additionally, Green Tree was responsible for the handling and maintenance of the escrow account on the loan. *Id.* ¶ 38.

### D.    Green Tree's Underfunding of the Escrow Account

Green Tree did not implement the loan modification and treated Mr. Bowen's loan as if it were in default when it began servicing the loan. *Id.* ¶ 39. On or around the end of January 2014, Green Tree did capitalize at least $38,495.97 in interest, servicing expense, and escrow advances to the unpaid principal balance of the loan. *Id.* ¶ 40. However, in this process, Green Tree failed to properly apply the correct amounts per the Clarity Commitment and Loan Modification Agreement to the escrow account. *Id.* ¶ 41. Mr. Bowen alleges, upon information and belief, that more servicing fees had accrued than were accounted for on the Clarity Commitment and

that Green Tree made the unilateral decision to pay themselves back about $27,521.86 in servicing fees and then allocate the remaining $2,384.66 to the escrow account. *Id.* ¶¶ 42, 43. This decision contradicted the agreed-upon terms of the Clarity Commitment and was done without Mr. Bowen's consent or knowledge. *Id.* ¶ 44. The amount allocated to the escrow account was short of the $3,630.70 the Clarity Commitment stated would be allocated to the escrow account, and the account was underfunded by $1,246.04. *Id.* ¶ 45.

Per the terms of Mr. Bowen's mortgage, monthly payments are to be applied in the following order: interest, then principal, then escrow. *Id.* ¶ 46. If the payment is not enough to cover all three, it is placed in unapplied funds until another payment makes up the difference. *Id.* Because the monthly payment is not applied to the month in which it is received, the loan is considered past due and eventually in default. *Id.* By disregarding the Clarity Commitment and Loan Modification and "secretly applying the capitalized funds to their own questionable servicing fees first," Ditech thereby left a deficiency in the escrow account that, two years later, it would seek to recoup as part of an increased monthly payment. *Id.* ¶ 47. In doing so, Ditech put Mr. Bowen's loan at risk of default. *Id.* Because this was not disclosed to Mr. Bowen, he was not able to dispute any of the extra undisclosed servicing fees. *Id.* ¶ 48.

### E.     Foreclosure Action & Settlement Agreement

On March 10, 2014, Green Tree initiated a foreclosure action captioned *Green Tree Servicing LLC v. Mark A. Bowen, et al.*, No. AUSBSC RE 2014-00044 (State of

Maine Superior Court, Androscoggin) (foreclosure action) that should not have been initiated due to the permanent loan modification. *Id.* ¶ 49. Mr. Bowen amended his answer to the foreclosure action and added counterclaims on January 5, 2015. *Id.* ¶ 50. As alleged in Mr. Bowen's counterclaims in the foreclosure action, including claims for fraud and negligent misrepresentations and violations of the MFDCPA, FDCPA, RESPA, and MUTPA, Green Tree failed to properly implement the permanent modification that brought the loan current, and Green Tree continued to attempt to collect on the pre-modified terms of the loan and monies not owed by Mr. Bowen. *Id.* ¶ 50.

The foreclosure action was transferred to the Maine Business and Consumer Court on January 22, 2015, and the docket number changed to BCD-RE-15-01. *Id.* ¶ 51. On April 17, 2015, the parties entered into a confidential settlement agreement and release. *Id.* ¶ 52. The parties filed a Stipulation of Dismissal of the foreclosure action dated April 30, 2015, stating that "[e]ach party shall bear its own costs and attorneys' fees." *Id.* ¶ 53.

### F. Reinstatement Quote & Green Tree's Improper Fee Collection

After the effective date of the settlement, Green Tree, through their attorneys at Shapiro and Morley, provided Mr. Bowen a reinstatement quote of $21,056.30 good through May 12, 2015 to reinstate the loan per the terms of the permanent loan modification. *Id.* ¶ 54. The loan was considered in foreclosure status at the time the reinstatement quote was issued. *Id.* ¶ 55.

The itemization of the reinstatement amount included (a) twenty-three past due payments, including principal, interest, and escrow amounts for taxes and insurance, from July 1, 2013 through May 1, 2015 per the terms of the loan modification, (b) late fees of $37.53, and (c) unpaid amounts in the loan's suspense account of $386.64. *Id.* ¶ 56. The reinstatement quote did not include any funds allegedly owed for any additional advanced escrow amounts or make any reference to any escrow deficiency. *Id.* ¶ 57. Green Tree failed to provide a history of the escrow account within ninety days of the reinstatement. *Id.* ¶ 60.

On May 8, 2015, Mr. Bowen hand-delivered a check in the amount of $21,056.30 to counsel for Green Tree to effectuate the reinstatement. *Id.* ¶ 58. In a mortgage statement dated June 14, 2015, Green Tree acknowledged receipt of the $21,056.30 payment and reflected the terms of the loan modification in the regular monthly payment due of $930.67 for principal, interest, and escrow. *Id.* ¶ 59. In addition, Green Tree attempted to collect $35.70 in "Total Fees and Charges Due" for a grand total of $966.37. *Id.* Mr. Bowen made a payment of $966.37 to Green Tree on or around June 25, 2015 for July to cover the additional $35.70 charge. *Id.* ¶ 61.

In a mortgage statement dated July 14, 2015, Green Tree again attempted to collect $35.70 in "Total Fees and Charges Due." *Id.* ¶ 62. Mr. Bowen made a payment of $966.37 to Green Tree on or around July 28, 2015 for August. *Id.* ¶ 63.

Mr. Bowen contacted Green Tree to dispute the $35.70 charge several times by phone, explaining that the fees were part of a settlement and he should not have to pay them. *Id.* ¶ 64. In a letter dated July 28, 2015, Green Tree claimed the $35.70

was a proper fee on the account. *Id.* ¶ 65. When Green Tree failed to correct the error, Mr. Bowen retained counsel to assist him with his dispute. *Id.* ¶ 66.

Through counsel, on August 3, 2015, Mr. Bowen delivered a Qualified Written Request (QWR), including a Notice of Error (NOE) and Request for Information (RFI), to Green Tree explaining that Mr. Bowen did not owe the fees and charges Green Tree was attempting to collect. *Id.* ¶ 67. Green Tree received the letter on August 10, 2015. *Id.*

In a mortgage statement dated August 14, 2015, Green Tree again attempted to collect $35.70 in "Total Fees and Charges Due." *Id.* ¶ 68. However, in a letter dated August 20, 2015, Green Tree stated that it had determined that the additional monthly fee of $35.70 was improper and would be removed from the loan. *Id.* ¶ 69. Enclosed with the letter was a document entitled "Advances," which showed a series of amounts paid from the account that include attorney's fees, legal costs, filing fees, and foreclosure costs. *Id.*

Even though it had determined that the fee was improper, in a letter dated August 26, 2015, Green Tree stated that it would take out a payment from Mr. Bowen's bank account that included the $35.70 fee. *Id.* ¶ 70. Green Tree did take this money from Mr. Bowen's account. *Id.* ¶ 71.

## G. Ditech Continues to Collect Improper Fee

On or around August 27, 2015, Green Tree delivered a notice to Mr. Bowen about their "new name." *Id.* ¶ 72. The letter stated that as of August 31, 2015, Green Tree and Ditech Mortgage Corp. would be known as Ditech. *Id.*

In a mortgage statement dated September 7, 2015, Ditech listed only the principal, interest, and escrow payment of $930.67 due and omitted the disputed $37.50 fee. *Id.* ¶ 73. However, in a mortgage statement dated October 7, 2015, Ditech again attempted to collect $35.70 in "Total Fees and Charges Due." *Id.* ¶ 74. Mr. Bowen made a payment of $966.37 to Ditech on or around November 2, 2015. *Id.* ¶ 75. Mr. Bowen contacted Ditech directly to dispute the fees again. *Id.* ¶ 76.

Mr. Bowen paid his counsel $50.00 to send another QWR, RFI, and NOE to try and resolve the problem. *Id.* ¶ 77. On November 3, 2015, through counsel, Mr. Bowen delivered a second QWR with NOE and RFI to Ditech outlining why Mr. Bowen did not owe the alleged fees and costs and demanding that Ditech adjust the account accordingly. *Id.* ¶ 78. Ditech received the letter on November 6, 2015. *Id.* Also on November 3, 2015, Mr. Bowen, through counsel, delivered a demand letter to Ditech pursuant to MUTPA outlining Ditech's failure to properly maintain Mr. Bowen's loan account and unfair conduct of attempting to collect amounts not owed. *Id.* ¶ 79. Ditech received the demand letter on November 9, 2015. *Id.*

In a mortgage stated dated November 7, 2015, Ditech again attempted to collect $35.70 in "Total Fees and Charges Due." *Id.* ¶ 80. Mr. Bowen made a payment of $966.37 to Ditech on or around December 21, 2015. *Id.* ¶ 81.

On December 4, 2015, Mr. Bowen's online Ditech account showed that his payments were being unapplied. *Id.* ¶ 82. Ditech also misstated that the next payment amount due was $823.57. *Id.*

Mr. Bowen paid at least $142.80 in fees he did not owe and should not have been billed by Ditech. *Id.* ¶ 83. On December 9, 2015, Ditech delivered to Mr. Bowen, care of his counsel, a letter explaining that the advances that had been applied to the escrow account before the modification took place were waived and there was a zero balance owed. *Id.* ¶ 84. Ditech promised to remove the fees and refund $142.80 to the account. *Id.* The $142.80 was never refunded in cash or check to Mr. Bowen. *Id.* ¶ 85. This was money he never should have had to pay to Ditech. *Id.*

**H.    Improper Fees Charged for Escrow Shortage & Deficiency**

In an Annual Escrow Disclosure Statement dated January 25, 2016, Ditech alleged that Mr. Bowen had an escrow shortage of -$1,109.22 and escrow deficiency of -$1,702.16. *Id.* ¶ 86. It stated that the alleged amounts owed would be charged over a 36-month period beginning March 1, 2016: $30.87 per month extra for the shortage and $47.28 per month extra for the alleged deficiency, making Mr. Bowen's new monthly payment $992.28. *Id.* ¶ 86. Ditech included a payment coupon for $2,811.38 for the alleged amounts due to escrow. *Id.* This is the first escrow analysis Ditech performed on the loan and delivered to Mr. Bowen. *Id.* ¶ 87.

The escrow deficiency of -$1,702.16 alleged in the Escrow Disclosure Statement was comprised in part of the underfunded $1,246.04 that should have been applied to the escrow account per the terms of the Clarity Commitment and Loan Modification but were "unilaterally and secretly applied and capitalized as part of Ditech's servicing fees instead." *Id.* ¶ 88. Ditech "line[d its] own pockets" by paying servicing fees first thus causing the escrow account to be underfunded, and it now is trying to collect on that underfunded amount as an escrow deficiency over thirty-six

months. *Id.* ¶ 89. This money should never have been treated as an escrow deficiency—Ditech should have fulfilled its fiduciary duty and funded the escrow account first and then its own pockets second. *Id.* ¶ 90. A deficiency in servicing fees does not carry the same consequences as a deficiency in an escrow account. *Id.* ¶ 91. Per the mortgage, a loan payment is not placed in unapplied funds solely because there are outstanding servicing fees due. *Id.* However, if a payment is short due to increased escrow amounts, it gets placed in unapplied funds until another payment comes in the next month to make up the difference, at which time it is applied to the previous month causing the borrower to be past due and at risk of default. *Id.*

Had Ditech applied the $1,246.04 to the escrow account per the agreements, Mr. Bowen's escrow deficiency would not have been nearly what was alleged and Ditech would not be trying to collect an extra $47.28 per month over thirty-six months. *Id.* ¶ 92. Even if the $1,246.04 is found to be money technically owed on the loan, per the Loan Modification, it should not be owed as an escrow amount and definitely is not owed over a thirty-six-month period. *Id.* ¶ 93. It should have been added to the deferred principal of the loan to be paid at the end of the forty-year loan term in 2053. *Id.* Yet Ditech has now demanded these amounts be paid as escrow over thirty-six months and has actually placed the loan in default, and in jeopardy of foreclosure, for Mr. Bowen's failure to pay the full overstated monthly payment of $992.28 for March through June 2016. *Id.* ¶ 94. Because of Ditech's continuous threats of default and foreclosure, Mr. Bowen did start paying the inflated $992.28 per month in July 2016 and has paid this amount each month. *Id.* ¶ 95. The total

payments made by Mr. Bowen since March 2016 to the present should have been more than sufficient to keep the loan current. *Id.* ¶ 96.

Ditech had many chances to correct their misapplication of the capitalized amounts by performing an escrow analysis at the time the loan modification was booked to capture and capitalize the funds, at the time of the reinstatement to include any escrow advances in the quote, and shortly after the reinstatement, but it did not. *Id.* ¶ 97. No alleged escrow advances that would have equaled the escrow deficiency of -$1,702.16 were included in the May 2015 reinstatement quote in violation of Ditech's policies and Fannie Mae's Servicing Guide, section E-3.2-08. *Id.* ¶ 98. When Ditech finally did perform an escrow analysis and discovered a deficiency, it did not investigate the cause of the deficiency. *Id.* ¶ 99.

## I. Ditech's Continued Treatment of Loan as if in Default

On February 10, 2016, through counsel, Mr. Bowen sent a settlement demand letter to Ditech per MUTPA explaining the unfair and deceptive trade practices of the extra payments charged to and taken from Mr. Bowen's account in the amount of $35.70 each month and the inaccurate escrow deficiency. *Id.* ¶ 100. Ditech acknowledged receipt of the demand letter in a letter dated February 22, 2016. *Id.* ¶ 101.

Ditech failed to apply Mr. Bowen's February payment for March in the amount of $930.67 to the loan and instead placed it in suspense because it allegedly did not constitute a "full payment." *Id.* ¶ 102. Ditech reported a monthly payment due on March 1, 2016 of $992.28 on Mr. Bowen's online account. *Id.* ¶ 103. In a monthly billing statement dated March 7, 2016, Ditech alleged an amount due of $1,984.56

which included current and alleged past due payments due in the inflated monthly amounts of $992.28. *Id.* ¶ 104.

Mr. Bowen has made every payment due on time in the amount of at least $930.67 per the terms of the Loan Modification Agreement since reinstating his loan. *Id.* ¶ 105. In a letter dated March 17, 2016, Ditech stated that all maintenance has been completed on the loan to credit the overpayments and the escrow analysis was correct, including the alleged shortage and deficiency. *Id.* ¶ 106. Ditech stated that the final calculations determining the escrow shortage and deficiency were correct and that Mr. Bowen would owe an additional $47.28 per month for the alleged deficiency and $30.81 per month extra for the escrow shortage. *Id.*

On April 5, 2016, Mr. Bowen filed this current action. *Id.* ¶ 107. The implementation of the loan modification, along with the reinstatement payment, should have brought the loan current. *Id.* ¶ 108. Any alleged escrow advances should have either been capitalized into the modification or provided for in the reinstatement quote. *Id.* Ditech should have known about and corrected its error in misapplying the capitalized amounts at the time it calculated the reinstatement quote, at the time it performed the escrow analysis, and definitely after the demand letter was delivered in February 2016. *Id.* ¶ 109. Ditech did not conduct a proper investigation of the issue and therefore did not determine its error until sometime after the Complaint was filed in April 2016. *Id.* ¶ 110. Even upon its knowledge of the mishandling of the loan and escrow account, it did not correct the error and, to the date of the filing of the Amended Complaint, had not corrected the error. *Id.* ¶ 111. Instead, it is

passing its mistakes on to Mr. Bowen to fix by paying an escrow amount he should not have to be paying at all, especially over thirty-six months. *Id.* ¶ 112. Because of Ditech's mishandling of the escrow account, it is now billing Mr. Bowen at least an extra $34.59 per month that he otherwise should not have to pay. *Id.* ¶ 113. Mr. Bowen has paid at least $172.95 more than he should have had to pay on the loan ($34.59 x five months) and he continues to pay the $34.59 extra each month because he is terrified Ditech will again attempt to wrongfully foreclose on his home. *Id.* ¶ 114. Based on his payments from the date of reinstatement to the present, Mr. Bowen should be considered current on his loan. *Id.* ¶ 115. Ditech has put all monthly payments less than $992.28 in suspense and is treating Mr. Bowen's loan as if in default. *Id.* ¶ 116.

Since April, each monthly billing statement has alleged a past due amount on the account. *Id.* ¶ 117. In a letter dated April 1, 2016, Ditech offered loss mitigation assistance to Mr. Bowen, which included "information on avoiding foreclosure." *Id.* ¶ 118. In a letter to Mr. Bowen dated April 14, 2016, Ditech informed Mr. Bowen of loss mitigation options as an "alternative to foreclosure." *Id.* ¶ 119. In a letter dated May 2, 2016, Ditech offered loss mitigation assistance to Mr. Bowen which included "information on avoiding foreclosure." *Id.* ¶ 120. In a letter dated July 12, 2016, Ditech alleged Mr. Bowen was past due $1,984.56 and suggested connection with a homeownership counselor to explore home retention options. *Id.* ¶ 121. In a letter dated September 17, 2016, Ditech alleged Mr. Bowen was "past due." *Id.* ¶ 122. In a letter dated October 18, 2016, Ditech alleged Mr. Bowen was "past due." *Id.* ¶ 123.

All of these letters stated they were from a debt collector and were an attempt to collect a debt. *Id.* ¶¶ 118–23.

### J.  Emotional Distress

As a result of Ditech's conduct, Mr. Bowen has experienced severe emotional distress. *Id.* ¶ 127. During the conduct alleged in the previous matter against Green Tree, Mr. Bowen began taking medication to help him sleep and deal with the anxiety caused by Green Tree's conduct and the fear that he might lose his home. *Id.* After the settlement of the first matter with Green Tree, it took Mr. Bowen some time to feel relieved and trust that the loan was current. *Id.* It was not one month after his reinstatement of the loan that Green Tree started attempting to collect on alleged fees and charges from Mr. Bowen. *Id.* When Green Tree eventually admitted its mistake of attempting to collect the $37.50 each month in August 2015 after Mr. Bowen and his counsel's efforts to resolve the issue, Mr. Bowen began to feel relieved again. *Id.* He did not refill his prescription for the anti-depressant/sleep medication. *Id.*

However, Green Tree and Ditech's continued collection of fees not owed and misrepresentations about amounts owed and the status of his loan made Mr. Bowen anxious and fearful again. *Id.* He suffered shortness of breath and heart palpitations. *Id.* By the end of December into January 2016, Mr. Bowen felt increasingly anxious, depressed, and worried about his home. *Id.* He could not sleep and would lay awake wondering how this could be happening again and if he might really lose his house this time. *Id.* He would check his online account in the middle of the night, trying to

figure out Ditech's errors.  *Id.*  He had to take time off from work and, at times, struggled to get out of bed.  *Id.*  He spent less time with his children and became irritable and short-tempered.  *Id.*  Mr. Bowen became afraid that there would be a knock on the door from the sheriff with another foreclosure complaint even though he was making every payment on time each month as agreed.  *Id.*  He worried about his children and losing the home.  *Id.*  He started on the anti-anxiety, sleep medication again in February 2016 but still constantly worries about his home.  *Id.* He checks his account daily and pours over his statements and notices wondering what went wrong.  *Id.*  He has lacked focus at work and with his family because he is constantly plagued with the thought of losing his home.  *Id.*  He just could not believe that or understand why Ditech was mishandling his loan again.  *Id.*

## III.    LEGAL STANDARD

Rule 12(b)(6) requires dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  Under the general pleading standards, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  In *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), the United States Supreme Court elaborated on this pleading standard in the context of a motion to dismiss: "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

The First Circuit explained that "[t]he plausibility inquiry necessitates a two-step pavane." *García–Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013) (citing *Rodríguez–Reyes v. Molina–Rodríguez*, 711 F.3d 49, 53 (1st Cir. 2013)). "First, the court must distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" *Id.* (quoting *Morales–Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)). "Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678)).

## IV.  DISCUSSION

### A.  Barred Claims

The Defendants claim that the FDCPA, MFDCPA, MUTPA, fraud, and breach of fiduciary duty claims are barred as a matter of law. *Defs.' Mot.* at 2. Specifically, the Defendants assert that these claims are "based upon pre-settlement conduct and are, therefore, precluded by the terms of the Settlement Agreement [from the underlying foreclosure action]." *Id.* at 8. The Defendants contend that "[a]t a minimum, the claims should have been known to [Mr.] Bowen at the time he executed the settlement agreement and released all claims" and that "even if the claims or their factual basis were unknown to [Mr.] Bowen at the time he signed the settlement agreement, the claims are still barred" due to the broad wording of the release. *Id.* at 10. They argue that even if certain of the invoices on which Mr. Bowen relies for

his claim were issued after the settlement, the error that serves as the basis of Mr. Bowen's claim occurred pre-settlement. *Id.*

In response, Mr. Bowen asserts that he brings the claims not based upon mistakes Ditech made pre-settlement but rather based upon Ditech's attempts from June 2015 on, after the settlement, to collect on monies it was not owed and for Ditech's misrepresentations of an inflated escrow amount arising out of errors in the May 2015 reinstatement. *Pl.'s Opp'n* at 2–3. He also argues that the Settlement Agreement in the foreclosure action only released past and present claims up until the effective date of the Agreement but not future claims arising out of future misconduct. *Id.* at 3. He claims that the cases upon which Ditech relies deal with pre-existing claims that ripened into causes of action due to events subsequent to the releases, and distinguishes his claims, arguing that the underlying incidents at issue here all took place after the date of the release. *Id.* at 5.

As the Court noted above and pointed out at oral argument, the Defendants have not placed the Settlement Agreement before the Court for purposes of this motion. *Tr. of Oral Argument* at 6–8, *Mark A. Bowen v. Ditech Fin. LLC, f/d/b/a Green Tree Servicing LLC, & Fed. Nat'l Mortg. Ass'n*, No. 2:16-cv-00195-JAW (D. Me. argued Sep. 5, 2017) (*Tr. of Oral Argument*). As the Defendants acknowledged at oral argument, because the Defendants' argument on this issue is premised on "the terms of the Settlement Agreement", *Defs.' Mot.* at 8, the failure to place the terms of the Settlement Agreement before the Court precludes the dismissal of any of Mr. Bowen's claims solely on the basis that the Settlement Agreement bars such claims. *Tr. of*

*Oral Argument* at 6–8.  Accordingly, the Court dismisses this part of the Defendants'
motion to dismiss without prejudice.

## B.    Debt Collector

The FDCPA[2] defines a "debt collector" as "any person who uses any
instrumentality of interstate commerce or the mails in any business the principal
purpose of which is the collection of any debts, or who regularly collects or attempts
to collect, directly or indirectly, debts owed or due or asserted to be owed or due
another."   15 U.S.C. § 1692a(6).   "Creditors collecting on their own accounts are
generally excluded from the statute's reach."  *Chiang v. Verizon New Eng., Inc.*, 595
F.3d 26, 41 (1st Cir. 2010) (citing 15 U.S.C. § 1692a(6)(F)(ii)).   The term also does not
include persons attempting to collect such debts if the "debt was not in default" at the
time it was obtained by such person.   15 U.S.C. § 1692a(6)(F)(iii).   In other words,
when a debt is assigned, the FDCPA "treats assignees as debt collectors if the debt
sought to be collected was in default when acquired by the assignee, and as creditors
if it was not."  *Napolitano v. Green Tree Servicing, LLC*, No. 2:15-cv-00160-JAW, 2016
WL 447451, at *8, 2016 U.S. Dist. LEXIS 14122, at *24 (D. Me. Feb. 4, 2016) (quoting
*Schlosser v. Fairbanks Capital Corp.*, 323 F.3d 534, 536 (7th Cir. 2003)); *Beaulieu v.
Bank of Am. N.A.*, No. 1:14-cv-00023-GZS, 2014 WL 4843809, at *12 (D. Me. Sept. 29,

---

[2]      Mr. Bowen brings claims under both the Federal Fair Debt Collection Practice Act and the
Maine Fair Debt Collection Practices Act.  Because the MFDCPA tracks the language of the FDCPA,
the claims are analyzed under the same standard, and the Court refers collectively to the two statutes
as the "FDCPA" unless otherwise noted.  *See Shapiro v. Haenn*, 222 F. Supp. 2d 29, 44 (D. Me. 2002);
*Hamilton v. Fed. Home Loan Mortg. Corp.*, No. 2:13-cv-00414-JAW, 2014 WL 4594733, at *18 (D. Me.
Sept. 15, 2014) (analyzing the federal and state statutes together); *In re Martel*, 539 B.R. 192, 194 n.4
(Bankr. D. Me. 2015) ("The Maine FDCPA mirrors the federal Act, and therefore, my analysis applies
equally to each"); *Bank of Am., N.A. v. Camire*, 2017 ME 20, ¶ 13, 155 A.3d 416.

2014) (collecting cases). Courts have "look[ed] to any underlying contracts . . . governing the debt at issue" to determine whether it is in default. *Dionne v. Fed. Nat'l Mortg. Ass'n*, No. 15-cv-56-LM, 2016 WL 6892465, at *11 (D.N.H. Nov. 21, 2016) (quoting *De Dios v. Int'l Realty & Invs.*, 641 F.3d 1071, 1074 (9th Cir. 2016) (internal citation omitted).

A number of courts have determined Green Tree, during the course of its home-loan servicing activities, to be a debt collector for FDCPA purposes. *See, e.g., Ordonez v. Green Tree Servicing LLC*, No. 14-1284, 2016 U.S. Dist. LEXIS 88763, 2016 WL 3658684 (D. Nev. July 7, 2016); *Napolitano v. Green Tree Servicing, LLC*, No. 15-0160, 2016 U.S. Dist. LEXIS 14122, 2016 WL 447451 (D. Me. Feb. 4, 2016); *Adu v. Green Tree Servicing, LLC*, No. 15-0012, 2015 U.S. Dist. LEXIS 182947, 2015 WL 12777991 (N.D. Ga. Oct. 28, 2015); *Geary v. Green Tree Servicing, LLC*, No. 14-0522, 2015 U.S. Dist. LEXIS 35059, 2015 WL 1286347 (S.D. Ohio Mar. 20, 2015). Courts have rejected Green Tree's arguments to the contrary, including in a circumstance when the mortgage was not current at the time Green Tree acquired the servicing rights to the loan from the originator. *Grubb v. Green Tree Servicing, LLC*, 2017 WL 3191521 at *8 (D.N.J. Jul. 27, 2017) ("Significantly, Green Tree acquired the right to service Plaintiff's Mortgage *after* Plaintiff had defaulted on the loan. Indeed, Green Tree, by its own admission, concedes that 'Plaintiff was delinquent under the Loan at the time that Green Tree acquired the servicing rights from Bank of America' on May 1, 2013. Therefore, because the Mortgage was not current at the time of transfer,

Green Tree cannot claim creditor status simply because it provided Plaintiff with various loan mitigation options.") (emphasis in original) (citations omitted).

Ditech argues that it is not a debt collector as a matter of law, and therefore the FDCPA and MFDCPA claims fail. *Defs.' Mot.* at 11–12. It states that the FDCPA expressly exempts "loan servicers who obtain a debt prior to default" from the definition of "debt collector." Ditech argues that there was a superseding renegotiated payment plan in the form of the Modification Agreement, and because Mr. Bowen was not in default based on that agreement at the time of the service transfer, it is not a debt collector under the statute.

Mr. Bowen disputes Ditech's contention that the loan was not in default at the time of the service transfer. *Pl.'s Opp'n* at 7. He argues that the loan was in default during the Trial Period Plan and that the Modification Agreement did not become effective until July 1, 2013, but that servicing transferred to Green Tree, later Ditech, on June 1, 2013. *Id.* at 8. Moreover, Mr. Bowen argues that, irrespective of whether the loan was in default, Ditech treated the loan as if it was in default from the moment it acquired servicing rights. *Id.* at 9–10.

The Court agrees with Mr. Bowen. In 2012, Mr. Bowen fell behind on the loan and applied for a loan modification. *Am. Compl.* ¶¶ 26–27. BOA offered Mr. Bowen a Fannie Mae Trial Period Plan, which Mr. Bowen accepted. *Id.* ¶¶ 27–30. On May 30, 2013, Mr. Bowen received a permanent Fannie Mae Loan Modification Agreement. *Id.* ¶ 31. Green Tree began servicing the loan the next day, June 1, 2013. *Pl.'s Opp'n* at 8; *see also Defs.' Mot.* Attach. 4 *Notice of Service Transfer* (June 10,

2013).  At oral argument, Ditech acknowledged that the Trial Period Plan was still in effect at that time.  *Tr. of Oral Argument* at 22–23.  The Defendants are correct that generally, if a servicer is servicing a loan under a renegotiated plan, and the payments are timely under that new plan, the loan is not treated as if in default and the servicer is considered a creditor, exempt from the FDCPA's reach, rather than a debt collector.  *See Bailey v. Sec. Nat'l Servicing Corp.*, 154 F.3d 384, 387–88 (7th Cir. 1998) (holding that loan servicers were not debt collectors because the debt under superseding forbearance agreement was not in arrears at the time the servicers obtained it); *Dolan v. Fairbanks Capital Corp.*, 930 F. Supp. 2d 396, 415–16 (E.D.N.Y. 2013) (same).  However, in Mr. Bowen's case, the Loan Modification Agreement was not effective until July 1, 2013, after the transfer of service to Green Tree, and therefore the loan was still in default when Green Tree acquired service of the loan.  *See Am. Compl.* Attach. 3 *Loan Modification Agreement and Clarity Commitment* at 4.

In analogizing this case to *Bailey*, Defendants have also suggested that Mr. Bowen's loan was not in default under the Trial Period Plan, *Tr. of Oral Argument* at 22, and/or that the Trial Period Plan itself suspended the original loan's default status.  *Id.* at 28.  However, the relationship between the original loan and the subsequent agreement in *Bailey* is different than the one in this case.  In *Bailey*, the "renegotiated payment plan", specifically by its terms, "superseded" the original note. 154 F.3d at 386-87.  By contrast, here, the terms of the Trial Payment Plan entered into by Mr, Bowen suggest the opposite, noting that, other than the change in

monthly payment amount, "all other terms and provisions of your existing mortgage loan remain in effect and will not change until your loan is permanently modified."[3] *Defs.' Mot.* Attach. 1 *Trial Period Plan* at 2. It goes on to state, "You agree that all terms and provisions of your current mortgage note and mortgage security instrument remain in full force and effect and you will comply with those terms; and that nothing in the Trial Period Plan shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the loan documents." *Id.* at 5. The plain language of these terms contradicts Ditech's contention at oral argument that the mortgage note was not in effect. *Tr. of Oral Argument* at 30 ("[W]e're arguing that the note, the mortgage was basically not in effect and you're in default, they were suspended."). The Trial Period Plan did not supersede the original loan. Therefore, if Mr. Bowen was in default under the original loan, the Trial Period Plan did not change that status. Put differently, at the very least, the Court may not dismiss the Amended Complaint because there remains a disputed factual interweaving between the Trial Plan Period and the original loan.

Moreover, Mr. Bowen alleges that, regardless of the actual status of the mortgage note, Ditech treated the loan as if it was in default from the time it began servicing the loan. Courts have held that the definition of debt collector extends to any non-originating debt holder that treats the debt as if it were in default at the

---

[3]     The Trial Payment Plan reaffirms this in its "Frequently Asked Questions" section: "Note: This is only a temporary Trial Period Plan. Your existing loan requirements remain in effect and unchanged during the trial period and you will continue to receive monthly statements that will show the payment amount based on your original home loan agreement." *Defs.' Mot.* Attach. 1 *Trial Period Plan* at 3.

time of acquisition and during the servicing of the loan. *Bridge v. Ocwen Fed. Bank, FSB*, 681 F.3d 355, 362–63 (6th Cir. 2012); *Schlosser*, 323 F.3d at 538–39; *Gritters v. Ocwen Loan Servicing, LLC*, No. 14 C 00916, 2014 WL 7451682, at *4–5 (N.D. Ill. Dec. 31, 2014) (holding servicer was a debt collector because it treated account as if it was in default for over a year). Here, Mr. Bowen alleges that "Green Tree did not implement the loan modification and treated Mr. Bowen's loan as if it were in default when it began servicing the loan." *Am. Compl.* ¶ 39. He alleges that Green Tree did so by paying its own servicing fees, leaving a deficiency in the escrow account, initiating foreclosure in March 2014, and then continuing to allege an escrow deficiency and that the loan was in default two years later. *See id.* ¶¶ 39–49, 55, 86, 117–23.

Based on these allegations, Mr. Bowen has pleaded sufficient facts to demonstrate that Ditech is a "debt collector" under the FDCPA and MFDCPA.

## C. Fiduciary Duty

The Maine Supreme Judicial Court has described the elements of a fiduciary relationship as: (1) "'the actual placing of trust and confidence in fact by one party in another,' and (2) 'a great disparity of position and influence between the parties' at issue.'" *Bryan R. v. Watchtower Bible & Tract Soc'y of New York, Inc.*, 1999 ME 144, ¶ 19, 738 A.2d 839 (quoting *Morris v. Resolution Tr. Corp.,* 622 A.2d 708, 712 (Me. 1993)). To demonstrate the necessary disparity of position and influence in such a relationship, "a party must demonstrate diminished emotional or physical capacity or . . . the letting down of all guards and bars." *Camden Nat'l Bank v. Crest Const.,*

*Inc.*, 2008 ME 113, ¶ 13, 952 A.2d 213 (quoting *Stewart v. Machias Sav. Bank*, 2000 ME 207, ¶ 11, 762 A.2d 44); *see also Reid v. Key Bank of S. Me., Inc.*, 821 F.2d 9, 18 (1st Cir. 1987).

Standing alone, neither a creditor-debtor relationship nor a mortgagee-mortgagor relationship in and of itself establishes the existence of a confidential relationship. *Camden Nat'l Bank*, 2008 ME 113, ¶ 15; *see also Lariviere v. Bank of N.Y. as Trustee*, No. 9-515-P-S, 2010 WL 2399583, at *6 (D. Me. May 7, 2010) (dismissing claim because plaintiffs made no factual allegations regarding the placement of trust and confidence in loan servicers), *adopted by*, 2010 WL 2399556 (D. Me. June 11, 2010). However, as both parties acknowledge, Maine law suggests that a fiduciary relationship could arise between a creditor-debtor based on the creation and maintenance of an escrow account. *See Progressive Iron Works Realty Corp. v. E. Milling Co.*, 150 A.2d 760, 762 (Me. 1959) ("There is a fiduciary relationship created by and inherent in the nature of an escrow agreement"); *Hamilton v. Fed. Home Loan Mortg. Corp.*, No. 2:13-cv-00414-JAW, 2015 WL 144562, at *18 (D. Me. Jan. 12, 2015); *Crandall v. Bangor Sav. Bank*, No. CV-98-239, 1999 WL 35360329, at *2 (Me. Super. Ct. Nov. 4, 1999).

Although Ditech recognizes that an escrow agreement may give rise to a fiduciary relationship under Maine law, *Defs.' Mot.* at 15–16, it argues that the escrow agreement in this situation is different because Ditech had no discretion over the escrow account. *Id.* at 16–18. Ditech relies on cases from other jurisdictions that have distinguished general escrow agreements from escrow accounts set up to meet

tax and insurance obligations, such as the type of escrow account at issue here. *See, e.g.*, *Telfair v. First Union Mortg. Corp.*, 216 F.3d 1333, 1341–42 (11th Cir. 2000) (citing *Knight v. First Fed. Sav. & Loan Ass'n*, 260 S.E.2d 511, 515 (Ga. Ct. App. 1979)) (holding that, under Georgia law, funds paid by a mortgagor to an escrow account set up to meet tax and insurance obligations do not constitute trust properties such that it would render the mortgagee accountable for any earnings or profits from the funds); *Palestini v. Homecomings Fin., LLC*, No. 10CV1049-MMA, 2010 WL 3339459, at *5 (S.D. Cal. Aug. 23, 2010) (holding that under California law there is no fiduciary duty for escrow account when loan servicer is acting in its conventional role); *White v. Mellon Mortg. Co.*, 995 S.W.2d 795, 801 (Tex. 1999) ("Payment of funds by the mortgagor into an escrow account for the mortgagee's use to meet tax and insurance obligations on the property as they accrue does not create a trust or fiduciary relationship under Texas law") (citation omitted).

At the same time, courts in other jurisdictions have determined that escrow accounts similar to the one in this case do give rise to such a relationship. *See, e.g.*, *Dolan v. Fairbanks Capital Corp.*, 930 F. Supp. 2d 396, 421–22 (E.D.N.Y. 2013) (concluding that contractual language in mortgage requiring holder of note and mortgage to make specified payments, including tax payments, from the escrow funds gives rise to a fiduciary duty).

The Court is skeptical that a mortgagee who holds a mortgagor's money on the promise to pay those funds to a third entity, whether it be a taxing authority or insurance company, does not hold the mortgagor's funds in trust. At least on its face,

applying the Maine Supreme Judicial Court's guidance in *Bryan R.*, the mortgagor actually places trust and confidence in the mortgagee and there is a great disparity of position and influence between a residential mortgagor and an institutional or governmental lender. *Bryan R.*, 1999 ME 144, ¶ 19, 738 A.2d 839. Furthermore, a mortgagee's failure to comply with the terms of the escrow agreement by timely paying the mortgagor's taxes and insurance, could have a direct and consequential impact on the mortgagor. But the Court need not resolve the issue.

This is because the Court must apply Maine law in resolving this issue and Maine law, as it stands, does not distinguish among various types of escrow accounts in determining whether an escrow agreement gives rise to a fiduciary relationship, *see Progressive Iron Works*, 150 A.2d at 762, and "[f]ederal court is not the place to make new state law." *Town & Country Motors, Inc. v. Bill Dodge Auto. Grp., Inc.*, 115 F. Supp. 2d 31, 33 (D. Me. 2000); *see also Ramirez v. DeCoster*, 194 F.R.D. 348, 360 n.19 (D. Me. 2000) ("[A] federal court is not the forum to develop an extension of state law."); *Douglas v. York County*, 433 F.3d 143, 149 (1st Cir. 2005) ("It is not our role to expand Maine law; that is left to the courts of Maine.") Defendants do not dispute this principle. *Tr. of Oral Argument* at 32–33.

Furthermore, Ditech's argument requires a close analysis of the facts surrounding the escrow agreement and the level of discretion afforded to Ditech, which is better suited for resolution either at the summary judgment stage or later by a factfinder. Mr. Bowen has alleged that BOA created an escrow account, which gave rise to fiduciary obligations, that Ditech assumed responsibility over the escrow

account when service was transferred, and that Ditech mismanaged the escrow account in several respects. *Am. Compl.* ¶¶ 171–83. Therefore, he has pleaded sufficient facts to survive the Defendants' motion to dismiss. The Court denies Ditech's motion to dismiss Count VI.

### D. RESPA

Pursuant to RESPA:

> If any servicer of a federally related mortgage loan receives a qualified written request from the borrower (or an agent of the borrower) for information relating to the servicing of such loan, the servicer shall provide a written response acknowledging receipt of the correspondence within 5 days . . . unless the action requested is taken within such period.

12 U.S.C. § 2605(e)(1)(A). Not later than thirty days after the receipt of the QWR, the servicer is required to make appropriate corrections in the account, or, after conducting an investigation, provide a written explanation of why the account is correct or the requested information is unavailable. *Id.* § 2605(e)(2). A QWR is defined as "written correspondence, other than notice on a payment coupon" that states the name and account number of the borrower and includes a statement of the reasons that the borrower believes the account is in error. *Id.* § 2605(e)(1)(B).

Ditech argues that Mr. Bowen's RESPA claims should be dismissed because the second QWR was sent to the wrong address and is therefore not actionable. *Defs.' Mot.* at 12–14. Alternatively, Ditech argues that Mr. Bowen has failed to allege any damages causally connected to Ditech's allegedly inadequate responses to the QWRs. *Id.* at 14–15. Mr. Bowen disagrees, arguing that at least one of the QWRs is

actionable and that he has pleaded sufficient facts to support his claim for damages. *Pl.'s Opp'n* at 15–17.

### 1.    Designated Address

Regulation X, RESPA's implementing regulation, provides that "[a] servicer may, by written notice provided to a borrower, establish an address that a borrower must use to submit a notice of error . . . ." 12 C.F.R. § 1024.35(c).  Courts are split as to whether this language adds the additional substantive requirement that a written request be sent to a designated location before qualifying as a QWR, thereby triggering the servicer's obligation to respond.  *See McMillen v. Resurgent Capital Servs., L.P.*, No. 2:13-cv-00738, 2015 WL 5308236, at *6 (S.D. Ohio Sept. 11, 2015) (providing an overview of the split on this issue).  The First Circuit has not addressed this part of the regulation.  However, a majority of federal courts has held that sending a QWR to an address other than the designated address for receipt and handling does not trigger the servicer's duty to respond under RESPA, even if a servicer does in fact receive the QWR.  *Roth v. CitiMortgage, Inc.*, 756 F.3d 178, 182 (2d Cir. 2014); *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1148–49 (10th Cir. 2013); *Warren v. Green Tree Servicing, LLC*, No. 14-cv-02241-PAB-CBS, 2015 WL 9259454, at *5 (D. Colo. Dec. 18, 2015); *Bally v. Homeside Lending, Inc.*, No. 02 C 5799, 2005 WL 2250856, at *3 (N.D. Ill. Sept. 8, 2005).  These courts reason that the regulation envisioned that only certain communications would create liability, *Berneike*, 708 F.3d at 1149, and they point to the final rulemaking notice for Regulation X which explained that if a servicer establishes a designated QWR

address, "then the borrower must deliver its request to that office in order for the inquiry to be a 'qualified written request.'" *Roth*, 756 F.3d at 181 (quoting Real Estate Settlement Procedures Act, Section 6, Transfer of Servicing of Mortgage Loans (Regulation X), 59 Fed. Reg. 65,442, 65,446 (Dec. 19, 1994)).

A minority of courts has held that Regulation X does not require a borrower to send QWRs to the designated address. These courts instead focus their inquiry on whether the servicer actually received the borrower's correspondence. *Schatzman v. Partners for Payment Relief, LLC*, No. 1:15-cv-302, 2016 WL 51224, at *5 (S.D. Ohio Jan. 5, 2016) ("The 'receipt' of a QWR, not the address to which it is mailed, triggers the statutory requirements under RESPA."); *Benner v. Bank of Am., NA*, 917 F. Supp. 2d 338, 363–65 (E.D. Pa. 2013); *Vought v. Bank of Am., NA*, No. 10-2052, 2010 WL 4683599, at *5 (C.D. Ill. Sept. 24, 2010), *adopted by*, 2010 WL 4683596 (C.D. Ill. Oct. 27, 2010). These courts analyze the plain language of the statute, which indicates that receipt triggers the servicer's duty to respond. *McMillen*, 2015 WL 5308236, at *6; *see also* 12 U.S.C. § 2605(e)(1)(A) ("If any servicer of a federally related mortgage loan *receives* a qualified written request from the borrower (or an agent of the borrower) for information relating to the servicing of such loan, the servicer shall provide a written response acknowledging receipt of the correspondence within 5 days . . .") (emphasis added).

The Court need not resolve this issue. Mr. Bowen alleges that he sent two QWRs: the first one on April 3, 2015 and the second on November 3, 2015. *Am. Compl.* ¶¶ 150, 157. It may very well be that Mr. Bowen failed to send the second

QWR to the designated address, and therefore Ditech's duties with respect to that QWR were never triggered, although the Court is dubious of this argument. *See Nash v. Green Tree Servicing, LLC*, 943 F. Supp. 2d 640, 651 (E.D. Va. 2013). In any event, Mr. Bowen alleges that he sent the first QWR to the designated address and Ditech did not respond within the statutory period. *See Am. Compl.* ¶¶ 150–52. As Ditech acknowledged at oral argument, this allegation alone supports a claim under RESPA. *Tr. of Oral Argument* at 37-38.

### 2. Damages

Pursuant to RESPA, if a servicer fails to appropriately respond to a QWR, the borrower may recover (1) actual damages resulting from the servicer's failure, and (2) statutory damages in an amount not to exceed $2,000 in the case of a pattern or practice of noncompliance with the requirements of the law. 12 U.S.C. § 2605(f).

### a. Actual Damages

Although the First Circuit has not addressed the requirements for pleading actual damages under RESPA, other courts have held that in order to survive a motion to dismiss, a plaintiff must plead sufficient facts to show that he suffered actual, demonstrable damages and that the damages occurred as a result of the specific violation. *Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1246 (11th Cir. 2016); *Toone v. Wells Fargo Bank, N.A.*, 716 F.3d 516, 523 (10th Cir. 2013); *Hintz v. JPMorgan Chase Bank, N.A.*, 686 F.3d 505, 511 (8th Cir. 2012); *see also Moore v. Mortg. Elec. Registration Sys., Inc.*, 848 F. Supp. 2d 107, 122 (D.N.H. 2012); *Okoye v. Bank of N.Y. Mellon*, No. 10-11563-DPW, 2011 WL 3269686, at *17 (D. Mass. July

28, 2011).  Courts have interpreted the statutory term "actual damages" to include not only pecuniary losses but also damages for emotional distress, humiliation, or mental anguish.  *Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 696 (7th Cir. 2011); *McLean v. GMAC Mortg. Corp.*, 398 F. App'x 467, 471 (11th Cir. 2010); *see also Moore*, 848 F. Supp. 2d at 123.

In this case, Mr. Bowen has pleaded sufficient facts to suggest that he has suffered emotional distress and that his distress was caused by Ditech's RESPA violations.  He explains that he felt relieved after "his counsel's efforts to resolve the issue" and after Ditech eventually admitted to the violations, which the Court  infers refers to the initial QWR sent by his counsel.  *See Am. Compl.* ¶¶ 127, 150–54. However, Mr. Bowen explains that after Ditech failed to correct the error, continued to collect fees not owed, and failed to investigate his claims appropriately as it was required to do under RESPA, he grew anxious and fearful again.  *See id.* ¶ 127.  These facts are sufficient to suggest that his emotional distress was caused by, or was a result of, Ditech's RESPA violations.

### b.    Statutory Damages

Additionally, Mr. Bowen has pleaded sufficient facts to demonstrate a claim for statutory damages.  Mr. Bowen claims that Ditech violated RESPA by failing to acknowledge receipt of the first QWR, failing to perform a thorough investigation of the error, failing to correct the error by continuing to collect improper fee, and failing to provide an escrow history within ninety days of the loan reinstatement.  *Am. Compl.* ¶ 168.  These allegations are sufficient to demonstrate a pattern or practice

of RESPA violations. *Compare Long v. Residential Credit Sols., Inc.*, No. 9:15-cv-80590-ROSENBERG, 2015 WL 4983507, at *2 (S.D. Fla. Aug. 21, 2015) (one violation insufficient); *McLean v. GMAC Mortg. Corp.*, 595 F. Supp. 2d 1360, 1365 (S.D. Fla. 2009) (two violations insufficient), *with Ploog v. HomeSide Lending, Inc.*, 209 F. Supp. 2d 863, 868–69 (N.D. Ill. 2002) (five violations sufficient).

### E.    Claims Against Fannie Mae

Finally, Ditech argues that, even assuming that the claims survive against Ditech, there are no allegations in the Amended Complaint sufficient to support any of the claims against Fannie Mae. *Defs.' Mot.* at 18.  It further argues that Mr. Bowen cannot base his theory of liability for Fannie Mae on vicarious liability under either the FDCPA or RESPA.  *Id.* at 18–19.

The Court agrees that each of Mr. Bowen's allegations concerns the direct conduct of Ditech, not Fannie Mae.  *Am. Compl.* ¶¶ 128–84.  However, Mr. Bowen does allege that Fannie Mae hired Ditech to service the loan and that Fannie Mae and Ditech had a principal-agent relationship.  *Id.* ¶¶ 11–14.  Caselaw in the First Circuit supports Mr. Bowen's position.  *See R.G. Fin. Corp. v. Vergara–Nuñez*, 446 F.3d 178, 187 (1st Cir. 2006) ("Typically, a mortgage servicer acts as the agent of the mortgagee to effect collection of payments on the mortgage loan").  Therefore, as long as Mr. Bowen's claims can be supported by principles of agency law or vicarious liability, they will survive.

At the same time, the law is fairly clear that there is no vicarious liability under the FDCPA for non-debt collectors. *Chiang v. Verizon New Eng., Inc.*, No. 06-

cv-12144-DPW, 2009 WL 102707, at *5 (D. Mass. Jan. 13, 2009) (citing *Wadlington v. Credit Acceptance Corp.*, 76 F.3d 103, 108 (6th Cir. 1996)); *see also Doucette v. GE Capital Retail Bank*, No. 14-cv-012-LM, 2014 WL 4562758, at *2–3 (D.N.H. Sept. 15, 2014); *Ricciardi v. Serv. Credit Union*, No. 06-cv-092-JD, 2006 U.S. Dist. LEXIS 28468, at *6 (D.N.H. May 11, 2006) ("Because the FDCPA applies only to 'debt collectors,' however, courts have consistently rejected attempts to impose FDCPA liability on a creditor for the actions of those who collect its debts based on respondeat superior or similar theories"). Because Mr. Bowen agreed at oral argument that there is no vicarious liability as to Fannie Mae under the FDCPA and MFDCPA, *Tr. of Oral Argument* at 39, the Court dismisses Counts III and IV with respect to Fannie Mae.

The law is less clear with respect to vicarious liability under RESPA. RESPA's provisions requiring loan servicers to respond to borrower inquiries, under which Mr. Bowen brings his claims, explicitly apply to "loan servicers." 12 U.S.C. § 2605(e). Defendants suggest that this indicates a shield from liability for entities that do not meet the statute's definition of "loan servicer," similar to the FDCPA's requirement that an entity must be a "debt collector" in order to be liable. Based on this reasoning, some courts have dismissed claims against non-loan-servicers under RESPA. *See, e.g.*, *Castrillo v. Am. Home Mortg. Servicing, Inc.*, No. 09-4369, 2010 WL 1424398, at *7 (E.D. La. Apr. 5, 2010) (granting summary judgment on RESPA claim against trustee of loan servicer because it was not itself a loan servicer under the statute). Other courts have stated that there is no language in RESPA to support a conclusion that the ordinary rules of vicarious liability do not apply, and they have pointed to

the fact that RESPA provides that "[w]hoever" violates a statutory requirement may be held civilly liability. *See, e.g.*, *Rouleau v. U.S. Bank N.A.*, No. 14-cv-568-JL, 2015 WL 1757104, at *6–8 (D.N.H. Apr. 17, 2015); *see also* 12 U.S.C. § 2605(f). Given the uncertainty of the law on this issue, the Court concludes that Mr. Bowen has pleaded a plausible claim for relief against Fannie Mae, and therefore it denies the motion to dismiss as to the RESPA claim against Fannie Mae.

With respect to the UTPA and common law claims, the Defendants concede that vicarious liability is possible pursuant to general principles of principal-agent law. *Tr. of Oral Argument* at 41. The Court agrees and therefore denies the motion to dismiss these counts against Fannie Mae. *See Advanced Constr. Corp. v. Pilecki*, 2006 ME 84, ¶ 16, 901 A.2d 189 ("In an action for tortious conduct of an agent, both agent and the principal can be held liable. Actions pursuant to the UTPA and actions for unlawful and deceptive conduct sound in tort.") (internal citations omitted); *Dupuis v. Fed. Home Loan Mortg. Corp.*, 879 F. Supp. 139, 143–44 (D. Me. 1995) (holding that FHLMC is the principal for Fidelity (who serviced the note), and therefore FHLMC is liable for Fidelity's wrongdoing in breach of contract claim); *see also In re Hart*, 246 B.R. 709, 736 (Bankr. D. Mass. 2000) (holding Fannie Mae vicariously liable for unfair trade practices that violated Chapter 93A).

## V.     CONCLUSION

The Court GRANTS in part and DENIES in part the Defendants' Motion to Dismiss First Amended Complaint (ECF No. 66). The Court GRANTS the motion to

dismiss Counts III and IV with respect to Fannie Mae only. The Court DENIES the

remainder of the motion.

    SO ORDERED.

                /s/ John A. Woodcock, Jr.
                JOHN A. WOODCOCK, JR.
                UNITED STATES DISTRICT JUDGE

Dated this 19th day of September, 2017