## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| MARK A. BOWEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:16-cv-00195-JAW |
| | ) | |
| DITECH FINANCIAL LLC, f/d/b/a/ | ) | |
| GREEN TREE SERVICING LLC, | ) | |
| and FEDERAL NATIONAL | ) | |
| MORTGAGE ASSOCIATION, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Mark A. Bowen brings this action against the servicer and owner of his mortgage note and loan claiming that the loan servicer engaged in repeated, coercive, and harassing attempts to collect money not owed by him two months after settling previous allegations of unfair debt collection practices and one month after reinstating the modified loan. Both parties move for summary judgment on all counts. The Court grants in part and denies in part the Plaintiff's Motion for Summary Judgment (ECF No. 83). The Court grants in part and denies in part the Defendants' Motion for Summary Judgment (ECF No. 86).

## I.    PROCEDURAL HISTORY

On April 5, 2016, Mark A. Bowen filed a complaint in this Court against Ditech Financial LLC (Ditech), f/d/b/a Green Tree Servicing LLC (Green Tree) and the Federal National Mortgage Association (Fannie Mae). *Compl.* (ECF No. 1). On June

3, 2016, Ditech and Fannie Mae answered the Complaint. *Defs.' Answer and Affirmative Defenses* (ECF No. 11). On November 18, 2016, Mr. Bowen moved for leave to amend his Complaint due to newly discovered facts and evidence, *Pl.'s Mot. for Leave to Amend Compl.* at 1 (ECF No. 25), which the Court granted without objection on December 13, 2016. *Order* (ECF No. 28). Mr. Bowen filed the First Amended Complaint on December 14, 2016. *First Am. Compl.* (ECF No. 29) (*Am. Compl.*). The Amended Complaint contains six counts: Count I—Fraud and Fraudulent Misrepresentation; Count II—violations of the Maine Unfair Trade Practices Act (MUTPA), 5 M.R.S. §§ 205-A *et seq.*; Count III—violations of the Maine Fair Debt Collection Practices Act (MFDCPA), 32 M.R.S. §§ 11001 *et seq.*; Count IV—violations of the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. §§ 1692 *et seq.*; Count V—violations of the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. §§ 2601 *et seq.*; and Count VI—Breach of Fiduciary Duty. *Id.* at 19–30.

On March 10, 2017, Mr. Bowen filed a motion for summary judgment, *Pl. Mark A. Bowen's Mot. for Summ. J.* (ECF No. 83) (*Pl.'s Mot.*), with a statement of facts. *Pl.'s Statement of Undisputed Material Facts* (ECF No. 85) (PSMF). On March 29, 2017, the Defendants filed a response to Mr. Bowen's statement of facts, *Resp. to Pl.'s Statement of Undisputed Material Facts and Additional Material Facts* at 1–8 (ECF No. 95) (DRPSMF), and a set of additional material facts. *Id.* at 8–9 (DSAMF). The following day, the Defendants opposed Mr. Bowen's motion for summary judgment. *Defs.' Opp'n to Pl. Mark A. Bowen's Mot. for Summ. J.* (ECF No. 97) (*Defs.' Opp'n*).

On April 12, 2017, Mr. Bowen replied. *Pl.'s Reply to Defs.' Opp'n to Pl.'s Mot. for Summ. J.* (ECF No. 101) (*Pl.'s Reply*).

On March 10, 2017, the Defendants filed a cross-motion for summary judgment, *Defs.' Mot. for Summ. J.* (ECF No. 86) (*Defs.' Mot.*), and the stipulated record. *Joint Statement of Stipulated Facts* (ECF No. 81) (*Stip.*). They also requested oral argument. *Mot. for Oral Arg./Hr'g* (ECF No. 87). On March 29, 2017, Mr. Bowen responded to the Defendants' motion for summary judgment, *Pl. Mark A Bowen's Opp'n to Defs.' Mot. for Summ. J.* (ECF No. 93) (*Pl.'s Opp'n*), and on April 12, 2017, he filed a response to the Defendants' statement of additional material facts. *Pl.'s Reply to Defs.' Requests to Strike and Resps. to Defs.' Statement of Additional Material Facts* (ECF No. 102) (PRDSAMF). The Defendants replied on April 12, 2017. *Ditech Financial LLC and Federal National Mortgage Association's Reply Br.* (ECF No. 103) (*Defs.' Reply*).[1]

---

[1]     Mr. Bowen argues that because the Defendants' summary judgment motion and opposition exceed the allowed number of pages under Local Rule 7(e), the Court should strike the excess pages and exclude them from consideration. *Pl.'s Opp'n* at 4; *Pl.'s Reply* at 1 n.1. In response, the Defendants claim that they submitted a pre-filing statement estimating the length of their motion to be twenty-five pages, that Mr. Bowen estimated his motion to be thirty pages, that the parties discussed the issue at the pre-filing conference, and that they believed there was an agreement that the page limit would be thirty pages. *Defs.' Reply* at 1 n.1; *see also Ditech Financial LLC f/d/b/a Green Tree Servicing LLC and Federal National Mortgage Association Pre-Conference Filing* at 7 (ECF No. 49); *Pl.'s Pre-Filing Conference Mem.* at 7 (ECF No. 50).

    It is true that the Defendants exceeded the Court's twenty-page limit on dispositive motions without formally filing a motion to exceed the page limitation. *See* D. ME. LOC. R. 7(e). This Court's typical practice, when an attorney violates the three-day requirement of Local Rule 7(e) for the first time, is to overlook the transgression, while admonishing counsel to comply in the future. *Hearts with Haiti, Inc. v. Kendrick*, No. 2:13-cv-00039-JAW, 2013 WL 5729533, at *3 (D. Me. Oct. 22, 2013) (citing *Myfreemedicine.com v. Hasler*, No. 08–362–P–W, 2009 WL 1025526, at *11 n.2 (D. Me. Apr. 14, 2009)).

    The Defendants should have moved to exceed the page limit. However, given the fact that this is the first time the Defendants exceeded the limit, the fact that both parties estimated that they would exceed the page limit in their pre-filing memoranda, and the Defendants' representation that they believed an agreement on exceeding page limits had been reached at the pre-filing conference, the Court DENIES Mr. Bowen's request to strike the excess pages.

On April 18, 2017, the Court granted the motion for oral argument and on September 5, 2017, held oral argument on the pending motions. *Order Granting Mot. for Oral Arg.* (ECF No. 105); *Min. Entry* (ECF No. 112).

## II.   STATEMENT OF FACTS

### A.   Background

On December 20, 2005, Mr. Bowen and his now ex-wife, Nancy E. Bowen, signed a promissory note in the principal amount of $204,422.00 payable to Bank of America, N.A. (BOA) and a mortgage granting BOA a security interest on property located at 17 Orchard Lane, Minot, Maine 04258. *Stip.* ¶ 1. Mr. Bowen still resides at the property. *Stip.* ¶ 3.

Since December 20, 2005, Fannie Mae has been the owner and investor of the note and mortgage. *Stip.* ¶ 4. Originally, BOA was the servicer of the note and mortgage. *Stip.* ¶ 2. The mortgage requires BOA to maintain an escrow account to

pay for real estate taxes and hazard insurance.  PSMF ¶ 1; DRPSMF ¶ 1;[2] PSMF ¶ 2; DRPSMF ¶ 2.[3]

---

[2]      This statement originally read: "Upon execution of the mortgage on December 20, 2005, an escrow account was established as part of the loan for real estate taxes and hazard insurance."  PSMF ¶ 1.  The Defendants deny the statement, arguing that section 3 of the mortgage "provides the Lender a discretionary right to establish an escrow account," and state that "Plaintiff has submitted no evidence when an escrow account was 'created.'"  DRPSMF ¶ 1.

Section 3 of the mortgage is labelled "Monthly Payments for Taxes and Insurance."  *Stip.* Attach. 2 *Mortgage* at 5, ¶ 3.  Subsection a is labelled "Borrower's Obligations" and states:

> I will pay to Lender all amounts necessary to pay for taxes, assessments, ground leasehold payments or rents (if any), hazard or property insurance covering the Property, flood insurance (if any), and any required Mortgage Insurance, or a loss reserve . . . Each Period Payment will include an amount to be applied toward the payment of the following items, which are called "Escrow Items:"
> (1) The taxes, assessments and other items which under the Applicable Law may be or become superior to this Security Instrument as a lien on the Property. Any claim, demand or charge that is made against property because an obligation has not been fulfilled is known as a "lien;"
> (2) The leasehold payment or Ground Rents on the Property (if any);
> (3) The premium for insurance covering the Property . . .;
> (4) The premium for Mortgage Insurance (if any); and
> (5) If Lender requires, Community Association Dues, Fees, and Assessments.
> After signing of the Note, or at any time during its term, Lender may include these amounts as Escrow Items.  The monthly payment that I will make for Escrow Items will be based on Lender's estimate of the annual amount required.

*Id.* ¶ 3(a).  The mortgage labels the amounts paid to the Lender for the Escrow Items as "Funds" and under the "Lender's Obligations" the mortgage states:

> Lender will keep the Funds in a savings or banking institution which has its deposits insured by a federal agency, instrumentality, or entity, or in any Federal Home Loan Bank.  If Lender is such a savings or banking institution, Lender may hold the Funds. Lender will use the Funds to pay the Escrow Items.

*Id.* ¶ 3(b).  The "Lender" under the mortgage is BOA.  *Id.* at 2.

The Defendants are technically correct that nothing in the mortgage expressly establishes an escrow account at that time or specifies when one would be created.  But it is a picky point.  The Defendants have not disputed that Mr. Bowen did, in fact, make escrow payments, and BOA's own monthly statements confirm that BOA maintained Mr. Bowen's funds in an escrow account, reporting his "escrow balance."  *See, e.g., Stip.* Attach. 8 *BOA Billing Statement* at 1, 5 (May 30, 2014) (*May 2013 Statement*).  So the Court is unclear why Ditech is quibbling.

Still, the Court acknowledges that there is no evidence of exactly when BOA established the escrow account, and therefore the Court removes that date from the statement of facts.

[3]      The Defendants deny this statement, which originally read: "[BOA], as servicer of the loan, maintained the escrow account on the loan."  DRPSMF ¶ 2.  The Defendants state again that the cited mortgage provides the Lender a discretionary right to establish an escrow account and that Mr. Bowen "has submitted no evidence that [BOA] maintained an escrow account."  *Id.*

As just discussed, the record demonstrates that BOA established an escrow account at some point.  BOA, as the "Lender" under the mortgage, was obligated to maintain that account by keeping the funds in a federally insured savings or banking institution.  *See supra* note 2.  The Court rejects the denial.

## B. Loan Modification Agreement

In early 2013, Mr. Bowen defaulted under the terms of the note by failing to make his monthly payments, and he requested a loan modification. *Stip.* ¶¶ 6–7. BOA offered Mr. Bowen a Fannie Mae Trial Period Plan (TPP). *Stip.* ¶ 8. The TPP required Mr. Bowen to make three payments in the amount of $928.24 on March 1, 2013, April 1, 2013, and May 1, 2013. *Stip.* Attach. 4 *Fannie Mae Trial Period Plan* at 1 (Feb. 5, 2013) (*TPP*). Mr. Bowen accepted the offer by making all three payments on time, and BOA sent him a Loan Modification Agreement. *Stip.* ¶ 9; DSAMF ¶ 5; PRDSAMF ¶ 5.[4],[5]

BOA delivered a Loan Modification Clarity Commitment dated May 30, 2013 to Mr. Bowen. *Stip.* ¶ 10. The Clarity Commitment stated:

---

[4]     The Defendants seek to include the additional material fact that "[o]n June 1, 2013, [Mr.] Bowen made all three payments timely pursuant to the Fannie Mae Trial Period Plan." DSAMF ¶ 5. Mr. Bowen qualifies this statement, explaining that "Mr. Bowen made the three [TPP] payments on the dates they were due, not all on June 1, 2013." PRDSAMF ¶ 5.

     In support of their statement, the Defendants cite Mr. Bowen's deposition transcript in which he states that he "made the three payments correctly." *Add'l Attachs.* (ECF No. 84) Attach. 18 *Dep. of Mark A. Bowen* 71:15-16 (*Bowen Dep.*). They also cite the Modification Agreement. However, the Modification Agreement does not say when Mr. Bowen made his payments; it simply provides the terms of the modified loan *after* Mr. Bowen made his payments. *Stip.* Attach. 5 *Fannie Mae Loan Modification Agreement* (*Modification Agreement*). The TPP states that the first payment was due by March 1, 2013, the second by April 1, 2013, and the third by May 1, 2013. *TPP* at 1. Based on this document, and Mr. Bowen's own testimony that he "made the three payments correctly," the Court agrees with Mr. Bowen that he did not make all of the payments on June 1, 2013; rather, he made the payments on time. The Court adjusts the statement accordingly.

[5]     The Defendants seek to include the statement: "On June 1, 2013, [Mr.] Bowen was not in default of the [TPP]." DSAMF ¶ 6. In response, Mr. Bowen admits that he made all three payments on time pursuant to the TPP but denies any categorization of his being in default on a plan that did not bring him current in the first place as "confusing and ambiguous and as a legal conclusion." PRDSAMF ¶ 6.

     The Court agrees with Mr. Bowen that whether he was in default on the loan as of June 1, 2013, the dates of the transfer of service, is central to whether Ditech is a "debt collector" under the FDCPA, and requires legal analysis of the underlying documents in place at the time of the modification. *See Dionne v. Fed. Nat'l Mortg. Ass'n*, No. 15-cv-56-LM, 2016 WL 6892465, at *11 (D.N.H. Nov. 21, 2016) (looking to "any underlying contracts . . . governing the debt at issue" to determine whether it is in default). The fact that Mr. Bowen made the TPP payments on time is already reflected in the record. Therefore, the Court excises the additional statement.

Your new loan balance is $217,698.87. To calculate this new loan balance, we added past due interest in the amount of $8,202.81 and eligible servicing expenses of $26,662.46 and taxes and insurance of $3,630.70 totaling $38,495.97 to your principal balance. Unpaid late fees are not included in this amount and will be waived when your loan modification is finalized.

*Stip.* Attach. 6 *Loan Modification Clarity Commitment* (May 30, 2013) (*Clarity Commitment*). BOA also issued a billing statement dated May 30, 2013 that showed that Mr. Bowen's negative escrow balance was -$3,763.20. *Stip.* ¶ 13; *id.* Attach. 8 *BOA Billing Statement* at 1 (May 30, 2013) (*May 2013 Statement*); DSAMF ¶¶ 3–4; PRDSAMF ¶¶ 3–4.[6]

Mr. Bowen signed the Modification Agreement on June 3, 2013 and returned it to BOA. *Stip.* ¶ 11. The payment schedule for the modified loan was as follows:

Maturity Date: 06/01/2053
Interest Rate: 4.000%
New Principal Balance: $217,698.87
Deferred Principal Balance: $65,309.66
Interest Bearing Principal Balance: $152,389.21
First Modified Payment Due Date: 07/01/2013
Number of Monthly Payments: 480
Monthly Principal and Interest Payment: $636.89
Estimated Monthly Escrow Payment: $293.78
**Total Monthly Payment: $930.67**

---

[6]     The Defendants seek to include the statements that on May 30, 2013, Mr. Bowen owed BOA for taxes and insurance that BOA had paid on his behalf, in other words the negative escrow balance, and that the negative escrow balance was in the amount of $3,763.20. DSAMF ¶¶ 3–4. Mr. Bowen qualifies these statements:

> Admit that the statement, Exhibit I, speaks for itself in that it states there was an escrow balance of -$3,763.20 on Mr. Bowen's account. This statement, however, contradicts another Bank of America statement on the same date, SOF Ex. G, which states that there was $3,630.70 due for taxes and insurance.

PRDSAMF ¶¶ 3–4.

The Court agrees that the Clarity Commitment and billing statement, both dated May 30, 2013, provide different amounts owed for the escrow balance. *Compare Clarity Commitment*, *with May 2013 Statement*. The Court also agrees that the documents speak for themselves and includes the information as stated in both documents.

*Stip.* Attach. 5 *Fannie Mae Loan Modification Agreement* at 3–4 (*Modification Agreement*) (emphasis supplied).  The Effective Date of the Modification Agreement was July 1, 2013.  *Id.* at 3.

## C.     Transfer of Service to Ditech

BOA service-transferred the loan to Ditech[7] effective June 1, 2013.  *Stip.* ¶ 12. Fannie Mae owned the loan and retained Ditech to service the loan.  PSMF ¶ 3; DRPSMF ¶ 3.[8]  As servicer of the loan, Ditech maintained the escrow account to pay taxes and insurance on behalf of Fannie Mae.  PSMF ¶ 4; DRPSMF ¶4.[9]  Since the date of service transfer, Ditech has paid Mr. Bowen's taxes and insurance.  *Stip.* ¶ 68.

---

[7]     On or around August 31, 2015, Mr. Bowen received notice that Green Tree became known as Ditech.  *See Stip.* ¶ 40.  Therefore, for ease of reference, the Court refers to Green Tree as Ditech unless otherwise noted.

[8]     The Defendants qualify this statement.  The Defendants admit that Fannie Mae owned the loan and retained Ditech to service the loan but state that Fannie Mae did so "as an independent contractor and not an agent, assignee or representative of Fannie Mae."  DRPSMF ¶ 3.  The Defendants cite a portion of the Fannie Mae Servicing Guide to support their qualification.  *Id.* Attach. 1 *Servicing Guide* (Feb. 15, 2017).

The language in the Servicing Guide states that "[t]he servicer services Fannie Mae mortgage loans as an independent contractor and not as an agent, assignee, or representative of Fannie Mae." *Id.*  However, this servicing guide states that it was "Published February 15, 2017," almost four years after the date on which Fannie Mae retained Ditech to service the loan, and Section A2-1-01 thereof, to which the Defendants cite, is dated June 10, 2015, presumably when that section was last updated, almost two years after the service-transfer.  It may very well be that this particular part of the guide was the same on June 1, 2013, but the Court does not know based on the evidence in the record.  The Court rejects the qualification.

[9]     The Defendants qualify Mr. Bowen's statement, which originally read: "As servicer of the loan, Ditech maintained the escrow account on the loan on behalf of Fannie Mae."  PSMF ¶ 4.  The Defendants state that "Ditech maintained an account to pay taxes and insurance pursuant to . . . Section 3 operating as an independent contractor for Fannie Mae."  DRPSMF ¶ 4.

The Court accepts the first part of the Defendants' qualification in part.  It retains the language "escrow account," which is used in the mortgage and subsequent documents in the record, but it clarifies that the purpose of the account is to pay taxes and insurance.  *See Mortgage* ¶ 3.

As to the second part of the qualification, the section of the Fannie Mae Servicing Guide referenced by the Defendants was updated in 2015 and published in 2017 and does not provide any information as to Fannie Mae and Ditech's relationship at the time of the service-transfer.  *See supra* note 8.  Therefore, the Court rejects the qualification that Ditech was operating as an independent contractor for Fannie Mae at the time of the service transfer.

### D. 2013 Billing Statements

Ditech issued Mr. Bowen a welcome letter dated June 10, 2013 stating that Mr. Bowen had a negative escrow balance of $3,763.20 and including a payment coupon for the amount of $1,199.04. *Stip.* ¶¶ 14, 16; *id.* Attachs. 9, 11 *Letter from Green Tree to Mark A. Bowen* at 1 (June 10, 2013) (*Welcome Letter*). Ditech also issued Mr. Bowen a billing statement dated June 15, 2013 stating that Mr. Bowen had a negative escrow balance of $3,763.20 and a total payment due of $14,333.10, which included a current payment of $870.61, a past due payment of $9,576.71, and escrow due of $3,885.78. *Stip.* ¶ 18; *id.* Attach. 13 *Green Tree Monthly Billing Statement* (June 15, 2013) (*June 2013 Statement*); DSAMF ¶ 7; PRDSAMF ¶ 7.[10] Ditech issued to Mr. Bowen a billing statement dated July 8, 2013 stating that Mr. Bowen had a negative escrow balance of $3,763.20 and a total payment due of $15,522.91, which included a current payment of $870.61, a past due payment of $10,447.32, and escrow due of $4,204.98. *Stip.* ¶ 15; *id.* Attach. 10 *Green Tree Monthly Billing Statement* (July 8, 2013) (*July 2013 Statement*); DSAMF ¶ 8; PRDSAMF ¶ 8.[11]

---

[10]     In the Defendants' statement of additional material facts, they seek to include the statement that "Ditech issued a monthly statement for June 2013 demanding payment for the entire negative escrow balance." DSAMF ¶ 7. Mr. Bowen admits that the exhibit speaks for itself in that it is a demand for payment that includes the -$3,763.20 escrow balance. PRDSAMF ¶ 7.

    The Court agrees that the billing statement speaks for itself and revises the statement to include the information contained in that statement.

[11]     The Defendants seek to include the additional material fact that "Ditech issued and [Mr.] Bowen received monthly statements reflecting the Negative Escrow Balance." DSAMF ¶ 8. To support this statement, they cite Mr. Bowen's deposition transcript, stipulation paragraph 18, and what they label as "monthly statements reflecting negative escrow balance, genuine copies of which are attached to the Stip. as Exhibit N." *Id.*

    Mr. Bowen qualifies this statement. He admits that the exhibit speaks for itself but denies it constitutes multiple monthly statements. PRDSAMF ¶ 8.

    The Court agrees that Exhibit N is just one billing statement dated June 15, 2013. However, during Mr. Bowen's deposition, he reviewed his monthly billing statements dated May 30, 2013, June 15, 2013, and September 8, 2013, as well as the welcome letter from Ditech dated June 10, 2013, all of

## E.    January 2014 Modification of Loan

In January 2014, Ditech adjusted Mr. Bowen's account to reflect the terms of the Modification Agreement, including the modified agreed-upon monthly interest payment, except that Ditech only capitalized $2,646.45 of the entire negative escrow balance of $3,763.20 to the escrow account. *Stip.* ¶ 19. The remaining portion of the negative escrow balance, $1,246.06, remained on his account. *Stip.* ¶ 20.

Per the terms of the note and mortgage, if the monthly mortgage payment is not enough to cover principal, interest, and escrow, it is placed in unapplied funds until another payment is received to make up the difference. PSMF ¶ 5; DRPSMF ¶ 5.[12] When such a monthly payment is not applied to the month in which it is received, the borrower is considered in default. PSMF ¶ 6; DRPSMF ¶ 6.[13]

---

which reflected the negative escrow balance of $3,763.20. *Bowen Dep.* 75–90. Therefore, the Court agrees that Ditech issued and Mr. Bowen received monthly statements reflecting the negative escrow balance. However, this fact is already reflected in the record, and therefore the Court does not include the additional statement here.

[12]    The Defendants deny Mr. Bowen's statement, claiming that "[t]he Mortgage does not reference the term 'unapplied funds' or establish an unapplied funds account." DRPSMF ¶ 5.

In support of his statement, Mr. Bowen first cites paragraph 2 of the mortgage. The relevant portion of that paragraph states: "If Lender receives a payment from me for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent Periodic Payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from me to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full." *Mortgage* at 5, ¶ 2. The Defendants are correct that nothing in this section of the mortgage explains how unapplied funds work.

However, Mr. Bowen also cites the deposition transcript of Christy Christensen, Ditech's corporate representative, in which she explains that the term "unapplied amount" means that the "payment was put in suspense . . . [b]ecause it was not enough to satisfy the monthly payment" and that the amount "sits in unapplied, slash, suspense until the balance of the payment is received, and at that time it's applied." *Stip.* ¶ 59; *Pl.'s Opp'n* Attach. 3 *Dep. of Christy Christensen* 158:4-18 (*Christensen Dep.*). This testimony supports Mr. Bowen's statement and the Court rejects the Defendants' denial.

[13]    The Defendants qualify the statement: "The Note represents that if the borrower does 'not pay the full amount of each monthly payment on the date it is due I will be in default.'" DRPSMF ¶ 6. Having reviewed the note, the Court agrees that it states that the Borrower will be in default, not that the loan is considered in default. *See Stip.* Attach. 1 *Note* at 2, ¶ 6. The Court revised the statement accordingly.

### F.  Foreclosure Action and Settlement Agreement

On March 10, 2014, Ditech initiated a foreclosure action captioned *Green Tree Servicing LLC v. Mark A. Bowen, et al.*, No. AUSBSC RE 2014-00044 (State of Maine Superior Court, Androscoggin).  *Stip.* ¶ 21.  On July 8, 2014, Mr. Bowen filed an amended answer to the foreclosure action and added counterclaims.  *Id.* ¶ 22.  On April 24, 2015, the parties entered into a confidential settlement agreement and release in the foreclosure action.  *Id.* ¶ 23.  Mr. Bowen subsequently signed and filed a stipulation of dismissal of the counterclaims with prejudice.  *Id.* ¶ 24.[14]

### G.  Reinstatement of Loan

Green Tree issued a reinstatement quote dated May 6, 2015 requiring a total sum of $21,056.30 in order to reinstate the loan.  *Stip.* ¶ 25; *id.* Attach. 18 *Reinstatement Quote* (May 6, 2015).  The loan was considered in foreclosure status at the time the May 6, 2015 reinstatement quote was issued.  PSMF ¶ 7; DRPSMF ¶ 7.

---

[14]    The Defendants seek to include the following statement: "On April 24, 2015, Mr. Bowen knew that he owed a negative escrow balance of $3,673.20."  DSAMF ¶ 9.  Mr. Bowen denies this statement. PRDSAMF ¶ 9.

Both parties cite Mr. Bowen's deposition testimony to support their position.  During Mr. Bowen's deposition, he admits that, at the time he signed the settlement agreement, April 21, 2015, *see Settlement Agreement* at 9, Ditech had continued to charge him for the negative escrow balance of $3,763.20.  *Bowen Dep.* 114:2-10.  However, Mr. Bowen also states that he did not know that Ditech had not capitalized the negative escrow balance.  *Id.* 114:12-22 ("No. I didn't – no, I didn't – I don't know. I don't know what they did. I'm assuming they took it out of the $21,000 because that's what should have happened").  Mr. Bowen goes on to say that, before he signed the agreement, he knew that Ditech maintained that it was owed a separate negative escrow balance but that after he signed it, the balance should have been taken care of.  *Id.* 115:3-12.

As the Court perceives it, Mr. Bowen's testimony shows that he did not know that he owed a negative escrow balance as of April 24, 2015; he was only aware that one existed before the settlement agreement but believed that the balance would be capitalized or taken care of when he signed the settlement agreement.  The Court accepts Mr. Bowen's denial and strikes the statement from the record.

On May 8, 2015, Mr. Bowen delivered a check in the amount of $21,056.30 to counsel for Ditech to effectuate the reinstatement of the loan. *Stip.* ¶ 26.

Per Ditech's policies and procedures laid out in its Collection Manual, a reinstatement quote should include any advances for taxes and insurance in calculating the amounts in arrears; however, Christy Christensen of Ditech stated that those funds are not included in the reinstatement quote because the escrow payment is established on a yearly basis. PSMF ¶ 8; DRPSMF ¶ 8.[15] Per Fannie Mae Guidelines, a reinstatement quote must include all amounts to bring the loan current including all past due advances for taxes and insurance; however, according

---

[15] The Defendants deny this statement. DRPSMF ¶ 8. They cite two portions of Ms. Christensen's deposition. The first portion, pages 96-98, deals with Fannie Mae guidelines, not Ditech's own policies. *See Christensen Dep.* 96:21-22. However, the second portion, pages 100-102, deals with Ditech's policies:

> Q. And if, in fact, that $21,405.41 is not sufficient to cover the amount of money that had been paid for taxes and insurance, if it was insufficient to pay for the amount of money that was paid for taxes and insurance, should that extra money that was paid for taxes and insurance have been included in the reinstatement fee?
> A. No.
> Q. Okay. And one more time, can you tell me why?
> A. Because when the escrow payment amount is established, it's done on a yearly basis. And it's set for 12 months.

*Christensen Dep.* 100:8-22.

At the same time, Mr. Bowen cites a section titled "Foreclosure and Reinstatements and Payoffs" excerpted from Ditech's Collection Manual to support his statement. This section lays out the requirements for reinstatement and states, in relevant part:

> **Funds Calculation** – Amount in arrears should include:
> - All past due mortgage payments
> - Late charges
> - Advances, including those for:
>   - Taxes
>   - Insurance
>   - Property maintenance, including work completed but not yet invoiced.
> - Attorney/legal fees, including any costs yet to be billed by the attorney to the account.

*Collection Manual-COLL-100: Foreclosure Reinstatements and Payoffs* at 2. This passage suggests that it is Ditech's policy to include any advances, including those for taxes and insurance, when calculating the amount in arrears provided at reinstatement. *Id.*

Based on the conflict between Ms. Christensen's testimony and the policies and procedures as laid out in the Collections Manual, the Court perceives a genuine dispute of fact as to Ditech's policies and includes both positions in the record since the respective facts do not change the outcome of the countervailing motions.

to Ms. Christensen, advances for taxes and insurance do not need to be included in the reinstatement because escrow analyses are performed only once per year. PSMF ¶ 9; DRPSMF ¶ 9.[16] Ditech did not provide a history of the escrow account within ninety days of the reinstatement. PSMF ¶ 10; DRPSMF ¶ 10.[17] Ditech did not perform an escrow analysis on the loan before January 2016 because it considered the loan delinquent. PSMF ¶ 11; DRPSMF ¶ 11.

### H. Improper Collection of "Total Fees & Charges Due"

---

[16]     The Defendants deny this statement. In support of the statement, Mr. Bowen cites a portion of Fannie Mae's Servicing Manual setting forth the RESPA Rules for Escrow. The guidelines state:
> **Initial Statement** – Ditech must prepare and deliver an initial escrow statement to the customer within 45 calendar days of settlement. The statement must include:
> - Monthly account payment total
> - Portion of each monthly payment going into escrow
> - Itemization of taxes, insurance and other charges
> - Cushion amount
> - Trial running balance
> - Any customer's discretionary payment made as part of the monthly account payments for items being escrowed
> - HUD-required format.

*Servicing Manual – Escrow Administration (ESC-300)* at 3. It further states: "**Default** – Initial and annual statements are NOT required if the account is in foreclosure, unless the analysis identifies a deficiency, in which case a statement must be sent to the customer." *Id.*
The Defendants, in their denial, again cite Ms. Christensen's deposition:
> Q. If the monthly escrow payments did not cover all of the advances that had been made by Bank of America or Green Tree before the reinstatement, was that difference, the amount in the advances that exceeded the monthly escrow payments, was that to be included in the reinstatement fee, according to this Fannie Mae guideline?
> A. No.
> Q. And can you tell me why?
> A. Because an escrow analysis is done on a yearly basis, and that is at the time that the escrow payment is established. In order to reinstate a loan, the escrow payment is based on the prior analysis and the escrow payment that was established at that time. Any disbursements between the account, in or out, would not affect the amount required to reinstate.

*Christensen Dep.* 97:15-98:7.
Based on the conflicting evidence, the Court perceives a genuine dispute of fact as to Fannie Mae's guidelines and includes both positions since the respective facts do not change the outcome of the countervailing motions.

[17]     The Defendants qualify this statement by removing the language "May 2015" as the date of the reinstatement. DRPSMF ¶ 10. Both parties cite the deposition transcript for Christy Christensen. In her testimony, Ms. Christensen does not specify the timing of the reinstatement, and therefore the Court excises the language "May 2015." *See Christensen Dep.* 107:22-25.

Mr. Bowen paid $930.67, representing his June 2015 payment. *Stip.* ¶ 27. On June 14, 2015, Ditech issued a monthly billing statement with an amount of $966.37 due by July 1, 2015. *Id.* ¶ 28; *id.* Attach. 19 *Green Tree Monthly Billing Statement* (June 14, 2015) (*June 2015 Statement*). The statement included "Total Fees & Charges Due" in the amount of $35.70. *June 2015 Statement* at 1. Mr. Bowen made a payment of $966.37 to Ditech on or around June 25, 2015 for the month of July 2015. *Stip.* ¶ 29. Ditech issued a monthly stated dated July 14, 2015 with an amount of $966.37 due by August 1, 2015. *Stip.* ¶ 30; *id.* Attach. 20 *Green Tree Monthly Billing Statement* (July 14, 2015) (*July 2015 Statement*). The statement included "Total Fees & Charges Due" in the amount of $35.70. *July 2015 Statement* at 1. On or around July 28, 2015, Mr. Bowen paid $966.37 to Ditech for the month of August 2015. *Stip.* ¶ 31.

Mr. Bowen corresponded with Ditech on July 21, 2015 and July 27, 2015 regarding the fees. *See Stip.* Attach. 21 *Consolidated Notes Log* at 10. On July 28, 2015, Ditech sent a letter to Mr. Bowen that reads:

> This letter is in response to a request to provide you information regarding the above-referenced account with Green Tree Servicing LLC ("Green Tree").
>
> Please be advised the advances in the amounts of $7.00 and $350.00 that were assessed to your account on May 15, 2015, have been scheduled for collection over a period of 10 months, beginning July 1, 2015. These are legitimate fees due to foreclosure action. The legal fees were not included in the reinstatement figures.

*Stip.* ¶ 33; *id.* Attach. 22 *Letter from Green Tree to Mark and Nancy Bowen* (July 28, 2015).

On or around August 2015, Mr. Bowen retained counsel to assist him with his dispute. *Stip.* ¶ 34. On August 3, 2015, Mr. Bowen, through counsel, delivered a letter to Ditech that states:

> As servicer of my client's mortgage loan, please treat this as a "qualified written request" under [RESPA] and "request for information" and "notice of error" pursuant to RESPA, subject to the response period set out in Regulation X, 12 C.F.R. § 1024.36(d)(2)(i)(B).

*Id.* ¶ 35; *id.* Attach. 23 *Letter from A. Stark to Green Tree* at 1 (Aug. 3, 2015) (*Aug. 3, 2015 Dispute Letter*). The letter asks Ditech to provide an explanation for the $35.70 in total fees and charges sought and requests other information about the loan payment history. *Id.* at 1–2. Attorney Stark sent the letter to P.O. Box 6176. *Id.* at 1. Ditech received Mr. Bowen's August 3, 2015 dispute letter on August 10, 2015. PSMF ¶ 14; DRPSMF ¶ 14.[18]

In August 2015, Mr. Bowen's anxiety subsided, and he weaned off his anxiety medication. *Stip.* ¶ 36.

Ditech issued a monthly billing statement dated August 14, 2015 with an amount of $966.37 due by September 1, 2015. *Stip.* ¶ 37; *id.* Attach. 24 *Green Tree Monthly Billing Statement* (Aug. 14, 2015) (*Aug. 2015 Statement*). The statement included "Total Fees & Charges Due" in the amount of $35.70. *Aug. 2015 Statement* at 1.

---

[18]    The Defendants qualify this statement by clarifying the date on which Ditech received the letter. They state that Ditech received the August 3, 2015 letter on August 10, 2015 and cite a copy of Mr. Bowen's August 3, 2015 letter with a completed mail receipt that has a date stamp for August 10, 2015. DRPSMF ¶ 14; *see also Aug. 3, 2015 Letter* at 3. The Court accepts the qualification and revises the statement accordingly.

The Defendants also deny that the August 3, 2015 letter was a Qualified Written Request (QWR). DRPSMF ¶ 14. The Court agrees that whether the letter is a QWR is a matter of law. *See* 12 U.S.C. § 2605(e)(1)(B). The Court removes the characterization of the dispute letter as a "QWR."

On August 20, 2015, Ditech sent Mr. Bowen, care of counsel, a letter stating that it had "completed a review of the above-referenced inquiry or dispute case number." *Stip.* ¶ 38; *id.* Attach. 25 *Letter from Green Tree to Andrea Bopp Stark* at 1 (Aug. 20, 2015) (*Aug. 20, 2015 Ditech Letter*). The letter went on to say:

> After further research, we have determined that the additional fees assessed after the reinstatement payoff will be removed. At this time, we are in the process of removing the subsequent fees in question. Please continue to monitor Mr. Bowen's monthly billing statements for the adjustment. We apologize for any inconvenience this matter has caused.
>
> As of today's date, the current unpaid balance is $148,893.66 and the current escrow balance is -$137.22. The account is next due $930.67 for the September 1, 2015 payment. Enclosed is list of advances that have been set up on the account. Below is a list of late fees that have been assessed to the account. As of today's date the late fee balance due is $0.00.
>
> 8/27/2013: $24.19 (Waived)
> 9/17/2013: $24.19 (Waived)
> 1/17/2014: $12.51
> 2/17/2014: $12.51
> 3/17/2014: $ 12.51

*Aug. 20, 2015 Ditech Letter* at 1.

Ditech then sent Mr. Bowen a letter on August 26, 2015 thanking Mr. Bowen for participating in the Automatic Payment Plan and stating that the first automatic payment in the amount of $966.37 would be processed on September 1, 2015 from his checking account. *Stip.* ¶ 39; *Letter from Green Tree to Mark A. Bowen* (Aug. 26, 2015) (ECF No. 84) (*Aug. 26, 2015 Ditech Letter*).

Ditech issued Mr. Bowen a monthly billing statement dated September 7, 2015 with a total amount due of $930.67 and $0.00 in "Total Fees & Charges Due." *Stip.*

¶ 41; *Add'l Attachs.* (ECF No. 84) Attach. 1 *Ditech Monthly Billing Statement* (Sept. 7, 2015) (*Sept. 2015 Statement*). Ditech issued Mr. Bowen a monthly billing statement dated October 7, 2015 with a total amount due of $966.37, re-including the $35.70 for "Total Fees & Charges Due." *Stip.* ¶ 42; *Add'l Attachs.* Attach. 2 *Ditech Monthly Billing Statement* (Oct. 7, 2015) (*Oct. 2015 Statement*).

On October 22, 2015, Ditech sent Mr. Bowen a letter that stated:

> During a recent conversation, you orally denied, disputed or challenged Ditech's claim that you owe the above-referenced debt or the amount asserted.
> Therefore, in order to properly investigate your claim, you must submit your dispute in writing along with any supporting documentation to:
> > Ditech Financial LLC
> > PO Box 6172
> > Rapid City, SD 57709-6172
> Please include your account number within your correspondence. Upon receipt of your dispute, Ditech will investigate and respond within 30 days. If you provide additional information within this 30-day period, Ditech may require an additional 15 days to respond. If you fail to submit the requested information within 30 days from the date of this letter, Ditech will be unable to complete an investigation.

*Stip.* ¶ 43; *Add'l Attachs.* Attach. 3 *Letter from Ditech to Mark A. Bowen* (Oct. 22, 2015) (*Oct. 22, 2015 Ditech Letter*).

On or around November 2, 2015, Mr. Bowen made a payment of $966.37 to Ditech. *Stip.* ¶ 44.

Mr. Bowen, through counsel, sent two letters via certified mail to Ditech dated November 3, 2015. *Id.* ¶ 45. The first letter states: "please treat this as a 'qualified written request' (QWR) . . . and 'request for information' and 'notice of error.'" *Add'l Attachs.* Attach. 4 *Letter from Andrea Bopp Stark to Ditech re Fee Dispute* (Nov. 3, 2015) (*Nov. 3, 2015 Dispute Letter*). The letter discusses the $35.70 fee and asks for

an explanation as to certain "Advances" on the account. *Id.* The second letter states "[p]lease consider this an offer of settlement per the Maine Unfair Trade Practices Act, 5 M.R.S. § 205-A et seq. for Ditechs continued efforts to collect monies not owed on Mr. Bowen's account." *Add'l Attachs.* Attach. 5 *Letter from Andrea Bopp Stark to Ditech re UTPA* (Nov. 3, 2015) (*Nov. 3, 2015 UTPA Letter*).

Ditech sent a letter dated November 9, 2015 to Mr. Bowen that stated: "Ditech Financial LLC received your correspondence regarding the above referenced account on 11/06/2015. Our inquiry is currently under review." *Stip.* ¶ 47; *Add'l Attachs.* Attach. 7 *Letter from Ditech to Mark A. Bowen* (Nov. 9, 2015).

Ditech issued Mr. Bowen a monthly billing statement on November 7, 2015 with a total amount due of $966.37, which included the $35.70 in fees. *Stip.* ¶ 46; *Add'l Attachs.* Attach. 6 *Ditech Monthly Billing Statement* (Nov. 7, 2015) (*Nov. 2015 Statement*). On or around December 1, 2015, Mr. Bowen made a payment of $966.37 to Ditech. *Stip.* ¶ 48.

Ditech sent a letter dated December 9, 2015 to Mr. Bowen, care of his counsel, stating:

> The Real Estate Settlement Procedures Act ("RESPA") permits account servicers to designate a unique mailing address for receipt of a "qualified written request." This is to ensure that the servicer receives the request timely in order to respond within the statutory time frame. Enclosed is a copy of the Notice of Assignment, Sale, or Transfer of Servicing Rights sent to you. According to the second page of the notice, qualified written requests are to be sent to Ditech Financial LLC, P.O. Box 6176, Rapid City, SD 57709-6176. As such, your correspondence mailed to Ditech Financial LLC, P.O. Box 6172, Rapid City, SD 57709, is not considered qualified and does not trigger RESPA. Regardless Ditech responds accordingly.

*Stip.* ¶ 50; *Add'l Attachs.* Attach. 9 *Letter from Ditech to Stark re QWR* (Dec. 9, 2015)

(*Dec. 9, 2015 Ditech Letter*). The letter went on to state:

> Please be advised, we have removed the fees that were inadvertently charged towards your client's account. The amount of $142.80 that was paid towards these advances is in the process of being credited back to the account.
>
> On December 1, 2015, we received a payment of $966.37 and are in the process of applying $930.67 of these funds towards the December 1, 2015 due date. Please note the remaining amount of $35.70 will be applied towards the current unapplied funds balance of $107.10, so the full amount of $142.80 received for the advances will be available.

*Dec. 9, 2015 Ditech Letter* at 1–2.

The $35.70 billed to Mr. Bowen in monthly statements dated June 14, 2015, July 14, 2015, August 14, 2015, October 7, 2015, and November 7, 2015 should not have been billed to Mr. Bowen. PSMF ¶ 12; DRPSMF ¶ 12. Mr. Bowen contacted Ditech to dispute the $35.70 charges on July 21, 2015, July 27, 2015, August 25, 2015, and November 5, 2015. PSMF ¶ 13; DRPSMF ¶ 13.[19] Ditech alleges that on December 4, 2015, it removed all fees and charges challenged by Mr. Bowen through his two alleged QWRs and provided Mr. Bowen a credit for each charge; however,

---

[19] This statement originally read: "Mr. Bowen contacted Green Tree by phone to dispute the $35.70 charges several times." PSMF ¶ 13. The Defendants qualify this statement: "Ditech admits that [Mr.] Bowen contacted Ditech by phone on July 21, 2015 and that there was contact between Ditech and [Mr.] Bowen regarding these charges on July 27, 2015, August 25, 2015, and November 5, 2015." DRPSMF ¶ 13. The Defendants and Mr. Bowen both cite the notes log to support the statement. *See Consolidated Notes Log.*

The Court agrees that, based on the log, Mr. Bowen contacted Ditech July 21, 2015, July 27, 2015, August 25, 2015, and November 5, 2015 to dispute the charges. *See id.* Ditech's qualification is picky: four times is several times. Nevertheless, the Court adjusts the statement to specify the exact dates of the contact.

according to Mr. Bowen, he had a total payment amount due of $1,073.47 on December 9, 2014.  DSAMF ¶ 1; PRDSAMF ¶ 1.[20]

## I.    Escrow Shortage & Deficiency

Ditech issued an Annual Escrow Disclosure Statement dated January 25, 2016 with a shortage amount of -$1,109.22 and a deficiency amount of -$1,702.16 for a total amount due of $2,811.38.  *Stip.* ¶ 52; *Add'l Attachs.* Attach. 10 *2016 Annual Escrow Disclosure Statement* (*Escrow Statement*).  These amounts are based on an escrow payment that was not capitalized at the time of modification.  PSMF ¶ 16; DRPSMF ¶ 16.[21]  In the statement, Ditech explained that it would collect the shortage and

---

[20]    Mr. Bowen denies this statement.  He points to a Ditech online account from December 9, 2015 which shows a total payment amount due of $1,073.47.  *Add'l Attachs.* Attach. 8 *Online Account Statement* at 7.

In support of their statement, the Defendants cite page 3 of Mr. Bowen's Payment History, which shows six reversal payments on December 4, 2015.  *See Stip.* Attach. 12 *Payment History* at 3.  At the same time, it appears that on the same date, the payments were added on again.  *See id.* at 2–3.  Additionally on December 4, 2015, there appear to be several payments and disbursements to unapplied funds.  *Id.* at 2.

The Court is having trouble making sense of these documents and cannot tell whether Mr. Bowen was, in fact, credited for each charge.  Moreover, as Mr. Bowen points out, Ditech sent him a statement with a higher than normal monthly payment only five days after the alleged credits on the account.  Perceiving a genuine dispute as to whether Ditech accurately credited Mr. Bowen for each charge, the Court includes both Ditech and Mr. Bowen's positions since the respective facts do not change the outcome of the countervailing motions.

[21]    The Defendants deny this statement, which originally read: "On January 25, 2016, through Ditech's Annual Escrow Disclosure Statement, Ditech attempted to collect a total monthly payment of $992.28 that included amounts that should have been capitalized into the loan but were not."  PSMF ¶ 16.  The Defendants quote portions of the Annual Escrow Account Disclosure Statement that state: "The shortage has been spread over the next 36 monthly payments and the deficiency has been spread over the next 36 monthly payments" and "This is not an attempt to collect a debt but instead a legally required notice regarding your escrowed taxes and insurance."  *See* DRPSMF ¶ 16.

The Escrow Statement provides a breakdown of the new monthly payment and includes a shortage payment in the amount of $30.81, a deficiency payment in the amount of $47.28, and a total monthly payment of $992.28.  *Escrow Statement* at 2.

To support his assertion that the monthly payment included amounts that should have been capitalized but were not, Mr. Bowen cites Ms. Christensen's deposition.  In her deposition, Ms. Christensen states that the $992.28 "includes an escrow payment which included the amount that was not capitalized at the time the modification was booked."  *Christensen Dep.* 154:18-20.  She goes on to say that the amount that was not capitalized was based on a thirty-six-month payout.  *Id.* 154:22-155:1.

deficiency over a thirty-six-month period, resulting in a new monthly payment of $992.28. *Id.* Mr. Bowen knew there was a problem with his escrow account in January of 2016. DSAMF ¶ 10; PRDSAMF ¶ 10.

Mr. Bowen, through counsel, issued a letter dated February 10, 2016 to Ditech stating "please consider this an offer of settlement per the Maine Unfair Trade Practices Act . . . for Ditech's continued efforts to collect monies not owed on Mr. Bowen's account." *Stip.* ¶ 54; *Add'l Attachs.* Attach. 12 *Letter from Att'y Stark to Att'y Hobbib* at 1 (Feb. 10, 2016). On February 22, 2016, Ditech sent a letter to Mr. Bowen's counsel acknowledging receipt of the consumer complaint filed in connection with Mr. Bowen's account and stating that it was reviewing the subject of the complaint. *Stip.* ¶ 55; *Add'l Attachs.* Attach. 13 *Letter from Ditech to Mr. Bowen* (Feb. 22, 2016). On March 17, 2016, Ditech responded to the complaint. *Stip.* ¶ 56; *Add'l Attachs.* Attach. 14 *Letter from Ditech to Att'y Stark* (Mar. 17, 2016).

---

Mr. Bowen also cites an expert witness report. In that report, the expert concluded that "[t]he underfunded escrow balance resulted in Ditech's subsequent attempt two years later to collect this amount through an increase in the escrow payment beginning March 1, 2016 of $34.59 per month for 36 months." *Add'l Attachs.* Attach. 21 *Expert Witness Report of Bernard Jay Patterson, CFE* at 15 (*Expert Rep.*). The expert also stated: "Based on the above analyses, $859.40 in capitalized funds were applied to corporate advances when they should have been applied to escrow. $386.64 in unapplied funds were not applied to reduce the principal balance and as a result, there were insufficient capitalized funds available to capitalize the escrow account." *Id.* at 13.

Based on Mr. Bowen's expert's analysis, Ditech improperly underfunded the escrow account and then attempted to collect the underfunded balance through the additional monthly escrow payments beginning in March 2016. However, for purposes of Mr. Bowen's motion, the Court must view this statement of fact in a light most favorable to Ditech's theory of the case, and Ditech denies that the thirty-six-month escrow payment was inappropriate, arguing instead that it was authorized to collect the deficiency and shortage by the terms of the note and mortgage. Based on this conflict, the Court adjusts the statement to state that the amount was not capitalized at modification but instead collected over a thirty-six-month period. It removes the characterization that the amounts "should have been capitalized."

From March 2016 through January 2017, Mr. Bowen received monthly billing statements with a regular monthly payment of $992.28 and a total amount due of $1,984.56. *Stip.* ¶¶ 53; 57; *Add'l Attachs.* Attach. 15 *Monthly Billing Statements March 2016-January 2017.* Ditech sent letters to Mr. Bowen dated April 1, 2016 and May 2, 2016 stating that "[y]our mortgage payment is now 30 days or more past due and your account is in default" and providing options available to Mr. Bowen to avoid foreclosure. *Stip.* ¶ 58; *Add'l Attachs.* Attach. 16 *April 1, 2016 Letter and May 2, 2016 Letter.*

According to Mr. Bowen, each month Ditech attempted to collect $992.28, it was attempting to collect an inaccurate amount which was more than Mr. Bowen actually owed; however, Ditech believes that the mortgage authorized it to collect the escrow payments. PSMF ¶ 17; DRPSMF ¶ 17.[22] Mr. Bowen made the additional escrow payment each month based on Ditech's misrepresentations to avoid further

---

[22] The Defendants qualify this statement by admitting that from March 2016 to December 2016 Ditech issued monthly billing statements that included an amortized portion of the negative escrow balance but claiming that the mortgage authorizes Ditech to collect the negative escrow balance. *See* DRPSMF ¶ 17.

In support of the material fact, Mr. Bowen cites the deposition transcript of Ms. Christensen. Ms. Christensen explains that the $992.28 amount includes the amount that was not capitalized and goes on to say that it would be less had the $1,278 amount been capitalized. *Christensen Dep.* 182:9-183:2. She further testifies that the amount *should have been capitalized. See id.* 183:4-5. Later on in her testimony, when asked if the $992.28 was "not what Mark Bowen should be being billed" Ms. Christensen replied "Yes." *Id.* 197:4-7.

The Defendants cite the monthly statements, as well as the note and mortgage, arguing that the mortgage authorizes them to collect the monthly escrow payment. Charged as it is to view this fact in a light most favorable to the Defendants, the Court includes the additional statement that the Defendants believe that the mortgage authorizes them to collect the escrow payment. It reserves its judgment as to whether the note authorized the charges for its legal analysis.

complications with his loan, particularly another wrongful foreclosure.  PSMF ¶ 18;

DRPSMF ¶ 18.[23]

## J.    Correction of Errors

Ditech first realized that the incorrect amounts had been capitalized to the

escrow account after the Complaint was filed in the current case.  PSMF ¶ 19;

DRPSMF ¶ 19.  Ditech had an obligation to correct the errors with the escrow account.

PSMF ¶ 20; DRPSMF ¶ 20.[24]  Ditech made a decision not to correct the error in the

escrow calculation or readjust the loan figures upon realization or discovery of the

error because a lawsuit had been filed.  PSMF ¶ 21; DRPSMF ¶ 21.[25]  However, on

December 8, 2016, Ditech's counsel emailed Mr. Bowen's counsel:

---

[23]    The Defendants qualify this statement.  They state that the statement should be stricken because the Affidavit relied upon to support these statements contradicts previous deposition testimony.  Specifically, they cite Mr. Bowen's testimony in which he states: "I thought the whole thing was wrong . . . Because I did the math in my head and I couldn't see where they came up with $1,700." *Bowen Dep.* at 41:6-19.
     Mr. Bowen replied to the request to strike, arguing that the cited testimony does not contradict Mr. Bowen's declaration.  *See* PRDSAMF at 1–2.  The Court agrees with Mr. Bowen.  Although Mr. Bowen believed that Ditech was incorrect, he explains that "[b]ased on [his] past experiences with Ditech's misconduct, [he] started making the full increased payments so Ditech would not put [his] loan in foreclosure again."  PSMF Attach. 1 *Decl. Of Mark A. Bowen* ¶ 24.  The Court rejects the qualification.

[24]    The Defendants qualify this statement.  They cite Ms. Christensen's deposition testimony in which she states, "I believe it needs to be corrected."  *Christensen Dep.* 75:25.  However, in the very next line of that testimony, Ms. Christensen responds "yes" when asked "Does that mean Ditech has an obligation to fix it."  *Id.* 76:2-4.  The Court rejects the qualification.

[25]    The Defendants deny this statement.  They cite Ms. Christensen's deposition testimony in which she states "I believe it needs to be corrected. And it's Ditech's doing to do that."  *Christensen Dep.* 75:25-76:1.  They also cite Mr. Bowen's payment history, presumably to show that they refunded some of the charges on the account.  However, the Defendants do not point the Court to a particular citation or page from the payment history, nor explain why it is relevant.  Furthermore, Ms. Christensen specifically says in her deposition testimony that Ditech did not fix the error because a lawsuit had been filed and that "[i]n the investigation for the lawsuit, when it was determined that there was an issue, we were already deep in the lawsuit.  And it was determined at that time not to fix it."  *Christensen Dep.* 76:7-18.  This supports Mr. Bowen's statement that Ditech chose not to fix the error.  However, because the Court must view this fact in a light most favorable to the Defendants for purposes of the Plaintiff's dispositive motion, it revises the statement to include the fact that Ditech did not correct the error because the lawsuit had been filed.

After reviewing Mr. Bowen's account, his prior history with Ditech Financial LLC, his deposition testimony and his current challenge to his monthly statements, Ditech has agreed to adjust Mark Bowen's monthly escrow account to $320.80 per month. Specifically, Ditech will agree to write off $1,246.04 (amounts not capitalized); Ditech will agree to write off $132.00 from escrow (additional advances from Bank of America not included in the transparency notice); and Ditech will reallocate $34.59 of the monthly amounts paid to escrow from March 1, 2016 to the present ($355.29). These adjustments are not an admission of liability. Ditech continues to maintain that all charges were appropriately assessed to Mr. Bowen's account. Rather, these adjustments are an attempt to work with Mr. Bowen in good faith to resolve his problems and continue to build a relationship of trust with Ditech.

*Add'l Attachs.* Attach. 22 *Email from Ditech Counsel to Andrea Bopp Stark* (Dec. 8, 2016).[26]

As of January 17, 2017, Mr. Bowen had an amount due of $1,915.38 reflecting the regular monthly amount of $957.69 and a past due amount of the same. PSMF ¶ 22; DRPSMF ¶ 22.[27]

---

[26]      The Defendants seek to include the statement: "On December 19, 2016, Ditech wrote off the escrow advances and credited Mr. Bowen's monthly payment of these advances to his account." DSAMF ¶ 2. Mr. Bowen denies this statement. PRDSAMF ¶ 2. He points to a January 17, 2017 Ditech Billing Statement showing an amount due of $1,915.38. *Monthly Billing Statements* at 33. This amount reflects the current monthly bill of $957.69, plus a past amount due for the same. *Id.* The statement does not provide any information as to whether Ditech wrote off the escrow advances or credited Mr. Bowen's monthly payment to his account. *See id.*

        At the same time, the payment history that the Defendants cite does not appear to have any entries for December 19, 2016 to support the Defendants' statement. Therefore, the Court excises the statement.

[27]      The Defendants deny the statement that "[a]s of January 17, 2017, Ditech had not fully corrected the escrow account errors." DRPSMF ¶ 22. They cite Mr. Bowen's payment history, in which certain of the monthly payments were credited to the account, as well as the email referenced above in which Ditech agreed to adjust Mr. Bowen's monthly escrow account and write off certain amounts. However, as already discussed, the Court cannot make sense of the credits and payment history, and the Defendants do not provide any explanation to support their denial, other than citing the two documents.

        Mr. Bowen, in support of his statement, cites a monthly billing stated dated January 17, 2017 in which there was an amount due of $1,915.38, reflecting the regular monthly amount and a past due amount. *Monthly Statements* at 33. Although the past due amount suggests that the account has not been fully corrected, the Court must view this fact in a light most favorable to the Defendants and adjusts the statement to reflect the information contained in the document.

Mr. Bowen has paid his counsel $50.00 thus far.  PSMF ¶ 15; DRPSMF ¶ 15.[28]

## III.  LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A fact is "material" if it "has the potential to change the outcome of the suit."  *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010)).  A dispute is "genuine" if "a reasonable jury could resolve the point in favor of the nonmoving party."  *Id.* (quoting *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).

Once this evidence is supplied by the moving party, the nonmovant must "produce 'specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'"  *Triangle Trading Co., Inc. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (quoting *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748

---

[28]    The Defendants qualify this statement, which originally read: "Mr. Bowen paid his counsel $50.00 for fees and costs to send the November 3, 2015 Qualified Written Request dispute letter."  PSMF ¶ 15.  They admit that Mr. Bowen paid $50 but deny that it was solely for the "Qualified Written Request dispute letter."  DRPSMF ¶ 15.  The Defendants cite a portion of Mr. Bowen's deposition transcript in which he testifies that he signed a fee agreement with Andrea Bopp Stark for $50.  *Bowen Dep.* 42:19-21.  He further testifies that he has only paid Attorney Stark the $50 for the retainer thus far for the work she has done on the complaint.  *Id.* 44:14-16.

In support of the statement, Mr. Bowen cites another portion of the deposition transcript in which he is asked about the dispute letter sent by Attorney Stark after the October 2015 fees and charges: "Q. And she charged you $50; is that right? A. Yeah. Q. And she wrote another letter? A. She did."  *Id.* 36:11-16.  Mr. Bowen also cites his deposition testimony from February 10, 2017: "Q. Mark, did you pay Andrea's law firm $50 at some point? A. Yes."  *Bowen Dep.* 21:14-17 (Feb. 10, 2017).

Based on this testimony, it appears that Attorney Stark may have charged a $50 fee to write the dispute letter but that Mr. Bowen has only actually paid a $50 retainer fee at this point in the litigation.  Charged as it is to view this statement in a light most favorable to Ditech for purposes of Mr. Bowen's motion, the Court accepts the qualification and revises the statement to read: "Mr. Bowen has paid his counsel $50.00 thus far."

(1st Cir. 1994)).  In other words, the nonmoving party must "present 'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Bos.*, 985 F.2d 1113, 1116 (1st Cir. 1993)).  The Court then "views the facts and draws all reasonable inferences in favor of the nonmoving party." *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011).  However, the Court "afford[s] no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'" *Tropigas*, 637 F.3d at 56 (quoting *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001)); *accord Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 325 (1st Cir. 2009).

Where, as here, the parties have filed cross-motions for summary judgment, the court must evaluate each motion independently and "determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Matusevich v. Middlesex Mut. Assurance Co.*, 782 F.3d 56, 59 (1st Cir. 2015) (citing *Barnes v. Fleet Nat'l Bank, N.A.*, 370 F.3d 164, 170 (1st Cir. 2004)).  As such, for cross-motions for summary judgment, the standard of review is applied to each motion separately. *Libertarian Party of N.H. v. Gardner*, 759 F. Supp. 2d 215, 221 (D.N.H. 2010), *aff'd*, 638 F.3d 6 (1st Cir. 2011).  The presence of cross-motions for summary judgment "neither dilutes nor distorts" the summary judgment standard. *Mandel v. Bos. Phoenix, Inc.*, 456 F.3d 198, 205 (1st Cir. 2006).

## IV. DISCUSSION

The Defendants raise two threshold issues: (1) whether all of Mr. Bowen's claims based on the negative escrow fees are barred by the settlement agreement and release in the underlying foreclosure action and (2) whether Mr. Bowen has demonstrated any pecuniary loss to sustain his tort and UTPA claims. The Court addresses these two arguments before turning to the individual counts.

## A.    The Effect of the Settlement Agreement and Release

The Defendants argue that Mr. Bowen's claims that are based on the negative escrow fees are barred by the Settlement Agreement from the underlying foreclosure action because these claims are "all based on Ditech's pre-settlement conduct." *Defs.' Mot.* at 12–13. They argue that Mr. Bowen knew about the negative escrow balance and knew that these amounts should have been capitalized before the date of the Settlement Agreement, and that even if he did not know, the language "known or unknown or capable of being known" from the Agreement extends to these claims. *Id.* at 13–16. Mr. Bowen argues that the Settlement Agreement only released claims "up until the effective date" of the Agreement but that all of his claims are based on future, albeit similar, conduct. *Pl.'s Mot.* at 3; *Pl.'s Opp'n* at 5–6. The Defendants agree that the Settlement Agreement only released claims up until its April 24, 2015 effective date, but they disagree with Mr. Bowen's contention that his claims arise from conduct after that date. *Tr. of Oral Argument* at 9–10, 42–43, *Mark A. Bowen v. Ditech Fin. LLC, f/d/b/a Green Tree Servicing LLC, & Fed. Nat'l Mortg. Ass'n*, 2:16-cv-00195-JAW (D. Me. *argued* Sep. 5, 2017) (*Tr. of Oral Argument*).

The Settlement Agreement in the underlying foreclosure action releases BOA, Green Tree, and any assignee:

> from and against any and all past and present claims up until the Effective Date of this Agreement . . . whether known or unknown or capable of being known, whether existing now or to become known in the future, arising at law or in equity, by right of action or otherwise . . . that the Releasors . . . have or may have against the Releasees, for, upon, or by reason of any matter, cause or thing, whatsoever, in law or equity, including, without limitation, the claims made or which could have been made by Bowen arising from the origination or servicing of the Loan (in any manner) as well as in any way related to the underlying property, Notes, Mortgage and/or Deeds of Trust, any servicing act or omission thereon as well as any claim or issue which was or could have been brought in the Litigation.

*Stip.* Attach. 16 *Settlement Agreement and Release* ¶ 1E. Under Maine law, settlement agreements are analyzed as contracts, and "[i]f a release is 'absolute and unequivocal' in its terms, it 'cannot be explained by parol evidence and must be construed according to the language that the parties have seen fit to use.'" *2301 Congress Realty, LLC v. Wise Bus. Forms, Inc.*, 2014 ME 147, ¶ 10, 106 A.3d 1131 (quoting *Norton v. Benjamin*, 220 A.2d 248, 253 (Me. 1966)); *see also Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 35 (1st Cir. 2001) (construing settlement agreement with unambiguous language "in accordance with its plain and generally accepted meaning"). Here, the Agreement that the parties reached in the underlying action was broad and clear: by its language it applies only to causes of action related to the origination or servicing of the loan that existed up to and including April 24, 2015, the date that the Agreement became effective. *See OfficeMax Inc. v. Sousa*, 773 F. Supp. 2d 190, 211 (D. Me. 2011). It does not include

future claims arising from future conduct. The disputed issue is whether the claims asserted by Mr. Bowen arise out of conduct occurring after April 24, 2015.

In the context of a general release, a claim comes into existence at the time of the underlying incident giving rise to the claim. *See Rodríguez–Vives v. P.R. Firefighters Corps of P.R.*, 743 F.3d 278, 282 (1st Cir. 2014) (holding that previous settlement agreement with Firefighters Corps did not bar subsequent discrimination action because harassment began after the date of the settlement); *Harrington v. Aggregate Indus. Ne. Region Inc.*, 668 F.3d 25, 35 (1st Cir. 2012) (applying Massachusetts law and holding that claim for retaliation was not barred because termination was the incident out of which the action arose and the termination occurred after the date of the release); *Barr v. Dyke*, 2012 ME 108, ¶ 32, 49 A.3d 1280 (barring claims because "[t]he pivotal events alleged in support of the claims . . . occurred before the release was signed"); *see also OfficeMax*, 773 F. Supp. 2d at 211 ("The events that form the gravamen of OfficeMax's Complaint had not yet taken place and, by the terms of the Releases, were not included").

Mr. Bowen brings his claims in part based on the allegations that Ditech inappropriately charged him a monthly fee to make up for an escrow shortage and deficiency. Mr. Bowen alleges that Ditech did not capitalize the escrow shortage and deficiency as it should have when the loan was modified in January 2014. Mr. Bowen further alleges that Ditech did not notify him of the shortage and deficiency in May 2015 when it provided the reinstatement quote, but instead informed him in January

2016 that it planned to recoup the amount through thirty-six monthly payments beginning in March 2016.

To the extent that any of Mr. Bowen's legal claims are based solely on Ditech's failure to capitalize the correct amount in January of 2014, the Defendants are correct that the claims would be barred. The agreed-to release is broad and extends to claims "known or unknown or capable of being known" that existed up until the effective date of the Agreement. Ditech's failure to properly capitalize the escrow amounts during its implementation of the loan modification took place in January 2014, before the effective date of the Settlement Agreement, and Mr. Bowen was generally aware that Ditech did not implement the loan modification correctly and that the escrow balance was inaccurate. *See Stip.* Attach. 15 *Def.'s First Am. Answer, Defenses, and Counterclaims to Pl.'s Compl.* at 6–7, ¶¶ 33, 43–44. Because Ditech's failure to implement the loan modification accurately with respect to the escrow balance was one of the problems that prompted Mr. Bowen's counterclaims in the underlying foreclosure action, his claims, to the extent they are based on this pre-settlement conduct, would be barred.

However, the allegations in the Amended Complaint confirm that Mr. Bowen's legal claims are not predicated on this specific conduct. He does not allege that Ditech is liable because it failed to implement the modification and did not capitalize the escrow amounts correctly. Instead, Mr. Bowen's claims arise out of Ditech's failure to notify him that the escrow shortage and deficiency still existed at the time of, and by ninety days after, the reinstatement in May 2015, and out of Ditech's decision to

make up for that escrow deficiency and shortage in March 2016 through additional monthly charges not included in the reinstatement quote. Essentially, Mr. Bowen argues that Ditech misrepresented the reinstatement amount in May 2015 by failing to take the shortage and deficiency into account. This conduct took place after April 24, 2015, the effective date of the Agreement.

The Defendants argue that even if Mr. Bowen did not know the factual basis for his claims related to the negative escrow balance at the time he signed the Settlement Agreement, they are still barred by the broad language of the release. *Defs.' Mot.* at 15–16. They rely on three cases to support this argument. *Id.*

The first is a Massachusetts case, *Eck v. Godbout*, 831 N.E.2d 296 (Mass. 2005). The Defendants cite this case for the proposition that the "broad wording in the release operates to settle all other, unrelated matters, even if they were not specifically in the parties' minds at the time the release was executed." *Eck*, 831 N.E.2d at 300–01. The Court agrees with this general proposition; however, it does not help the Defendants. Although the release in this case is general and broad, it expressly extends only to claims existing "up until the Effective Date of [the] Agreement." *Settlement Agreement and Release* ¶ 1E. Mr. Bowen's claims pertain to new conduct related to the escrow account that took place after the Agreement came into effect.

The second case is *Rivera-Olmo v. State Insurance Fund Corp. (SIFC)*, 250 F. App'x 365 (1st Cir. 2007) (per curiam), a case in which the plaintiff claimed that the defendant failed to adhere to the terms of the settlement agreement and that the

failure constituted new violations of the Americans with Disability Act (ADA). Mr. Bowen does not make similar contentions here. He is not arguing that the Defendants failed to adhere to the underlying Settlement Agreement. He alleges that Ditech engaged in new conduct and new violations. Further, the language in the release from the *Rivera-Olmo* case was not limited to claims existing up until the date of the Agreement, as it is here, but instead "releas[ed] and forever discharg[ed] [SIFC] for any and all claims, without limitation . . . including . . . a release and discharge for any potential and/or actual liability for any causes of action pursuant [sic] and/or under" various laws and statutes, including the ADA. *Id.* at 367. It is for this reason that the First Circuit concluded that "[a]ny of Rivera-Olmo's claims alleging new violations of the ADA . . . are therefore barred by the general release." *Id.* The same rationale does not apply in Mr. Bowen's case.

The final case is *Pilalas v. Cadle Company*, 695 F.3d 12 (1st Cir. 2012). In *Pilalas*, the plaintiff brought claims based upon allegedly unlawful debt collection practices engaged in by the defendant prior to plaintiff signing a release and that the release was obtained by fraud. *Id.* at 14. The release, by its terms, covered all claims the plaintiff might bring against the defendant "[then] existing or arising [t]hereafter." *Id.* at 13. The case before the Court differs from *Pilalas* in two important respects. First, Mr. Bowen's argues that his claims arise out of post-release conduct, and, second, the release Mr. Bowen signed bars only those claims arising out of conduct up to the date of the release. Mr. Bowen cannot sustain a claim based on pre-release and pre-settlement conduct, such as the failure to capitalize the

correct amount at the time of the loan modification in 2014. However, the conduct about which Mr. Bowen now complains is new conduct that took place after the Settlement Agreement and Release and is therefore not barred.[29] Even if Ditech were correct in its contention that some of Mr. Bowen's claims are completely predicated upon pre-settlement conduct, there are too many intertwined factual issues regarding Ditech's handling of the negative escrow balance for the Court to find so as a matter of law.

## B. Pecuniary Loss

As a second threshold matter, the Defendants argue that the fraud/fraudulent misrepresentation, breach of fiduciary duty, and UTPA claims fail because Mr. Bowen has not proven that he suffered a pecuniary loss. *Defs.' Mot.* at 16–17; *Defs.' Opp'n* at 18–19. Specifically, they argue that emotional distress and attorney's fees are not recoverable as pecuniary losses and that Ditech removed all of the challenged fees and/or credited them to Mr. Bowen's account.

The Defendants are correct insofar as Mr. Bowen must demonstrate a pecuniary loss in order to sustain a claim for fraud, breach of fiduciary duty, or UTPA. *See Jourdain v. Dineen*, 527 A.2d 1304, 1307 (Me. 1987) ("We therefore conclude that pecuniary loss is an essential element of a fraud action and that damages for emotional or mental pain and suffering are not recoverable"); *Warner v. Atkinson Freight Lines Corp.*, 350 F. Supp. 2d 108, 124 (D. Me. 2004) (stating that a claim for

---

[29]     Mr. Bowen also argues that even if the Agreement bars his claims, Fannie Mae was not a party to the settlement, and therefore the release is inapplicable to the claims against Fannie Mae. *Pl.'s Mot.* at 3. Because the Court concludes that the Settlement Agreement and Release does not bar Mr. Bowen's claims, it does not reach this issue.

breach of fiduciary duty requires a plaintiff to show that he has damages proximately caused by the defendants' breach of fiduciary duty); *McAfee v. Wright*, 651 A.2d 371, 373 (Me. 1994) (concluding that emotional distress damages are not available for breach of fiduciary duty); *Poulin v. Thomas Agency*, 746 F. Supp. 2d 200, 206 (D. Me. 2010) ("UTPA allows only those private litigants who have lost 'money or property' to sue for actual damages, restitution, and equitable relief") (quoting *In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*, 660 F. Supp. 2d 94, 102 (D. Me. 2009)); *see also* 5 M.R.S. § 213(1) (limiting relief to plaintiffs who have suffered a "loss of money or property, real or person"). However, the Defendants are incorrect that Mr. Bowen has failed to demonstrate any pecuniary loss. According to the record, Mr. Bowen paid additional charges and fees that he did not owe in the amount of $142.80 ($35.70 x 4) and paid the inflated escrow payment for the escrow shortage and deficiency. These overpayments constitute a loss of money.

Ditech argues that because it credited Mr. Bowen's account for the overcharges[30], Mr. Bowen's claim fails. The Court is not persuaded. There is no Maine law that suggests that a loss must be uncompensated in order to sustain a claim for fraud, breach of fiduciary duty, or UTPA violations. In the similar context of Chapter 93A, the Massachusetts Consumer Protection Statute, courts have held that "the loss of the use of money owed to a plaintiff" satisfies the loss of money or property requirement of the statute. *See Arthur D. Little, Inc. v. Dooyang Corp.*, 147 F.3d 47, 56–57 (1st Cir. 1998); *see also Auto Flat Car Crushers, Inc. v. Hanover Ins.*

---

[30]     Mr. Bowen acknowledges that Ditech credited his account for these improper charges. *Tr. of Oral Argument* at 47–48.

*Co.*, 17 N.E.3d 1066, 1071 (Mass. 2014) ("We conclude that, because the statute does not require a plaintiff to demonstrate uncompensated loss or to obtain a judgment on an underlying claim in order to proceed, neither the plaintiff's acceptance of full reimbursement of its expenses nor the absence of a judgment establishing contract damages precludes the plaintiff from pursuing a claim under [Chapter 93A]."). Chapter 93A has been a prototype for the UTPA, suggesting that Maine courts would reach the same conclusion, at least with respect to the UTPA claim. *See Hoglund ex rel. Johnson v. Diamler Chrysler Corp.*, 102 F. Supp. 2d 30, 31 (D. Me. 2000). Mr. Bowen was wrongfully deprived of funds for at least some period of time, and that constitutes the pecuniary loss he must demonstrate to sustain his claims for fraud, breach of fiduciary duty, or UTPA.

### C.    Count I: Fraud/Fraudulent Misrepresentation

The Court turns to Mr. Bowen's claims. In Count I of the Amended Complaint, Mr. Bowen brings a claim for fraud or fraudulent misrepresentation. *Am. Compl.* at 19. The elements of fraud or fraudulent misrepresentation are (1) making a false representation; (2) of material fact; (3) with knowledge of its falsity or in reckless disregard of whether it is true or false; (4) for purposes of inducing another to act upon it; and (5) justifiable and detrimental reliance by the other. *Harkness v. Fitzgerald*, 1997 ME 207, ¶7, 701 A.2d 370 (citing *Grover v. Minette-Mills, Inc.*, 638 A.2d 712, 716 (Me. 1994)); *Flaherty v. Muther*, 2011 ME 32, ¶45, 17 A.3d 640 (citing *Me. Eye Care Assocs. P.A. v. Gorman*, 2008 ME 36, ¶ 12, 942 A.2d 707).

The Defendants argue that Mr. Bowen's claims fail because whether the fees were an error is a legal issue and misrepresentations of legal issues do not constitute fraud. *Defs.' Opp'n* at 19–20. To support their position, the Defendants rely on a case from the Northern District of California, *Ellis v. J.P. Morgan Chase & Co.*, No. 12-cv-03897-YGR, 2016 WL 5815733 (N.D. Cal. Oct. 5, 2016). However, the *Ellis* case is distinguishable from this one. In *Ellis*, the plaintiff brought a fraud claim for Chase's explicit statements that the property inspection fees assessed to their accounts "include those amounts allowed by [their] Note and Security Instrument." 2016 WL 5815733, at *6. The *Ellis* Court rejected the plaintiff's claim, explaining that "[a]s a rule, fraud cannot be predicated on misrepresentations as to the legal effect of a written instrument as, for example . . . a note and mortgage" and reasoning that the misstatements related to Chase's interpretation of its authority under the mortgage agreements. *Id.* at *7. By contrast, Mr. Bowen's claim is not based on any affirmative representations made by Ditech about its authority under the loan. His claims are based on additional fees and charges not due under the loan. Ditech itself stated that the $35.70 fees were inadvertent, *see Dec. 9, 2015 Letter*, and Ditech's corporate representative, Ms. Christensen, acknowledged that Ditech should not have charged Mr. Bowen the additional fees for the escrow payment. *See Christensen Dep.* 197:4-7. The representation that Mr. Bowen owed additional money for fees and charges to make up for the escrow deficiency and shortage is a statement of fact, not a conclusion of law.

Ditech also argues that Mr. Bowen has not demonstrated justifiable and detrimental reliance because he knew the fees were incorrect and therefore could not have justifiably relied on the representations. *Defs.' Mot.* at 17; *Defs.' Opp'n* at 20. The Defendants are correct that a reliance is unjustified "if the plaintiff knows the representation is false or its falsity is obvious to him." *St. Francis De Sales Fed. Credit Union v. Sun Ins. Co. of N.Y.*, 2002 ME 127, ¶ 29, 818 A.2d 995 (quoting *Estate of Whitlock*, 615 A.2d 1173, 1176 (Me. 1992)). However, the Court is not convinced that Mr. Bowen knew to a certainty that the amounts charged by Ditech were false representations of what he owed. After examining the record, including the relevant correspondence between Ditech and Mr. Bowen, the Court observes that it would be extraordinarily difficult for anyone lacking certification as a public accountant or similar specialized training to know that the Ditech fees were improper. It may be true that Mr. Bowen believed that he did not owe the additional Ditech fees. However, in its initial letter regarding the $35.70 charges, Ditech represented that the fees were proper, *July 28, 2015 Ditech Letter*, and, even now, Ditech maintains that the inflated escrow payments are proper, suggesting to Mr. Bowen that he did actually owe the additional amounts. Moreover, if Mr. Bowen did not pay the additional charges, his payments could have been held in suspense, and he would have risked being foreclosed upon. Foreclosure was not an unreasonable concern since it had happened to him before based on very similar conduct and began to happen to him again when he stopped making the higher monthly escrow payments. *See April 1, 2016 Ditech Letter* (warning Mr. Bowen his account was in default and

providing alternatives to foreclosure). These are exactly the reasons Mr. Bowen provides to explain why he made the inflated payments. *See Bowen Aff.* ¶¶ 13, 14, 24, 25. The Court concludes that in this situation and based on these facts, a reasonable jury could conclude that Mr. Bowen's reliance on the misrepresentation was both justified and detrimental.

The question remains whether Mr. Bowen has proven the other elements of fraud and is entitled to summary judgment on Count I. It is undisputed that Ditech, in continuing to charge the fees, even after acknowledging that these fees were improper, made a false representation with knowledge of its falsity. Further, the misrepresentation of an amount owed on a debt is a material fact. *See Asch v. Teller, Levit & Silvertrust, P.C.*, No. 00 C 3290, 2003 U.S. Dist. LEXIS 16747, at *18 (N.D. Ill. Sept. 26, 2003) ("Here, plaintiffs have shown that defendant misrepresented a material fact, namely, the proper amount owed by debtors."). Additionally, as already discussed, Mr. Bowen has demonstrated that he detrimentally and justifiably relied on those misrepresentations.

It is less clear whether Ditech intentionally made the false representations "for purposes of inducing another to act upon it." *Harkness*, 1997 ME 207, ¶7, 701 A.2d 370. On the one hand, the inclusion of the fees may have been an honest mistake. On the other hand, Ditech repeatedly re-included the fees and demanded the higher payment knowing that Mr. Bowen would either need to make the higher payment or risk entering default. Given the lack of factual development on this issue and the

difficulties in determining intent, the Court perceives a genuine dispute of facts as to Ditech's intentions that precludes summary judgment on these claims.

### D. Count II: MUTPA

In Count II of his Amended Complaint, Mr. Bowen claims that Ditech violated the MUTPA. *Am. Compl.* at 21. The MUTPA provides in relevant part: "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful." 5 M.R.S. § 207. An act or practice is unfair if it: (1) causes, or is likely to cause, substantial injury to consumers; (2) that is not reasonably avoidable by consumers; and (3) that is not outweighed by any countervailing benefits to consumers or competition. *State v. Weinschenk*, 2005 ME 28, ¶ 16, 868 A.2d 200; *see also Anderson v. Hannaford Bros. Co.*, 659 F.3d 151, 159 (1st Cir. 2011). An act or practice is deceptive if "it is a material representation, omission, act or practice that is likely to mislead consumers acting reasonably under the circumstances . . . An act or practice may be deceptive, within the meaning of Maine's UTPA, regardless of a defendant's good faith or lack of intent to deceive." *Weinschenk*, 2005 ME 28, ¶ 17, 868 A.2d 200 (citations and internal quotation marks omitted). The Maine Law Court looks to federal precedent in determining what constitutes an unfair or deceptive act. *See* 5 M.R.S. § 207(1) ("It is the intent of the Legislature that in construing this section the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 45(a)(1) of the Federal Trade Commission Act . . . "); *see also Tungate v. MacLean-Stevens Studios, Inc.*, 1998 ME 162, ¶ 9, 714 A.2d 792.

1. **Statutory Notice**

The MUTPA requires that at least thirty days prior to the filing of an action for damages, "a written demand for relief, identifying the claimant and reasonably describing the unfair and deceptive act or practice relied upon and injuries suffered." 5 M.R.S. § 213(1-A). The Defendants argue in their brief in opposition to Mr. Bowen's motion for summary judgment that because Attorney Stark did not provide written notice with regard to the inflated escrow claim, that claim is barred as a matter of law. *Defs.' Opp'n* at 22–23. The Defendants are mistaken, and at oral argument they conceded that *Oceanside at Pine Point Condominium Owners Association v. Peachtree Doors, Inc.*, 659 A.2d 267 (Me. 1995) explains why. *Tr. of Oral Argument* at 49-50.

In *Oceanside*, the Maine Supreme Judicial Court explicitly held that the notice requirements of section 213(1-A) are not jurisdictional and do not operate to preclude a plaintiff from maintaining a MUTPA claim. 659 A.2d at 273. Instead, the Law Court explained that the requirement is designed "to encourage settlement by notifying the defendant of the claim within a certain amount of time prior to the initiation of the suit" and that, if a defendant makes an offer and that offer is rejected, "attorneys fees and costs otherwise recoverable become unavailable if the judgment recovered is less favorable than the rejected settlement offer." *Id.* Therefore, the Law Court reasoned, "[d]isallowing attorney fees and costs would be one remedy consistent with the section's purpose." *Id.*

Attorney Stark did send an offer of settlement per the MUTPA with regard to both claims. She sent one letter regarding the claims under the MUTPA on November

3, 2015 and a second letter on February 20, 2016.  In the first letter, Attorney Stark discusses the improper charges and fees in the amount of $35.70 and makes an offer for settlement; however, she never mentions the inflated escrow payments, presumably because they had not begun at this time.  She did, however, discuss the inflated escrow amounts in her February 20, 2016 letter.  The Court rejects the Defendants' argument on this issue.

### 2. Unfair or Deceptive Acts

The Court concludes that Ditech's conduct in this case was deceptive under the MUTPA.  As already discussed with respect to the fraud claim, Ditech made misrepresentations about the amount of money that Mr. Bowen owed under the loan, and Mr. Bowen was likely to rely on these misrepresentations, especially given Ditech's conduct with respect to the loan in the past.  Mr. Bowen did in fact rely on the representations in making inflated payments.  *See Weinschenk*, 2005 ME 28, ¶ 17, 868 A.2d 200.  Unlike the fraud counts, Mr. Bowen need not show that Ditech's actions were in bad faith or that it had the intent to deceive in order to demonstrate that the conduct was "deceptive" under UTPA.  *See id.*  Therefore, Mr. Bowen is entitled to summary judgment on his MUTPA claim.[31]

### E. Counts III & IV: MFDCPA & FDCPA

Mr. Bowen alleges that Ditech violated the FDCPA and the MFDCPA and that he is entitled to summary judgment on both of those counts.  In order to prevail on

---

[31]     The Defendants argue that Mr. Bowen's injury is not substantial.  The Court disagrees.  The substantial injury requirement is for analyzing whether an act is "unfair," but the Court's determination is based on the acts being "deceptive," which does not include substantial injury as an element.  *See Weinschenk*, 2005 ME 28, ¶¶ 15–18, 868 A.2d 200.

an FDCPA[32] claim, a plaintiff must show that "(1) he was the object of collection activity arising from consumer debt, (2) the defendant is a debt collector within the meaning of the statute, and (3) the defendant engaged in a prohibited act or omission under the FDCPA." *Kowalski v. Seterus, Inc.*, No. 2:16-cv-00160-JAW, 2017 WL 79949, at *9 (D. Me. Jan. 19, 2017) (quoting *Poulin*, 760 F. Supp. 2d at 158). The parties do not dispute that the account at issue was a consumer loan. However, Ditech argues that it is a not a debt collector because the loan was not in default at the time it acquired servicing rights to the loan. *Defs.' Mot.* at 21–23; *Defs.' Opp'n* at 10–13. It further argues that it did not violate the FDCPA or MFDCPA because the fees collected by Ditech were authorized under the note and mortgage. *Defs.' Reply* at 2–3; *Defs.' Opp'n* at 14.

### 1. Debt Collector

The FDCPA defines a "debt collector" as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). "Creditors collecting on their own accounts are generally excluded from the statute's reach." *Chiang v. Verizon New Eng., Inc.*, 595

---

[32] Mr. Bowen brings claims under both the Federal Fair Debt Collections Practice Act and the Maine Fair Debt Collections Practices Act. Because the MFDCPA tracks the language of the FDCPA, the claims are analyzed under the same standard, and the Court refers only to the FDCPA unless otherwise noted. *See Shapiro v. Haenn*, 222 F. Supp. 2d 29, 44 (D. Me. 2002); *Hamilton v. Fed. Home Loan Mortg. Corp.*, No. 2:13-cv-00414-JAW, 2014 WL 4594733, at *18 (D. Me. Sept. 15, 2014) (analyzing federal and state statutes together); *In re Martel*, 539 B.R. 192, 194 n.4 (Bankr. D. Me. 2015) ("The Maine FDCPA mirrors the federal Act, and therefore, my analysis applies equally to each").

F.3d 26, 41 (1st Cir. 2010) (citing 15 U.S.C. § 1692a(6)(F)(ii)). The term also does not include persons attempting to collect such debts if the "debt was not in default" at the time it was obtained by such person. 15 U.S.C. § 1692a(6)(F)(iii). In other words, when a debt is assigned, the FDCPA "treats assignees as debt collectors if the debt sought to be collected was in default when acquired by the assignee, and as creditors if it was not." *Napolitano v. Green Tree Servicing, LLC*, No. 2:15-cv-00160-JAW, 2016 WL 447451, at *8 (D. Me. Feb. 4, 2016) (quoting *Schlosser v. Fairbanks Capital Corp.*, 323 F.3d 534, 536 (7th Cir. 2003)); *Beaulieu v. Bank of Am. N.A.*, No. 1:14-cv-00023-GZS, 2014 WL 4843809, at *12 (D. Me. Sept. 29, 2014) (collecting cases). Courts have "look[ed] to any underlying contracts . . . governing the debt at issue" to determine whether it is in default. *Dionne v. Fed. Nat'l Mortg. Ass'n*, No. 15-cv-56-LM, 2016 WL 6892465, at *11 (D.N.H. Nov. 21, 2016) (quoting *De Dios v. Int'l Realty & Invs.*, 641 F.3d 1071, 1074 (9th Cir. 2016) (internal citation omitted)).

Whether Mr. Bowen's loan was in default at the time of the service transfer is less than clear. The parties agree that Mr. Bowen entered into the Fannie Mae TPP because he had defaulted on his loan. The FDCPA, the TPP, and the mortgage loan all fail to define "default." Mr. Bowen was required to make three timely payments, one on March 1, 2013, the second on April 1, 2013, and the final on May 1, 2013. Mr. Bowen did so and signed a permanent loan modification agreement on June 3, 2013; however, the loan modification agreement did not become operative until July 1, 2013. Meanwhile, the servicing of his loan was transferred to Ditech, and the transfer became effective on June 1, 2013.

Ditech argues that the TPP is a contract that superseded the original note and mortgage and that, because Mr. Bowen's TPP payments were timely, the loan was not in default when it acquired servicing rights. It relies on two cases to support its statement that the TPP is itself a contract. The first is *Durmic v. JP Morgan Chase, NA*, No. 10-CV-10380-RGS, 2010 WL 4825632 (D. Mass. Nov. 24, 2010), in which the District of Massachusetts stated that the TPP "has the appearances of a contract" based on the fact that the TPP "characterizes itself as an agreement, contains signature lines for the Lender and the Borrower and includes distinctly contractual phrases such as 'under seal' and 'time is of the essence.'" *Id.* at *1 n.4. However, the District of Massachusetts never held that a TPP is, as a matter of law, a contract; it concluded that this issue depended on the intention of the parties and therefore could not be resolved at the motion to dismiss stage. *Id.* at *4. The second case relied upon by Ditech is also from the District of Massachusetts, *Bosque v. Wells Fargo Bank, N.A.*, 762 F. Supp. 2d 342 (D. Mass. 2011). In that case, the District of Massachusetts concluded that the plaintiffs alleged sufficient facts to survive the motion to dismiss stage for a claim for breach of contract based on the terms of the TPP. *Id.* at 352–53.

Ditech then relies on caselaw in which courts have concluded that when a borrower is current on the payments for a superseding agreement, the loan is not in default. *See In re Tolliver*, 464 B.R. 720, 746 (Bankr. E.D. Ky. 2012) (citing *Bailey v. Sec. Nat'l Servicing Corp.*, 154 F.3d 384, 387–88 (7th Cir. 1998)); *see also Dolan v. Fairbanks Capital Corp.*, 930 F. Supp. 2d 396, 415–16 (E.D.N.Y 2013) (holding that

loan was not in default because borrower was current on payments under superseding

forbearance agreement). The *Bailey* Court explained the reasoning::

> [I]f we did not make this common-sense distinction between defaulted
> agreements and superseding agreements not in default, we would be
> ignoring the terms and the parties' undoubted purpose behind the new
> payment plans by saying that a debtor in default can never have his
> slate wiped clean or given a last chance to become credit-worthy under
> a new plan. We also would be saying that a mortgage servicer . . . is a
> debt collector that is subject to the hyper-technical requirements of the
> Act no matter how far down the line it is hired to service a debt that
> superseded a debt previously in default.

*Bailey*, 154 F.3d at 387. Applying that reasoning to the case at bar, Ditech argues

that because Mr. Bowen was current in his payments on the TPP at the time of the

service transfer, his loan was not in default and Ditech is not a debt collector under

the FDCPA.

It is possible that Ditech is correct in its conclusions that the TPP is a contract,

that the TPP superseded the original terms of the mortgage and note, and that

technically, under the terms of the TPP, Mr. Bowen was not in default.[33] However,

the Court need not reach this issue because Ditech alleged that the loan was in

---

[33] The Court is skeptical. Unlike *Bailey*, wherein the "renegotiated payment plan" at issue
expressly "superseded" the original note and mortgage, the terms of the Trial Payment Plan entered
into by Mr. Bowen suggest the opposite. The TPP notes that other than the change in monthly
payment amount, "all other terms and provisions of your existing mortgage loan remain in effect and
will not change until your loan is permanently modified." *Defs.' Mot.* Attach. 1 *Trial Period Plan* at
2. It goes on to state:

> Note: This is only a temporary Trial Period Plan. Your existing loan requirements
> remain in effect and unchanged during the trial period and you will continue to receive
> monthly statements that will show the payment amount based on your original home
> loan agreement . . . You agree that all terms and provisions of your current mortgage
> note and mortgage security instrument remain in full force and effect and you will
> comply with those terms; and that nothing in the Trial Period Plan shall be understood
> or construed to be a satisfaction or release in whole or in part of the obligations
> contained in the loan documents.

*Id.* at 3, 5. The plain language of these terms contradict Ditech's contention at oral argument that the
mortgage note was not in effect. *Tr. of Oral Argument* at 30.

default, and treated it as if it was in default, from the moment it began servicing the loan. Courts have concluded that an entities that mistakenly believe a debt was in default when they acquired the debt as well as entities that treat the debt as such are not freed from the strictures of the FDCPA by their own error. *Schlosser,* 323 F.3d at 538; *see also Bridge v. Ocwen Fed. Bank, FSB,* 681 F.3d 355, 362–63 (6th Cir. 2012); *Poynter v. Ocwen Loan Servicing, LLC,* No. 3:13-cv-773-DJH-CHL, 2016 WL 5380926, at *5 (W.D. Ky. Sept. 23, 2016) (holding that debt collector even through current on modification agreement payments because engaged in conduct that is more likely to occur when a loan is in default); *Ademiluyi v. PennyMac Mortg. Inv. Tr. Holdings I, LLC,* No. ELC-12-00752, 2015 WL 2455811, at *19 (D. Md. May 22, 2015); *Gritters v. Ocwen Loan Servicing, LLC,* 14–C00916, 2014 WL 7451682, at *4–5 (N.D. Ill. Dec. 31, 2014); *Belin v. Litton Loan Servicing, LP,* 8:06–cv–760–T–24 EAJ, 2006 WL 1992410, at *3 (M.D. Fla. July 14, 2006). As the Seventh Circuit explained in *Schlosser*:

> It makes little sense, in terms of the conduct sought to be regulated, to exempt an assignee from the application of the FDCPA based on a status it is unaware of and that is contrary to its assertions to the debtor. The assignee would have little incentive to acquire accurate information about the status of the loan because, in the context of the mistake in this case, its ignorance leaves it free from the statute's requirements.

323 F.3d at 538.

Ditech issued to Mr. Bowen a billing statement dated June 15, 2013, two weeks after it began servicing the loan, claiming that Mr. Bowen had a negative escrow balance of $3,763.20 and a total payment due of $14,333.10, which included a current payment of $870.61, a past due payment of $9,576.71, and escrow due of $3,885.78.

*Stip.* ¶ 18; *id.* Attach. 13 *Green Tree Monthly Billing Statement* (June 15, 2013) (*June 2013 Statement*); DSAMF ¶ 7; PRDSAMF ¶ 7. This billing statement includes the language "YOUR ACCOUNT IS SERIOUSLY PAST DUE!" *June 2013 Statement* at 1. Ditech also issued to Mr. Bowen a billing statement dated July 8, 2013 stating that Mr. Bowen had negative escrow balance of $3,763.20 and a total payment due of $15,522.91, which included a current payment of $870.61, a past due payment of $10,447.32, and escrow due of $4,204.98. *Stip.* ¶ 15; *id.* Attach. 10 *Green Tree Monthly Billing Statement* (July 8, 2013) (*July 2013 Statement*); DSAMF ¶ 8; PRDSAMF ¶ 8. This billing statement includes the same language "YOUR ACCOUNT IS SERIOUSLY PAST DUE!" *July 2013 Statement* at 1. It was not until January 2014, seven months after the transfer of service, that Ditech adjusted Mr. Bowen's account to reflect the terms of the Modification Agreement. *Stip.* ¶ 19. However, only two months later, Ditech brought a foreclosure action against Mr. Bowen. *Stip.* ¶ 21. Given this course of conduct at the time of the transfer, even assuming the loan was not technically in default because Mr. Bowen had made the TPP payments on time, Ditech treated the loan as if it was in default and therefore Ditech is a debt collector under the FDCPA.

### 2. Alleged Violations

Mr. Bowen alleges that Ditech violated the FDCPA by charging him $35.70 in fees that he did not owe and that he repeatedly disputed, and by inflating his monthly escrow payments after the loan reinstatement. In particular, Mr. Bowen argues that this conduct violated the following provisions of the FDCPA: engaging in harassing,

oppressive, or abusive debt collection in violation of § 1692d; using false representation or deceptive means to collect or attempt to collect a debt in violation of § 1692e; and engaging in unfair and unconscionable means in violation of § 1692f.

In determining whether a communication has violated a provision of the FDCPA, the communication "is to be viewed from the perspective of the hypothetical unsophisticated consumer." *Pollard v. Law Office of Mandy L. Spaulding*, 766 F.3d 98, 103 (1st Cir. 2014). This standard protects "all consumers, including the inexperienced, the untrained and the credulous." *Id.* at 103 (citations omitted). However, the standard is an objective one, which preserves an element of reasonableness. *Id.* at 104. "A debt collector will not be held liable based on an individual consumer's chimerical or farfetched reading of a collection letter." *Id.*; *see also Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241, 251 (3rd Cir. 2011) ("[W]e preserv[e] a quotient of reasonableness and presum[e] a basic level of understanding and willingness to read with care") (internal quotations omitted); *Pettit v. Retrieval Masters Creditors Bureau, Inc.*, 211 F.3d 1057, 1060 (7th Cir. 2000) ("[O]ur uneducated debtor possesses rudimentary knowledge about the financial world ... and is capable of making basic logical deductions and inferences").

### a.    15 U.S.C. § 1692d

Under § 1692d, "[a] debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." 15 U.S.C. § 1692d. The FDCPA provides a non-exhaustive list of examples of the type of conduct that would violate this provision, such as the

use or threat of use of violence, the use of obscene or profane language, and the causing of a telephone to ring or the engaging of any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass. *Id.*

Mr. Bowen claims that Ditech's continued efforts to collect the fees not owed by him was harassing and abusive conduct. He relies on a case from this Court, *Kowalski v. Seterus, Inc.*, No. 2:16-cv-00160-JAW, 2017 WL 79949 (Jan. 9, 2017). In *Kowalski*, a loan servicer repeatedly sent demands for payment on a loan after a stipulated judgment of foreclosure that released personal liability on the loan, and after the period of redemption had expired. *Id.* at 2. The Court concluded that the plaintiff pleaded sufficient facts to demonstrate a violation of § 1692d stating that "sending letters on a repeated basis suggesting an obligation to pay money when none is present could rise to the level of harassing conduct." *Id.* at *15. Although the procedural posture and factual circumstances of *Kowalski* are different from Mr. Bowen's case, the same principles apply. Ditech repeatedly included fees and charges in the amount of $35.70 and continued to do so even after Mr. Bowen complained and Ditech acknowledged that these fees were improper. Moreover, after having removed the $35.70 in fees and charges for good, Ditech began to charge Mr. Bowen an inflated monthly payment for an escrow shortage and deficiency. Ditech argues that it was authorized to collect payments to make up for the escrow deficiency and shortage.

The Court is not persuaded. At the time of the reinstatement, Ditech did not perform an escrow analysis. Mr. Bowen was under the impression that his escrow account should have been and had been taken care of during the loan modification

back in 2014, and therefore was reasonably led to believe the shortage no longer existed on his escrow account. Ditech failed to notify him otherwise. Therefore, Mr. Bowen reasonably believed that in reinstating his loan, his monthly payments would be the same as they had been before. *See Pollard*, 766 F.3d at 103 (communications are "to be viewed from the perspective of the hypothetical unsophisticated consumer"). In failing to notify Mr. Bowen about the escrow deficiency and shortage at reinstatement but then attempting to collect higher monthly payments almost a year later and sending Mr. Bowen letters explaining that his account was in default because his mortgage payment was past due, Ditech engaged in conduct, the natural consequence of which is to abuse Mr. Bowen. *See Gritters*, 2014 WL 7451682, at *6 (citing *Evory v. RJM Acquisitions Funding, LLC*, 505 F.3d 769, 778 (7th Cir. 2007) ("[A] threat to impose a penalty that the threatener knows is improper because unlawful is a good candidate for a violation of sections 1692d and e")). Ditech therefore violated § 1692d.

### b.    15 U.S.C. § 1692e

Under § 1692e, "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. Specifically, the act prohibits a debt collector from providing a "false representation of the character, amount, or legal status of any debt." *Id.* § 1692e(2)(A). A representation is deceptive "when it can be reasonably read to have two or more different meanings, one of which is inaccurate." *Waters v. Kream*, 770 F.

Supp. 2d 434, 436 (D. Mass. 2011) (quoting *Russell v. Equifax A.R.S.*, 74 F.3d 30, 35 (2d Cir. 1996)).

Mr. Bowen argues that Ditech's attempts to collect fees and escrow payments not owed is a clear violation of section 1692e. The Court agrees. Ditech itself admitted that the fees and charges of $35.70 were improper, but it continued to include the fees for a short period in Mr. Bowen's monthly statements. Further, although Mr. Bowen may have had an escrow shortage and deficiency on his account, that escrow deficiency was Ditech's fault and was not included in the reinstatement quote it provided to Mr. Bowen in 2015. In addition, Ditech's own corporate representative admitted in her deposition that Ditech should not have been collecting the additional payment. By issuing these monthly statements with the improper amount owed, Ditech violated § 1692e(2)(A). *See Gritters*, 2014 WL 7451682, at *6. Further, by sending Mr. Bowen letters stating that his loan was in default and providing alternatives to foreclosure when in fact Mr. Bowen's loan was not in default given he made the correct monthly payments, Ditech violated § 1692e(5) which prohibits a "threat to take any action that cannot legally be taken or that is not intended to be taken."

### c.      15 U.S.C. § 1692f

Mr. Bowen also alleges a violation of § 1692f of the FDCPA, which provides that "[a] debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f. The FDCPA does not define "unfair or unconscionable means," but it does provide examples of conduct that could violate

the provision. For example, it is a violation to collect any amount unless such amount is expressly authorized, or to take or threaten to take any non-judicial action to effect dispossession or disablement of property if there is no present right to possession. *Id.* § 1692f(1), (6). Other courts have defined "unfair or unconscionable means" by relying on the plain meaning of the terms. The meaning of "unfair" is "marked by injustice, partiality, or deception." *See LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1200 (11th Cir. 2010) (citing Merriam-Webster Online Dictionary (Feb. 11, 2010), http://www.merriam-webster.com/dictionary/unfair). The meaning of "unconscionable" is "having no conscience," "unscrupulous," "showing no regard for conscience," or "affronting the sense of justice, decency, or reasonableness." *See id.* (citing *Unconscionable*, BLACK'S LAW DICTIONARY (7th ed. 1999)).

Mr. Bowen claims that Ditech violated § 1692f(1) by collecting unauthorized amounts. The Court agrees. Ditech argues that the note allowed it to charge the escrow amounts and therefore its conduct was not an unfair practice under the statute. *See* 15 U.S.C. § 1692f(1) ("The collection of any amount . . . unless such amount is expressly authorized by the agreement creating the debt or permitted by law"). The Court disagrees. Ditech's corporate representative conceded that Ditech should not have been charging the inflated escrow payment.

Because Ditech violated various provisions of the FDCPA, Mr. Bowen is entitled to summary judgment on these counts.[34]

---

[34]     The Defendants argue that even if Mr. Bowen established violations of the FDCPA, he is limited to statutory damages because he has not established any causal link between the alleged FDCPA and MFDCPA violations and his emotional distress. *Defs.' Opp'n* at 14–16. The facts surrounding Mr. Bowen's emotional distress were not sufficiently developed in the record, and the

### F.      Count V: RESPA

Mr. Bowen claims that Ditech did not satisfy its obligations under RESPA by failing to respond to his two QWRs, Notice of Errors, and Requests for Information appropriately.[35]  *Pl.'s Mot.* at 10–12.  Ditech argues that the November 2015 Letter does not constitute a QWR under RESPA, and therefore it had no obligation to respond.  *Defs.' Mot.* at 25.

#### 1.      QWRs

Pursuant to RESPA:

> If any servicer of a federally related mortgage loan receives a qualified written request from the borrower (or an agent of the borrower) for information relating to the servicing of such loan, the servicer shall provide a written response acknowledging receipt of the correspondence within 5 days . . . unless the action requested is taken within such period.

12 U.S.C. § 2605(e)(1)(A).  Not later than thirty days after the receipt of the QWR, the servicer is required to make appropriate corrections in the account, or, after conducting an investigation, provide a written explanation of why the account is correct or the requested information is unavailable or cannot be obtained.  *Id.* § 2605(e)(2).  The servicer's duty to respond is triggered by receipt of a QWR, which is defined as "written correspondence, other than notice on a payment coupon" that states the name and account number of the borrower and includes a statement of the reasons that the borrower believes the account is in error.  *Id.* § 2605(e)(1)(B).

---

parties agree that the issue of damages is not resolvable on the pending motions, so the Court makes no finding on the issue.

[35]     The requirements for the notice of error and request for information are the same as the requirements for a QWR, so the Court refers only to QWR in its analysis.  *See* 12 C.F.R. § 1024.35; 12 C.F.R. § 1024.36.

Regulation X, RESPA's implementing regulation, provides that "[a] servicer may, by written notice provided to a borrower, establish an address that a borrower must use to submit a notice of error . . . ." 12 C.F.R. § 1024.35(c). Courts are split as to whether the language in 12 C.F.R. § 1024.35(c) allowing a servicer to establish an address for QWRs adds the additional substantive requirement that a written request be sent to such designated address before qualifying as a QWR, thereby triggering the servicer's obligation to respond. *See McMillen v. Resurgent Capital Servs., L.P.*, No. 2:13-cv-00738, 2015 WL 5308236, at *6 (S.D. Ohio Sept. 11, 2015) (providing an overview of the split on this issue). The First Circuit has not addressed this part of the regulation. However, a majority of the federal courts that have examined the issue has held that a QWR sent to an address other than the designated address for receipt and handling does not trigger the servicer's duties under RESPA even if a servicer does in fact receive the QWR. *Roth v. CitiMortgage, Inc.*, 756 F.3d 178, 182 (2d Cir. 2014); *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1148–49 (10th Cir. 2013); *Warren v. Green Tree Servicing, LLC*, No. 14-cv-02241-PAB-CBS, 2015 WL 9259454, at *5 (D. Colo. Dec. 18, 2015); *Bally v. Homeside Lending, Inc.*, No. 02 C 5799, 2005 WL 2250856, at *3 (N.D. Ill. Sept. 8, 2005). These courts reason that the regulation envisioned that only certain communications would trigger liability, *Berneike*, 708 F.3d at 1149, and point to the final rulemaking notice for Regulation X which explained that if a servicer establishes a designated QWR address, "then the borrower must deliver its request to that office in order for the inquiry to be a 'qualified written request.'" *Roth*, 756 F.3d at 181 (quoting Real Estate Settlement

54

Procedures Act, Section 6, Transfer of Servicing of Mortgage Loans (Regulation X), 59 Fed. Reg. 65,442, 65,446 (Dec. 19, 1994)).

A minority of the courts has held that Regulation X does not require a borrower to send QWRs to the designated address and instead focus their inquiry on whether the servicer actually received the borrower's correspondence. *Schatzman v. Partners for Payment Relief, LLC*, No. 1:15-cv-302, 2016 WL 51224, at *5 (S.D. Ohio Jan. 5, 2016) ("The 'receipt' of a QWR, not the address to which it is mailed, triggers the statutory requirements under RESPA"); *Benner v. Bank of Am., NA*, 917 F. Supp. 2d 338, 363–65 (E.D. Pa. 2013); *Vought v. Bank of Am., NA*, No. 10-2052, 2010 WL 4683599, at *5 (C.D. Ill. Sept. 24, 2010), *adopted by*, 2010 WL 4683596 (C.D. Ill. Oct. 27, 2010). These courts focus on the plain language of the statute, which indicates that receipt triggers the servicer's duty to respond. *McMillen*, 2015 WL 5308236, at *6; *see also* 12 U.S.C. § 2605(e)(1)(A) ("If any servicer of a federally related mortgage loan *receives* a qualified written request from the borrower . . . ") (emphasis supplied).

### a. August 3, 2015 Letter

Attorney Stark sent a letter to Ditech disputing the $35.70 in fees and charges on August 3, 2015. This letter contains Mr. Bowen's name, his loan/member number, and a statement explaining why Mr. Bowen believes the charges are in error. *See Aug. 3, 2015 Letter* at 1–2. It therefore satisfies the requirements for a QWR. 12 U.S.C. § 2605(e)(1)(B); *see also Catalan v. GMAC Mortg. Corp*, 629 F.3d 676, 685–90 (analyzing requirements for QWRs). Attorney Stark sent the letter to P.O. Box 6176, the address designated by Ditech for QWRs, and Ditech received the dispute letter

on August 10, 2015, thereby triggering Ditech's obligation to respond within five days. *See Welcome Letter* at 2 ("If you want to send a 'qualified written request' regarding the servicing of your loan to your new servicer, it must be sent to this address: Green Tree, PO Box 6176, Rapid City, SD 57709-6176"); 12 C.F.R. § 1024.35(c). However, Ditech did not acknowledge receipt of the QWR within five days as required by the law. 12 U.S.C. § 2605(e)(1)(A) ("within 5 days (excluding legal public holidays, Saturdays, and Sundays)"). It did not respond until August 20, 2015, ten days after it received the letter. Moreover, even after Ditech admitted that it erred in charging the $35.70 of fees and stated that it would credit the account, it continued to charge the fee in subsequent monthly statements, evidencing a failure to correct the error within thirty days in violation of 12 U.S.C. § 2605(e)(2)(A). Therefore, Ditech violated RESPA with respect to the first QWR sent on August 3, 2015, and Mr. Bowen is entitled to summary judgment on this claim.

### b.      November 3, 2015 Letter

Attorney Stark sent a second dispute letter to Ditech on November 3, 2015. This letter contains Mr. Bowen's name, his loan/member number, and a statement explaining why Mr. Bowen believes the $35.70 charges and certain advances on the account are in error. It therefore satisfies the general requirements for a QWR. Ditech received the letter on November 6, 2015, but this time, Attorney Stark sent the letter to P.O. Box 6172, not P.O. Box 6176, the address initially designated by Ditech for receipt of QWRs. *See Welcome Letter* at 2. At the same time, in a letter dated October 22, 2015, Ditech directed Mr. Bowen to submit his dispute in writing

along with any supporting documentation to: "Ditech Financial LLC, *PO Box 6172*, Rapid City, SD 57709-6172." *October 22, 2015 Letter* at 1 (emphasis supplied). Ditech asserts that this direction pertains only to correspondence regarding the subject matter of the August 2015 QWR and that the letter does not indicate that Mr. Bowen should send any subsequent QWRs to P.O. Box 6172. *Tr. of Oral Argument* at 50–53.

This situation is unlike *Warren v. Green Tree Servicing LLC*, No. 14-cv-02241-PAB-CBS, 2015 WL 9259454 (D. Colo. Dec. 18, 2015), a case relied upon by the Defendants, because in *Warren*, Green Tree established the designated QWR address in the Welcome Letter and continued to explain that "Pursuant to section 6 of RESPA, a 'Qualified Written Request' regarding the servicing of your loan must be sent to [the QWR Address]." *Id.* at *5. Here, Ditech explicitly told Mr. Bowen that he "must" send his dispute to the P.O. Box 6172 address. *Id.* ("Therefore, in order to properly investigate your claim, you *must* submit your dispute in writing along with any supporting documentation to: Ditech Financial LLC, PO Box 6172, Rapid City, SD 57709-6172") (emphasis supplied).

Given the conflicting messages from Ditech, as well as the fact that there is only one-digit difference in the P.O. Box number between the two addresses, the Court concludes that Ditech did not set up one exclusive address for QWRs. *See Hittle v. Residential Funding Corp.*, No. 2:13-cv-353, 2014 WL 3845802, at *6 (S.D. Ohio Aug. 5, 2014) (holding that servicer did not clearly designate an exclusive address when it set forth two apparently contradictory addresses in correspondence two days apart); *Hammer v. Residential Credit Sols. Inc.*, No. 13 C 6397, 2015 WL 7776807, at

*23 (N.D. Ill. Dec. 3, 2015) (holding that a reasonable jury could have concluded that designated exclusive QWR mailing address had changed based on subsequent correspondence); *see also Nash v. Green Tree Servicing, LLC*, 943 F. Supp. 2d 640, 651 (E.D. Va. 2013) ("[I]t is unclear if Green Tree's use of a P.O. Box, presumably at the same location and with only one digit difference from that of the payment services P.O. Box, satisfies the establishment of a *separate* and exclusive office for QWRs") (emphasis in original). Mr. Bowen's November dispute letter qualifies as a QWR under the law.

However, based on the record, the Court is unclear whether Ditech committed any violations of RESPA with respect to the November QWR. Ditech responded to the letter on November 9, 2015, within the five-day window required by 12 U.S.C. § 2605(e)(1)(A). On December 9, 2015, within the thirty-day window, Ditech investigated and provided a written notice to Mr. Bowen explaining that "[t]he amount of $142.80 that was paid towards these advances is in the process of being credited back to the account." *Dec. 9, 2015 Letter*.

Although somewhat confusing, it does appear that Ditech credited Mr. Bowen's account for these inflated payments, and Mr. Bowen does not seem to dispute that Ditech took action with respect to the second QWR. *See Bowen Payment History*; *Pl.'s Mot.* at 10 ("Mr. Bowen, through counsel, delivered a second QWR, NOE, and RFI to Ditech, Ditech received it, reviewed it, and took action as a result of the second QWR."). Nevertheless, given the Court's confusion, even though it seems likely that Ditech satisfied its obligations under RESPA with respect to the second letter, the

Court declines to grant summary judgment on the second letter because it is unable to conclude that there are no material disputed facts.

## 2. Escrow Analysis within Ninety Days

Mr. Bowen also alleges that Ditech violated RESPA by failing to provide an escrow analysis within ninety days. According to RESPA's implementing regulations, no annual escrow statements are required in the case of default, foreclosure, or bankruptcy. 12 C.F.R. § 1024.17(i)(2). However, "[i]f the servicer does not issue an annual statement pursuant to this exemption and the loan subsequently is reinstated or otherwise becomes current, the servicer shall provide a history of the account since the last annual statement (which may be longer than 1 year) within 90 days of the date the account became current." *Id.*

In this instance, Ditech did not provide an annual disclosure statement until January 2016 and had not provided an escrow analysis before that point because it considered the loan delinquent. However, the loan was reinstated in May 2015, and no history of the account was provided within ninety days, as required under the regulations. Thus, Ditech's failure to perform an escrow analysis within ninety days was a violation of RESPA.[36]

## G. Count VI: Breach of Fiduciary Duty

---

[36] Again, the parties argue over whether Mr. Bowen suffered any damages. As previously discussed, the record was not fully developed on the issue of damages. It is unclear how much Mr. Bowen has paid and incurred in terms of attorney's fees, in particular with respect to the QWRs. Also, the only facts presented dealing with emotional distress are that his distress subsided around August 2015. Moreover, the Court is uncertain exactly how much Mr. Bowen was credited on his account. As such, summary judgment on this claim is inappropriate because the Court cannot conclude there are no disputed material facts.

Mr. Bowen alleges that Ditech breached its fiduciary duty of care to him by mismanaging his escrow account after the effective date of the Settlement Agreement. *Pl.'s Mot.* at 16–19; *Pl.'s Opp'n* at 8–12. The Defendants argue that Mr. Bowen's breach of fiduciary duty claims fail because the Defendants did not owe Mr. Bowen a fiduciary duty and, even if they did, they have not breached that duty. *Defs.' Mot.* at 16–21; *Defs.' Opp'n* at 18–19, 20–22.

### 1. The Existence of a Fiduciary Duty

The Maine Supreme Judicial Court has described the elements of a fiduciary relationship as: (1) "'the actual placing of trust and confidence in fact by one party in another,' and (2) 'a great disparity of position and influence between the parties' at issue.'" *Bryan R. v Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 1999 ME 144, ¶ 19, 738 A.2d 839 (quoting *Morris v. Resolution Tr. Corp.,* 622 A.2d 708, 712 (Me. 1993)). To demonstrate the necessary disparity of position and influence in such a relationship, "a party must demonstrate diminished emotional or physical capacity or . . . the letting down of all guards and bars." *Camden Nat'l Bank v. Crest Const., Inc.*, 2008 ME 113, ¶ 13, 952 A.2d 213 (quoting *Stewart v. Machias Sav. Bank*, 2000 ME 207, ¶ 11, 762 A.2d 44); *see also Reid v. Key Bank of S. Me., Inc.*, 821 F.2d 9, 18 (1st Cir. 1987).

The law is clear that, standing alone, neither a creditor-debtor relationship nor a mortgagee-mortgagor relationship in and of itself establishes the existence of a confidential relationship. *Camden Nat'l Bank*, 2008 ME 113, ¶ 15; *see also Lariviere v. Bank of N.Y. as Tr.*, No. 9-515-P-S, 2010 WL 2399583, at *6 (D. Me. May 7, 2010)

(dismissing claim because plaintiffs made no factual allegations regarding the placement of trust and confidence in loan servicers), *adopted by*, 2010 WL 2399556 (D. Me. June 11, 2010).

What is less clear is whether the creation and management of an escrow account to pay for taxes and insurance under a mortgage would be sufficient to establish fiduciary duties. *Compare Lass v. Bank of Am., N.A.*, 695 F.3d 129, 141 (1st Cir. 2012) (reinstating breach of fiduciary duty claim arising out of charges for excessive flood insurance and related commissions levied by manager of escrow account); *Mahdavieh v. Suntrust Mortg., Inc.*, 2014 WL 1365425, at *5 (S.D. Fla. Apr. 7, 2014) ("While a lender generally does not owe a fiduciary duty to its borrower under Florida law, a fiduciary duty may arise in 'special circumstances' . . . [A]n escrow holder generally owes a fiduciary duty to the parties to the escrow transaction"); *Edwards v. Ocwen Loan Servicing, LLC*, 24 F. Supp. 3d 21, 30 (D.D.C. 2014), *with Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098, 1110-11 (11th Cir. 2014) (holding that lender's administration of escrow funds to pay for force-placed insurance did not give rise to fiduciary relationship); *Miller v. Wells Fargo Bank, N.A.*, 994 F. Supp. 2d 542, 556 (S.D.N.Y. 2014) (concluding that similar mortgage language did not create fiduciary duties because it merely requires the bank to "uses the Escrow funds to pay the Escrow items").

The Maine Supreme Judicial Court has not spoken directly on the issue but has stated that in general, "[t]here is a fiduciary relationship created by and inherent in the nature of an escrow agreement." *Progressive Iron Works Realty Corp. v. E.*

*Milling Co.*, 150 A.2d 760, 762 (Me. 1959); *see also Hamilton v. Fed. Home Loan Mortg. Corp.*, No. 2:13-cv-00414-JAW, 2015 WL 144562, at *18 (D. Me. Jan. 12, 2015) (concluding that a fiduciary relationship could arise between a creditor-debtor based on the creation and maintenance of an escrow account); *Crandall v. Bangor Sav. Bank*, No. CV-98-239, 1999 WL 35360329, at *2 (Me. Super. Ct. Nov. 4, 1999). Defendants argue for a distinction between escrow arrangements wherein the escrow agent is an unbiased, independent third party versus arrangements under which the escrow agent has an express interest in the property. *Tr. of Oral Argument* at 31–33. Defendants argue that fiduciary duties are inherent in the role of the agent in the former type of escrow arrangement and nonexistent in the latter. *Id.* Maine law, as it stands, makes no such distinction, and "[f]ederal court is not the place to make new state law." *Town & Country Motors, Inc. v. Bill Dodge Auto. Grp., Inc.*, 115 F.Supp.2d 31, 33 (D. Me. 2000); *see also Ramirez v. DeCoster*, 194 F.R.D. 348, 360 n.19 (D. Me. 2000) ("[A] federal court is not the forum to develop an extension of state law."); *Douglas v. York Cty.*, 433 F.3d 143, 149 (1st Cir. 2005) ("It is not our role to expand Maine law; that is left to the courts of Maine.") Defendants acknowledge that, *Tr. of Oral Argument* at 32-33, "there appears to be no confusion in the [Maine] decisions, no developing line of authorities that casts a shadow over the established ones, no dicta, doubts or ambiguities in the opinions of [Maine] judges on the question, no legislative development that promises to undermine the judicial rule. Thus, [*Progressive Iron Works*] is the law of Maine, and this Court must apply it." *Jordan v. Hawker Dayton Corp.*, 62 F.3d 29, 31–32 (1st Cir. 1995) (quoting *Bernhardt v.*

*Polygraphic Co. of Am.*, 350 U.S. 198, 205 (1956)). Based on the Maine Law Court's statement in *Progressive Iron Works*, the Court concludes that the establishment and maintenance of an escrow account in this case gave rise to fiduciary duties.

### 2. Breach

The next question is whether Ditech breached its fiduciary obligations. Mr. Bowen alleges that Ditech breached its fiduciary duty by: (1) failing to include all alleged escrow advances in the reinstatement quote; (2) failing to generate an escrow history within ninety days of the reinstatement of Mr. Bowen's loan; (3) failing to do a proper investigation and discover the error upon conducting an escrow analysis in January 2016; (4) failing to do a proper investigation upon receipt of Mr. Bowen's demand letter in February 2016; (5) failing to correct the error when they discovered it; (6) continuing not to correct the error after acknowledging its mistake; (7) attempting to collect money for the escrow not due from Mr. Bowen; and (8) failing to follow its own policies and procedures in not providing an escrow analysis with the reinstatement quote.[37]

Although the creation of the escrow account may have given rise to a fiduciary relationship, Ditech's obligations are not general but limited to the duties as outlined in the agreement. *See Progressive Iron Works*, 150 A.2d at 762 ("There is a fiduciary relationship created by and inherent in the nature of an escrow agreement. The depositary has been denominated a trustee for the parties, charged with the

---

[37] Mr. Bowen also alleges that Ditech breached its fiduciary duty by failing to capitalize the proper amount during the loan modification. However, this conduct occurred prior to the effective date of the settlement agreement and therefore was released. It cannot serve as the basis for Mr. Bowen's claim.

performance of an express trust *governed by the escrow agreement*.") (emphasis supplied) (internal citation omitted); *see also Marzan v. Bank of Am.*, 779 F. Supp. 2d 1140, 1154 (D. Haw. 2011) ("[A]n escrow holder has no general duty to police the affairs of its depositors; rather, an escrow holder's obligations are limited to faithful compliance with [the depositors'] instructions.") (internal citations omitted). Here, the escrow agreement required Ditech to (1) keep the escrow funds in a savings or banking institution insured by a federal agency, instrumentality, or entity; (2) use the funds to pay for escrow items, such as taxes and insurance; (3) provide annual accounting of the funds; and (4) report excess funds or shortages and deficiencies as required by RESPA. *See Mortgage* ¶ 3(b), (c). There is nothing in the record to suggest that Ditech failed to maintain the funds in an escrow account or that Ditech failed to pay the escrow items with the funds. However, there is evidence that Ditech failed to properly notify Mr. Bowen of the escrow deficiency and shortage at the time of reinstatement as required by RESPA. In this sense, Ditech breached its fiduciary obligations under the mortgage, and Mr. Bowen is entitled to summary judgment on this claim.

## H.     Fannie Mae's Liability[38]

The parties do not dispute, and the Court concludes, that vicarious liability exists for the claim brought under the MUTPA and for the fraud and breach of fiduciary duty claims. *See Advanced Const. Corp. v. Pilecki*, 2006 ME 84, ¶ 16, 901

---

[38]     The Court dismissed the FDCPA and MFDCPA claims against Fannie Mae at the motion to dismiss stage and therefore does not address any arguments on that issue. *See Order on Mot. to Dismiss* at 34–37 (ECF No. 114).

A.2d 189 ("In an action for the tortious conduct of an agent, both the agent and the principal can be held liable . . . Actions pursuant to the UTPA and actions for unlawful and deceptive conduct sound in tort"). The dispute centers on whether vicarious liability exists under RESPA, and whether Ditech was Fannie Mae's agent and can be held vicariously liable at all.

### 1. Vicarious Liability Under RESPA

The First Circuit has not addressed the issue of vicarious liability under RESPA, and there is a split among other courts. The District of New Hampshire has addressed the issue and concluded that the principle of vicarious liability does apply to RESPA. *Rouleau v. US Bank, N.A.*, No. 14-cv-568-JL, 2015 WL 1757104 (D.N.H. Apr. 17, 2015). It explained the test for determining whether vicarious liability exists under a federal statute:

> As a statute that provides a remedy for a defendant's breach of a duty created by and defined in the statute, RESPA creates "a species of tort liability." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.,* 526 U.S. 687, 709 (1999) (holding that because 42 U.S.C. § 1983 "provides for relief for invasions of rights protected under federal law," claims under that statute "sound in tort"); *see also Curtis v. Loether,* 415 U.S. 189, 195–96 (1974) (where a statute "defines a new legal duty, and authorizes the courts to compensate a plaintiff for the injury caused by the defendant's wrongful breach," an action under the statute "sounds basically in tort"). The United States Supreme Court has long assumed that "when Congress creates a tort action, it legislates against legal background of ordinary tort-related vicarious liability rules," and consequently, that its statutorily created torts "incorporate those rules." *Meyer v. Holley,* 537 U.S. 280, 285 (2003). And "[i]t is well established that traditional vicarious liability rules ordinarily make principals or employers vicariously liable for acts of their agents or employees in the scope of their authority or employment." *Id.* It follows that unless Congress has "expressed a contrary intent" in RESPA, this court must infer that "ordinary rules [ ] apply" to that statute. *Id.* at 287; *see also Astoria Fed. Sav. & Loan Ass'n v. Solimino,* 501 U.S. 104, 108 (1991)

> ("[W]here a commonlaw principle is well-established, ... the courts may take it as given that Congress has legislated with an expectation that the principle will apply except when a statutory purpose to the contrary is evident.").

*Id.* at *7. The District of New Hampshire reasoned that there is no statutory language that suggests the ordinary rules would not apply and pointed out that, unlike the FDCPA, in which vicarious liability is not possible, RESPA does not limit liability to servicers, but provides that "whoever" violates a statutory requirement may be held liable. *Id.* at 6–7 (citing 12 U.S.C. § 2605(f) and 12 C.F.R. § 1024.41(a)). At least one other court has agreed with the District of New Hampshire's interpretation of the statute. *See Cruz v. Green Tree Mortg. Servicing, LLC*, No. 3:15-cv-714(AWT), 2016 U.S. Dist. LEXIS 107391, at *36–38 (D. Ct. Aug. 15, 2016).

A growing majority of other courts disagrees with the analysis in *Rouleau* and *Cruz. See Hawk v. Carrington Mortg. Servs., LLC*, No. 3:14-1044, 2016 WL 4414844, at *4 (M.D. Pa. June 23, 2016); *Bennett v. Nationstar Mortg., LLC*, No. CA 15-00165-KD-C, 2015 WL 5294321, at *10 (S.D. Ala. Sept. 8, 2015); *Gibson v. Mortg. Elec. Registration Sys., Inc.*, No. 11-2173-STA, 2011 WL 3608538, at *5 (W.D. Tenn. Aug. 16, 2011). The *Hawk* Court explained its rationale for rejecting the effort to expand RESPA by imposing vicarious liability upon loan holders under § 2605 of the statute:

> We believe that this emerging majority position reflects the better view on this question regarding the scope and reach of RESPA. This position pays fidelity to the language used by Congress, language which spoke specifically and repeatedly about obligations owed by loan servicers when responding to consumers' qualified written requests. Congress presumably meant what it said in enacting RESPA, and to write an entirely new class of defendants into this statute would be an unwarranted intrusion into legislative prerogatives. In fact, when

Congress chose in RESPA to extend liability beyond loan servicers to others, it did so clearly and explicitly.

For example, RESPA's anti-kickback provision is cast broadly and plainly states that "no person" shall engage in this forbidden conduct. See 12 U.S.C. § 2607. Thus, it is unmistakably clear that when Congress wished to craft prohibitions of general application in RESPA it did so in clear and precise terms. Congress' ability and willingness in RESPA to draft some provisions of the law globally buttresses the growing legal consensus that the legislature's restriction of § 2605 to loan servicers was an intentional, considered act which should not be lightly cast aside by the courts. Given this evident expression of legislative intent, until Congress elects to extend civil RESPA culpability under § 2605 to loan holders who play no role in loan servicing we should decline to extend this liability to a class of defendants who are not mentioned in this provision of the statute.

2016 WL 4414844, at *4.

The Court agrees with the small majority of the courts and concludes that vicarious liability does not exist under the relevant provisions of RESPA. Although 12 U.S.C. § 2605(f) uses the language "whoever" violates the section is liable, the obligations laid out in that section only apply to servicers. The repeated use of the term "servicers" in describing the obligations under the section suggests that Congress only intended servicers to be liable. Therefore, the Defendants are entitled to summary judgment as to the RESPA claim against Fannie Mae.

### 2.    Whether Ditech was Fannie Mae's Agent

Mr. Bowen argues that Fannie Mae, as owner of the note and mortgage, is vicariously liable for the servicing agent's conduct giving rise to the tort and UTPA claims. *Pl.'s Mot.* at 19–20. Ditech argues that, at a minimum, there are unresolved issues of fact that are essential to determine whether Ditech is Fannie Mae's agent. It points out that Fannie Mae expressly acknowledges that Ditech is an independent

contractor in its servicing guide and relies on two cases that analyzed Fannie Mae's status as an agent based on the servicing guide. In *Allen v. Bank of America, N.A.*, 933 F. Supp. 2d 716 (D. Md. 2013), the District of Maryland explained that the ultimate question in determining an agency relationship is intent and concluded that, because the servicing guide controlled the relationship between Fannie Mae and its servicers, and because the guide stated that the servicers are independent contractors, no agency relationship existed. *Id.* at 728. In *Harrington v. Federal National Mortgage Association*, No. 14-12333-MBB, 2016 WL 3561858 (D. Mass. June 27, 2016), the District of Massachusetts examined the same language in the servicing guide and determined that, although the agreement stated that the servicer was an independent contractor, other conduct, such as the fact that the servicer had entered into an earlier settlement agreement, suggested that an agency relationship did exist. *Id.* at *7. The *Harrington* Court therefore denied summary judgment. *Id.*

Another judge in this District has rejected the argument that the language in the servicing guide means that a loan servicer is not an agent. *See Dupuis v. Fed. Home Loan Mortg. Corp.*, 879 F. Supp. 139, 143 (D. Me. 1995). The *Dupuis* Court explained that an independent contractor can still be an agent and then concluded that the servicer acted as an agent in servicing the loan. *Id.* (citing *Baker Bus Serv., Inc. v. Keith*, 416 A.2d 727, 730 n.2 (Me. 1980)). The Court agrees with *Dupuis* and concludes that even if the servicing guide in effect at the time of the service transfer stated that servicers are independent contractors, Ditech was still acting as an agent in servicing the loan. *See also R.G. Fin. Corp. v. Vergara-Nunez*, 446 F.3d 178, 187

(1st Cir. 2006) ("Typically, a mortgage servicer acts as the agent of the mortgagee to effect collection of payments on the mortgage loan"). Thus, Fannie Mae is vicariously liable for the violations of the MUTPA and tort.

## V.    CONCLUSION

The Court hereby GRANTS in part and DENIES in part the Plaintiff's Motion for Summary Judgment (ECF No. 83) and GRANTS in part and DENIES in part the Defendants' Motion for Summary Judgment (ECF No. 86). The Court DENIES all parties' Motions with respect to Count I. Regarding Count II, the Court GRANTS Plaintiff's Motion and DENIES Defendants' Motion. As to Counts III and IV, the Court GRANTS Plaintiff's Motion and DENIES Defendants' Motion. Regarding Count V, the Court GRANTS Defendants' Motion only as to Fannie Mae; the Court DENIES the remainder of Defendants' Motion and DENIES Plaintiff's Motion. Finally, with respect to Count VI, the Court GRANTS Plaintiff's Motion and DENIES Defendants' Motion.

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 20th day of September, 2017